UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 02754

--------------------------------------------------------X

In the Matter of the Arbitration between,        :

ALCOA Inc., and ALCOA Aluminio S.A.,        :

               Petitioners,        :

     -against-        Civil Action No.

                    :        ECF Case

AMCOR, Ltd.,

             Respondent.        :

--------------------------------------------------------X

### PETITION FOR JUDGMENT CONFIRMING AN ARBITRATION AWARD

     Petitioners, Alcoa Inc., the successor in interest to Alcoa Latin American Holdings Corp.

("Alcoa LA") and Alcoa Aluminio S.A. ("Alcoa SA") (collectively, "Alcoa"), by counsel,

hereby file their Petition for Judgment Confirming an Arbitration Award against Amcor, Ltd.

("Amcor") and allege as follows:

#### PARTIES

     1.     Alcoa Inc. is a corporation organized and existing under the laws of the

Pennsylvania, with its principal place of business in New York, New York.  With respect to the

June 2, 2003 acquisition agreement among Amcor, Alcoa LA and Alcoa SA (the "Acquisition

Agreement"), Alcoa Inc. is the successor in interest to Alcoa LA, a corporation organized under

the laws of the British Virgin Islands, with its principal place of business in Tortola, British

Virgin Islands.

     2.     Alcoa SA is a corporation organized and existing under the laws of Brazil, with

its principal place of business in São Paolo, Brazil.

     3.     Amcor is a corporation organized and existing under the laws of Australia, with

its principal place of business in Abbotsford, Victoria, Australia.

4.    Amcor does business in the United States through its subsidiary, Amcor PET Packaging, U.S.A. Inc., a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Ann Arbor, Michigan.

## JURISDICTION AND VENUE

5.    Australia is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention").

6.    This proceeding arises under the Convention and under the Federal Arbitration Act, Chapters 1 and 2, United States Code, particularly 9 U.S.C. §§ 9, 207.

7.    This Court has jurisdiction over this action pursuant to 9 U.S.C. § 203.

8.    Venue in this district is proper under 9 U.S.C. §§ 9 and 204 because New York City was the "place designated in the agreement as the place of arbitration."

## THE ARBITRATION

9.    On June 2, 2003, Alcoa and Amcor entered into the Acquisition Agreement pursuant to which Amcor acquired from Alcoa all of its assets in Latin America regarding Alcoa's manufacture of plastic bottle containers made of polyethylene terephthalate ("PET"). Exhibit A attached hereto is a true and accurate copy of the signed Acquisition Agreement.

10.    The Acquisition Agreement provides that it is to be "governed and construed in accordance with the laws of the State of New York." Exh. A, § 10.7 (Governing Law).

11.    The Acquisition Agreement also provides that "[a]ll disputes arising out of or in connection with the interpretation, application or enforcement of this Agreement shall be settled by arbitration," which "shall be conducted in New York, State of New York, United States of America, at the International Chamber of Commerce, pursuant to the commercial arbitration

rules of such Chamber in effect at the time the arbitration is commenced, before a sole arbitrator mutually chosen by the parties." Exh. A, § 10.3(a) (Dispute Resolution).

12.    The Acquisition Agreement further states that the decision of the arbitrator "shall be final, binding and enforced in any court of competent jurisdiction by either party." Exh. A, § 10.3(d) (Dispute Resolution).

13.    Section 10.1 of the Acquisition Agreement states that "[a]ll notices, consents, requests and other communications herein shall be in writing and shall be sent by hand delivery, by certified or registered mail (return-receipt requested), or by recognized overnight courier service" shall be delivered to Amcor via:  (i) General Counsel, Amcor PET Packaging, 10521 S. Highway M-52, Manchester, Michigan 48148, Facsimile – 734-428-4623, and (ii) Kirby Losch, Amcor PET Packaging, 10521 S. Highway M-52, Manchester, Michigan 48158, Facsimile – 734-428-4623.  Exh. A, § 10.1 (Notice).

14.    The Acquisition Agreement evidences a transaction involving commerce with foreign nations.  To wit, Alcoa agreed to sell, and Amcor agreed to buy, all of Alcoa's Latin American business associated with the manufacture of Alcoa's PET bottles and preforms.  Exh. A, "WHEREAS" Section, Section 1 (Purchase and Sale of the Shares and the Assets and Other Transactions; Closing).

15.    On December 28, 2005, Amcor filed an arbitration request with the International Court of Arbitration of the International Chamber of Commerce in accordance with § 10.3 of the Acquisition Agreement.

16.    Thereafter, Amcor and Alcoa proceeded to arbitration in accordance with the dispute resolution terms of the Acquisition Agreement.  The parties agreed upon Dr. Horacio A. Grigera Naón as the sole arbitrator (the "Arbitrator").

3

17.     On February 17, 2008, the Arbitrator issued a final, written and signed award and delivered it to the parties (the "Arbitration Award").  Exhibit B attached hereto is a certified copy of the Arbitration Award.

## THE ARBITRATION AWARD

18.     Amcor submitted a number of claims to the Arbitrator for which Amcor asserted that Alcoa owed Amcor monetary damages.  In particular, Amcor alleged that Alcoa:   (i) impermissibly modified customer payment terms not allowed under the Acquisition Agreement (Claim 1); (ii) misrepresented the value of certain leases and equipment associated with Frevo Brasil Industria de Bebidas Ltda. (Claims 2 & 3); (iii) failed to apply certain payments to Amcor (Claim 4); (iv) failed to transfer a forklift to Amcor (Claim 5); (v) failed to secure title to a labeling machine (Claim 6); (vi) had responsibility for various tax liabilities (Claim 7); (vii) failed to deliver good and marketable title to certain real estate located in Brazil (Claim 8); (viii) over-valued certain inventory prior to closing the Acquisition Agreement (Claim 9); (ix) owed Amcor for a potential liability related to a dividend declared by Alcoa prior to closing of the Acquisition Agreement (Claim 10); and (x) owed Amcor its legal fees pursuant to § 10.3(e) of the Acquisition Agreement (Claim 11).  Exh. B, Section 2, pages 4-7.

19.     Alcoa submitted a counterclaim against Amcor based on the amount of tax liability for which Alcoa was responsible.  Prior to the arbitration hearing, Amcor admitted that Alcoa was due a tax reimbursement.  Exh. B, Section 2, page 7.

20.     The Arbitrator held hearings on March 5 through March 9, 2007, in the City of New York, New York, at which Alcoa and Amcor appeared.

21.     The Arbitration Award reflects that the parties withdrew the following claims:

4

     i.   Amcor withdrew with prejudice Claims 4, 5, 9 and 10, and a portion of Claim 7; and

     ii.   Alcoa withdrew its counterclaim with prejudice.

22.    In the Arbitration Award, the Arbitrator made the following decisions:

     i.   The Arbitrator denied Amcor's Claims 1, 2, 3, 6 and 11 with prejudice;

     ii.   The Arbitrator found that certain portions of Amcor's Claim 7 were not ripe for determination and denied the remaining portion of Claim 7 with prejudice;

     iii.  With respect to Claim 8, the Arbitrator ordered Alcoa to reconstitute a holdback of working capital receivable corresponding to the amount of $75,000 (U.S.) to serve as security for registration of a plant built by Alcoa on the Queimados Property in Brazil;

     iv.  The Arbitrator held that the parties "shall bear in equal shares" the arbitration costs, fees and expenses fixed by the International Court of Arbitration; and

     v.   The Arbitrator held that Amcor must bear the legal fees and costs of Alcoa, "amounting to US$ 3,082,598.23."

Exh. B, Section V (Decision), pages 65-66.

23.    Alcoa has reconstituted a holdback of working capital receivables corresponding to the amount of $75,000 (U.S.) to serve as security for registration of the plant built by Alcoa Aluminio on the Queimados Property in Brazil.

24.    To date, Alcoa has not received payment from Amcor as a result of the Arbitration Award.

**WHEREFORE**, Alcoa requests that the Court enter an order confirming and directing entry of judgment upon the Arbitration Award against Amcor pursuant to 9 U.S.C. §§ 9, 207, and providing for execution thereupon, taxing costs against Amcor, and awarding such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         March 14, 2008

                                        Respectfully submitted,
                                        HUNTON & WILLIAMS LLP


                              By:       _____
                                        Joseph J. Saltarelli
                                        200 Park Avenue
                                        New York, New York 10166-0136
                                        (212) 309-1000
                                        jsaltarelli@hunton.com

                                        *Attorneys for Petitioner*
                                        *Alcoa Inc., and Alcoa Aluminio S.A.*

**Exhibit A to Petition**
**for Judgment Confirming An Arbitration Award**

# ACQUISITION AGREEMENT

### AMONG

Alcoa Latin American Holdings Corporation

Alcoa Alumínio S.A.

### ("Sellers")

### AND

Amcor Limited

### ("Buyer")

### Dated as of June 2, 2003.

*This draft is not a contract or an offer to enter into a contract. Only the document executed by the parties will contain the terms that will be binding upon them. Until such execution of the document by the parties, they shall not be deemed bound to this document and no indemnification shall be due from one part to the others.*

# ACQUISITION AGREEMENT

This Agreement (the "Agreement") is made and entered into this 2nd day of June, 2003 (the "Effective Date"), by and among:

1.    **Alcoa Latin American Holdings Corporation**, a company validly existing in accordance with the laws of the British Virgin Islands, with head-office at Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola (British Virgin Islands), in this act represented by its President, (hereinafter referred to as "**Alcoa Latin America**");

2.    **Alcoa Alumínio S.A.**, a company validly existing in accordance with the laws of Brazil, with head-office at Av. Maria Coelho Aguiar, 215, Jd. São Luis - Bloco C, São Paulo, BR-05804-900, Brazil, in this act represented by its President, (hereinafter referred to as "**Alcoa Alumínio**"),

      **Alcoa Latin America** and **Alcoa Alumínio** hereinafter jointly referred to as "**Sellers**" and individually as "**Seller**",

      and

3.    **Amcor Limited**, a company validly existing in accordance with the laws of Australia, with head-office at 679 Victoria Street, Abbotsford Victoria 3067 Australia, in this act represented by its attorney-in-fact, and/or any of its subsidiaries (all of which are hereinafter referred to as "**Amcor**" or "**Buyer**");

**WITNESSETH:**

WHEREAS, Sellers and its direct and indirect subsidiaries located in Latin America and listed in <u>Schedule A</u> (the "Subsidiaries") are engaged solely or together with other businesses in the business of developing, manufacturing and selling PET preforms and bottles and leasing blow molding machines to customers (the " PET Business");

WHEREAS, Alcoa Alumínio will, prior to the Closing Date (as defined below), contribute its PET Business divisions located in Queimados, Itapissuma, Suape and Brasília, (the "**Alcoa Alumínio PET Division**") to a newly formed limited liability company ("**Newco**"), and **Alcoa Alumínio** will be the lawful holder and beneficial owner of all the quotas of **Newco** ("**Newco Quotas**");

WHEREAS, prior to the Closing Date, Alcoa Alumínio will cause the **Newco Quotas** to be contributed to a newly formed corporation ("**Newco II**"), and **Alcoa Alumínio** will be the lawful holder and beneficial owner of all the shares of **Newco II**;

WHEREAS, Alcoa Alumínio is the lawful holder and beneficial owner of shares (the "Tamboré Shares") representing 100% of the shares of Tamboré Embalagens S.A., a Brazilian corporation enrolled with the Brazilian Internal Revenue Service under CNPJ n°. 02.645.572/0001-53 ("Tamboré");

2

WHEREAS, Alcoa Latin America is the lawful holder and beneficial owner of shares representing 100% of the outstanding capital stock of Alusud Argentina S.A. Ind. e Com. ("Alusud Argentina"), Alusud Embalagens Colombia S.A., ("Alusud Colombia"), Alusud Peru S.A. ("Alusud Peru"), Alusud Embalagens Chile S.A. ("Alusud Chile"), Torrenoble S.A. ("Torrenoble Uruguay"); Alusud Venezuela S.A. ("Alusud Venezuela") and Alusud Uruguay S.A. ("Alusud Uruguay");

WHEREAS, Alusud Argentina is the lawful holder and beneficial owner of shares ("Vinisa Shares") representing 100% of the outstanding capital stock of Vinisa Fueguina S.A. ("Vinisa");

WHEREAS, Alusud Uruguay is the lawful holder and beneficial owner of shares ("Uruguay Preform Shares") representing 100% of the outstanding capital stock of Uruguay Preform S.A. ("Uruguay Preform");

WHEREAS, pursuant to the terms and conditions set forth herein, and pursuant to such local implementing agreement as the parties agree are necessary and desirable (the "Local Agreements"), Sellers desire to sell, or cause Alusud Argentina, Alusud Uruguay, and Alcoa Aluminio, as the case may be, to sell or transfer ownership under another agreed transaction, to Buyer or to whom Buyer designates, Vinisa Shares, Uruguay Preform Shares, Tamboré Shares, Torrenoble Uruguay and Newco´s Quotas (collectively the "Shares"), and Buyer desires to purchase from Sellers or from Alusud Argentina, Alusud Uruguay, and Alcoa Aluminio, as the case may be, the Shares;

WHEREAS, pursuant to the terms and conditions set forth herein, and the Local Agreements, Sellers desire to cause Alusud Argentina, Alusud Colombia, Alusud Peru, and Alusud Chile to sell to the Buyer or to whom the Buyer designates, substantially all of the assets used or employed by Alusud Argentina, Alusud Colombia, Alusud Peru, and Alusud Chile in connection with the operation of the PET Business and Buyer desires to purchase from Alusud Argentina, Alusud Colombia, Alusud Peru, and Alusud Chile, as the case may be, all of such assets, as further described below within the definition of "Assets".;

NOW, THEREFORE, in consideration for the premises and the mutual promises contained herein, the parties hereto hereby agree as follows:

DEFINITIONS. Terms not otherwise defined within the text of the Agreement shall have the meanings set forth below:

"Assets" means all of the assets of the Sellers and the Subsidiaries of every kind, character and description, tangible and intangible, owned by, or related to or used exclusively in the PET Business, including, without limitation, all tangible Fixed Assets (as defined in Section 2.7 below); the Transferred Assets (as defined in Section 1.2(a) below); as well as all other assets located at each facility of the PET Business that is being transferred to Buyer, materials, on-site storage facilities, and other tangible property or improvements used in the PET Business; all licenses, permits, authorizations and benefits of any kind, including but not limited to tax benefits, issued or otherwise granted by any Governmental Authority relating to the PET Business ; all contracts, agreements, leases, commitments and understandings pertaining to the PET Business; all customer lists, contracts, accounts and credit records associated with the PET Business; and all books and records of the PET Business.

3

"Environment" means soil, land, surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, stream sediments, ambient air (including air in buildings, natural or man-made structures), all layers of the atmosphere, all inorganic and organic matter and living organisms (including humans), all natural resources and the interacting natural systems that include the foregoing listed components.

"Environmental Consent" means any applicable consent, approval, permit, license, Order, filing, authorization, exemption, registration, ratification, permission, waiver, and any other related stipulation, agreement or communication imposing enforceable legal requirements or authorizations issued, granted, given or otherwise transmitted by any Governmental Authority regarding protection of the Environment or under any Environmental Law.

"Environmental Investigation" means an evaluation of the condition of or the potential presence of any Hazardous Substances in any media of the Environment by the Buyer, and includes:

(i)      digging of trial or test pits;

(ii)     soil survey and soil sampling;

(iii)    a hydrological and/or hydrogeological survey;

(iv)     groundwater and/or surface water sampling;

(v)      analysis of soil and groundwater or surface water samples; and

(vi)     the reinstatement and aftercare (as required) of the area in which any such measures have been undertaken to the condition it was in before such measures were taken including reconnecting any affected drains and other services, making good any trial pits and boreholes, making safe any observation or monitoring wells and generally restoring the area to its previous appearance as far as possible.

"Environmental Law" means any applicable Legal Requirement that requires or relates to protection of human health (excepting employment-related worker health and safety within the meaning of the definition of Health & Safety Law) or the Environment, including any Legal Requirement that addresses:

(i)      advising appropriate authorities or the public of the presence of or intended or actual Releases of Hazardous Substances or violations of discharge limits or of the commencement of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(ii)     reducing the quantities of or minimizing the hazardous characteristics of wastes that are generated; assuring that products are designed, formulated, packaged and used so that they do not present unacceptable risks to the Environment when used or disposed of;

(iii)    the manufacture, Release, prevention or control of Release, transportation, use, remediation or cleanup, responsibility for and allocation of costs

4

associated with remediation or cleanup, and disposal of **Hazardous Substances**, and damage to natural resources from **Hazardous Substances**; or

(iv)    making responsible **Persons** or polluting **Persons** pay private parties for damages done to their health or the **Environment** or permitting representatives of the public interest (self-appointed or otherwise) to recover for injuries done to public assets and includes all **Environmental Consents**.

"**Facilities**" means any real property, leasehold or other interest in real property currently or formerly owned, leased, occupied, controlled, managed, operated, or used by the **Sellers** or any of the **Subsidiaries** or any other property for which the **Sellers** or any of the **Subsidiaries** could reasonably be held to be responsible under **Environmental Law** or **Health & Safety Law**, to the extent such are transferred to **Buyer** under this **Agreement**.

"**Governmental Authority**" means any government or political subdivision thereof, whether federal, state, local or foreign, or any regulatory or administrative agency, authority or instrumentality or such government or political subdivision, or any court, agency, tribunal, arbitration panel or arbitrator having jurisdiction over the **Parties** or the **Subsidiaries**.

"**Hazardous Activity**" means any activity that creates a risk of environmental, health or safety liability, including the disposal, distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, release, storage, transfer, transportation, treatment or use of any **Hazardous Substance** in, on, under, about and from any of the **Facilities** or any part thereof.

"**Hazardous Substance(s)**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous pursuant to any **Environmental Law**.

"**Health & Safety Consent**" means any consent, approval, permit, license, **Order**, filing, authorization, exemption, registration, ratification, permission, waiver, and any other related stipulation, agreement or communication imposing enforceable legal requirements or authorizations issued, granted, given or otherwise transmitted by any **Governmental Authority** regarding health or safety matters or under any **Health & Safety Law**.

"**Health & Safety Law**" means any **Legal Requirement** (including any **Legal Requirement** developed and/or enforced by any private entity pursuant to a valid delegation of authority from a **Governmental Authority**) that requires, or relates to, safe or healthful working conditions, **Industrial Disease** and/or the reduction of, and compensation for **Losses** related to occupational safety or health hazards.

"**Industrial Disease**" means any disease or medical condition of, or physical damage to any current, as of the **Closing Date**, or former employee of the **Sellers** or the **Subsidiaries** to the extent caused by conditions or working practices carried on at the **Facilities** or by the **Sellers** or any of the **Subsidiaries** prior to **Closing**, including, without

5

limitation, pneumoconiosis, mesothelioma, other impairments caused by exposure to asbestos, respiratory disease, dermatitis, noise induced hearing damage, solvent exposure and work related sprains including hernias, carpal tunnel syndrome and back injuries (provided that such can be shown by the Buyer to (a) be employment-related, and (b) have occurred, or begun to occur prior to Closing).

"Intellectual Property" means all patents, patent applications, trademarks, copyrights, service marks, know how and Trade Secrets which are owned or which are subject to express, written license agreements and which are used in the operation of the PET Business as currently conducted.

"Laws" shall mean any applicable federal, state, provincial, local or national statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law (including, without limitation, common law) as in effect on the date hereof.

"Legal Requirement" means any applicable international, multinational, federal, state, provincial, regional, local, or municipal Law, Order or any other instrument or written statement of a Governmental Authority, which such Governmental Authority generally applies and enforces with respect to operations that are, as of the Closing, or have been conducted by the Sellers and any of the Subsidiaries or operations conducted prior to or as of the Closing at any of the Facilities.

"Order" means any applicable order, writ, judgment, injunction, decree, decision, stipulation, ruling, assessment, determination or award entered by or with any Governmental Authority, whether temporary, preliminary or permanent.

"Person" means any individual, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, or leaching on or into the Environment.

"Threat of Release" means a reasonable likelihood of a Release that requires action in order to prevent or mitigate damage to the Environment that is likely to result from such a Release.

"Trade Secrets" means all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints that is material to the operation of the PET Business.

## SECTION 1.    PURCHASE AND SALE OF THE SHARES AND THE ASSETS AND OTHER TRANSACTIONS; CLOSING.

1.1.    Purchase and Sale of the Shares. On the Closing Date, as defined in Section 1.6. hereinbelow, Sellers will sell or cause Alusud Argentina, Alusud Uruguay and Alcoa Alumínio, as the case may be, to sell, to Buyer or to whom Buyer designates, the Shares, and Buyer, or whom Buyer designates, will purchase all but not less than all of the Shares, free and clear of any debt, intercompany balances, liens and encumbrances, and all minority interests in such a way that after such sale, assignment and transfer Buyer or whom Buyer designates shall be the lawful holders and beneficial owners of the Shares.

**1.2.    Purchase and Sale of the Transferred Assets and Other Transactions.**  On the Closing Date, as defined in Section 1.6. hereinbelow,

(a)    Sellers will cause Alusud Argentina, Alusud Colombia, Alusud Peru, Alusud Venezuela and Alusud Chile to sell the all of the assets owned or controlled by such entity and used in the PET Business (the "Transferred Assets) to Buyer or to whom Buyer designates, and Buyer or whom Buyer designates will purchase the Transferred Assets, free and clear of any debt, intercompany balances, liens and encumbrances, and all minority interests in such a way that after such sale Buyer or whom Buyer designates shall be the lawful owners of the **Transferred Assets**; and

(b)    Alcoa Aluminio and Buyer (or Buyer's designee) will begin the necessary steps to implement Buyer's investment into, and subsequent cisão (cission) of, **Newco II**, as described in the applicable Local Agreement.

**1.3.    Assumption of Liabilities by Buyer.**  At the Closing, Buyer shall assume the liabilities and obligations of the Sellers arising in the ordinary course of business with respect to the PET Business which have been disclosed to Buyer and are required to be accounted for by Sellers in accordance with Alcoa's applicable accounting policies as defined to, and mutually agreed with, Buyer, and as noted in a line item basis review of the **Preliminary Pricing Date Balance Sheet** as defined below (the "Agreed Accounting Policies") or (a) which arise with respect to any acts that arise or events that occur after the Closing under the contracts being assigned to Buyer hereunder and otherwise with respect to events related to those contracts arising after the Closing or (b) which arose from acts or events that occurred prior to the Closing that were incurred by the PET Business in the ordinary course of business consistent with past practices, except for the conditions that Sellers expressly represent, warrant and indemnify Buyer against under the terms of this Agreement ("Assumed Liabilities").

**1.4.    [intentionally omitted]**

**1.5    Purchase Price.**

**1.5.1. Aggregate Purchase Price and Working Capital Payment.**  The "Aggregate Purchase Price" is the sum of the Share Purchase Price and the Asset Purchase Price set forth below. The Aggregate Purchase Price is seventy-five million United States Dollars (US$75,000,000) for the PET Business (the "Payment") on the basis that there shall be US$15,000,000 of Working Capital in the PET Business (the "Working Capital") on Closing (any shortfall in **Working Capital** below US$15,000,000.00 to be made up by Sellers). Any Working Capital of the PET Business in excess of US$15,000,000 will be repaid to the Sellers in relation to the Alcoa Latin America resin supply payable as set forth in **Schedule 1.5.1**.

**1.5.2. Purchase Price for the Shares.**  Subject to the terms and conditions of this Agreement and the relevant Local Agreements in consideration of the sale and transfer of the Shares, Buyer agrees to purchase from Sellers and/or from Alusud Argentina, Alusud Uruguay and Alcoa Aluminio and, as the case may be, the Shares, and Buyer will receive the shares of Newco, as detailed in the applicable **Local Agreement**, allocated among the Shares as described in **Schedule 1.5.2**. (the "Share Purchase Price").

7

**1.5.3. Purchase Price for the Assets.** Subject to the terms and conditions of this Agreement and the relevant Local Agreements and in consideration of the sale of the Transferred Assets, Buyer agrees to purchase from Sellers and/or, Alusud Argentina, Alusud Colombia, Alusud Peru, Alusud Venezuela and Alusud Chile, as the case may be, the Transferred Assets, allocated among the Assets as described in Schedule 1.5.3.

**1.5.4. Payment.** On the Closing Date, the Payment shall be paid in immediately available funds, by wire transfer, in accordance with the written instructions given by Sellers to the Buyer not less than three (3) business days prior to the Closing.

**1.5.5. Closing Date Balance Sheet.** For the purposes of determining the amount of the Working Capital Adjustment, Sellers shall prepare a Balance Sheet of the PET Business being sold hereunder as of the Closing Date, to be delivered to Buyer within thirty (30) days of the Closing Date (the "Closing Date Balance Sheet"), which shall include all of the PET Business assigned and transferred from Sellers to Buyer, including, but not limited to the assets and liabilities in the Final Pricing Date Balance Sheet (as defined below) and as set forth in Schedule 1.5.5. hereto. The inventory counting shall be taken in the presence of Buyer's representatives and PricewaterhouseCoopers ("PWC") at 30 June 2003 or thereabouts by mutual agreement between the Parties.

**1.5.6. [Intentionally omitted]**

**1.5.7. Review of the Closing Date Balance Sheet.** Seller will prepare, and have its auditor audit the Closing Date Balance Sheet using the Agreed Accounting Policies, and will provide the Closing Date Balance Sheet within thirty (30) days after the Closing. To assist Buyer in its review of the Closing Date Balance Sheet, Seller and Seller's auditor will provide full access to Buyer and Buyer's representatives to its records and working papers relating to the Closing Date Balance Sheet and its staff who assisted in their preparation. Buyer shall review the Closing Date Balance Sheet, which shall be completed no later than thirty (30) days following the delivery of the Closing Date Balance Sheet. There shall be a further period of thirty (30) days to raise and resolve any disputes; any such disputes may arise only on the basis that the Closing Date Balance Sheet did not use the same policies and procedures in effect for the Final Pricing Date Balance Sheet or as otherwise specifically provided for in the Agreement. If an agreement cannot be reached by the Parties within such thirty (30) day period, then the Parties agree to the timely appointment of an internationally recognized independent public accounting firm to decide the matters in dispute (as an expert, not as an arbiter), such decision to be given within thirty (30) days. The decision of the public accounting firm shall be final and binding. In the event the decision from the independent public accounting firm is that an adjustment should be paid by one Party to the other as a resolution of the matters in dispute, such adjustment shall be paid within three (3) business days of the receipt of the decision by the Party obligated to make the payment.

**1.5.8. Basis of Accounting.** All assets and liabilities on the Preliminary Pricing Date Balance Sheet are to be accounted for in accordance with, and on a consistent basis with Alcoa's applicable accounting policies and procedures. The Final Pricing Date Balance Sheet and the Closing Date Balance Sheet will be prepared on the basis of the Agreed Accounting Policies. Except as provided by the audit procedures in Section 1.5.7, events subsequent to the Closing Date cannot be taken into

consideration in preparing the Closing Date Balance Sheet. For avoidance of doubt, no assets are to be revalued upwards from the values they were recorded at in the **Final Pricing Date Balance Sheet**, and no new assets recognized or liabilities (including provisions and accruals) reversed or released, other than assets acquired or liabilities discharged in the ordinary course of business between the **Final Pricing Date Balance Sheet** and the **Closing Date Balance Sheet**, where there has been no change in the circumstances underlying those assets and liabilities since they were recorded in the **Final Pricing Date Balance Sheet** (unless permitted under the **Agreed Accounting Policies**). The foreign exchange rates to be used for translation of the accounts into United States dollars shall be the rates as of the **Closing Date**.

1.5.9. Working Capital of the PET Business. The "Working Capital" of the PET Business shall consist of inventories (raw material at actual cost, work in process at actual cost and finished goods at the lower of cost or market), other current assets and accounts receivable net of bad debt provisions; less accounts payable, other current liabilities, including current taxes, resulting from ordinary operations and accrued liabilities as set forth on Schedule 1.5.5.

1.6.    Closing. Provided that all of the conditions contained in Sections 5 and 6 hereof have been satisfied or waived in accordance therewith, the closing of the transactions provided for in this **Agreement** (the "Closing") shall occur at the offices of Demarest e Almeida Advogados, at Avenida Pedroso de Moraes, 1201, São Paulo, Brazil, with effect from 11:59 p.m. local time on June 30, 2003  (the "Closing Date"), or on such other date or at such other place as the parties hereto shall mutually agree.

1.7.    Deliveries at Closing. At the Closing:

    (a)    Sellers will deliver to Buyer:

        (i)    the share transfer form attesting that the **Shares** were transferred from the name of **Sellers** to the name of **Buyer** or to whom **Buyer** indicates;

        (ii)   the **Shares**;

        (iii)  a certificate executed by **Sellers** certifying to **Buyer** that **Sellers'** representations and warranties in this **Agreement** were accurate in all material respects as of the **Effective Date** and are accurate in all material respects as of the **Closing Date** as if made on the **Closing Date**;

        (iv)  all of the **Assets** set forth on Schedules 2.7 (A), (B) and (C);

        (iv)  documentation evidencing that **Sellers** have applied for the transfer of all of the applicable **Tax Benefits** and applicable **Tax Incentives** associated with the PET Business to the **Buyer** or its designee as well as any other actions that are legally or usually required by the competent authorities to accept the transfer of tax benefits and tax incentives.

    (b)    Buyer will deliver to Sellers:

        (i)    the **Payment**; and

9

(II)    a certificate executed by Buyer certifying to **Sellers** that **Buyer's** representations and warranties in this **Agreement** were accurate in all material respects as of the **Effective Date** and are accurate in all material respects as of the **Closing Date** as if made on the **Closing Date**.

(c)    Buyer or whom it designates and **Sellers** or the **Subsidiaries**, as the case may be, will execute the **Local Agreements** and the **Transition Agreements**, as defined below.

## SECTION 2.  REPRESENTATIONS AND WARRANTIES OF SELLERS AND ALCOA.

Except as disclosed in the Schedules hereto and notwithstanding the access given to **Buyer** by **Sellers** during the due diligence period, **Sellers** represent and warrant to **Buyer** that the following circumstances and facts are and at all times up to the **Closing Date** will be true and correct, and hereby acknowledge that such facts and circumstances constitute the basis upon which **Buyer** is entering into this **Agreement**. Each warranty shall survive the **Closing** through December 31, 2005.

**2.1.**   <u>Shares</u>. The Shares have been validly issued and are fully paid. **Vinisa, Uruguay Preform, Tamboré, and Newco II** have no other shares of capital issued or outstanding and no subscriptions, options or other obligations of any nature obligating them to issue shares of their social capital.

**2.2.**   <u>Ownership of the Shares</u>. **Sellers**, or **Alusud Argentina** or **Alusud Uruguay** or, **Newco II**, as the case may be, are and shall be at the **Closing** the lawful owners of the **Shares** free and clear of any debt, lien, pledge, encumbrance, option, right of first refusal and any other claim of any kind or any other minority right ("**restriction**") and have and will have full right and power required by law to sell and transfer, or cause its **Subsidiaries** to sell and transfer, the **Shares** to **Buyer** or to whom **Buyer** designates. The sale and transfer of the **Shares** to **Buyer** or to whom **Buyer** designates, pursuant to this **Agreement** and the **Local Agreements** as defined below, will transfer to **Buyer** or to whom **Buyer** designates, title thereto free and clear of any **restriction**.

**2.3.**   <u>Organization and Good Standing</u>. **Vinisa, Uruguay Preform** and **Tamboré** are, and **Newco** and **Newco II** on the **Closing Date** will be corporations or limited liability companies duly organized, validly existing and in good standing under the laws of the jurisdictions where they are incorporated, and are duly organized and qualified to conduct their respective **PET Business** as currently carried on.

**2.4.**   <u>Power and Authorization</u>. **Sellers** have full power and authority to enter into this **Agreement**, to perform their obligations thereunder and to consummate the transactions contemplated hereby. The execution and delivery of this **Agreement** by **Sellers** and **Sellers'** performance of their obligations thereunder have been duly authorized by all necessary corporate action on the part of **Sellers**. No other action is necessary to authorize the execution, delivery and performance of this **Agreement** by **Sellers**.

**2.5.**   <u>Binding Effect</u>. This **Agreement** constitutes the legal, valid and binding obligation of **Sellers** enforceable in accordance with its terms.

2.6. **No Violation, Consents**. Neither the execution and delivery of this **Agreement** by **Sellers** nor the performance by **Sellers** of all of their obligations hereunder will:

    (a)    violate or conflict with any provision of the Bylaws of **Sellers**;

    (b)    violate, breach or otherwise constitute or give rise to a default under any material contract, commitment or other obligation to or by which **Sellers** is a party or is bound;

    (c)    violate or conflict with any statute, ordinance, law, rule, regulation, judgment or order of any court or other governmental or regulatory authority to which **Sellers** is subject; or

    (d)    except as disclosed in **Schedule 2.6. (d)** require any consent, approval or authorization of, notice to, or filing or registration with any person, entity, court or governmental or regulatory authority.

2.7. **The Assets**. **Schedule 2.7. (A)** describes the fixed assets component (including real estate) of the Assets for each location or Subsidiary (the "**Fixed Assets**"), and informs where the Fixed Assets are located. The Fixed Assets constitute and include all of the assets which are used or employed solely in connection with operation of the **PET Business** in a manner consistent with past operations. As of the date hereof, **Sellers**, **Alusud Argentina**, **Alusud Colombia**, **Alusud Peru**, and **Alusud Chile**, as the case may be, have, and, as of the **Closing** shall have good, valid and marketable title to all of their **Fixed Assets**, respectively, free and clear of all debt, liens, charges, security interests and other encumbrances, including any minority interests or liabilities. There will be no change in the fixed assets capitalization policy from 31 March 2003 in preparing the **Closing Balance Sheet**. Assets that are shared between the **PET Business** and other Alcoa operations at a facility where both are located (the "**Shared Assets**"), listed on **Schedule 2.7(B)** will not be transferred, but their use will continue to be made available to the Buyers in accordance with past practice. All material production **Assets** used by the **PET Business** are owned by, and not leased by the relevant entity. **Schedule 2.7(C)** lists other leased assets related to the **PET Business** ("**Other Leased Assets**"). As of the **Closing Date**, **Buyer** or whom it designates will have the right to use all of the **Other Leased Assets** pursuant to valid and enforceable lease agreements.

2.8. **Intellectual Property and PET Business Information**. **Schedule 2.8** contains a complete list of the "**Intellectual Property**" and business information (including, but not limited to books, records, customer lists and computer software) ("**PET Business Information**") owned, licensed or used by the **PET Business** or necessary to, the operation of the **PET Business** which shall be transferred to Buyer. Such Schedule correctly specifies each of the **Intellectual Property** owned, licensed or used in the **PET Business**. As of the date hereof, **Sellers** or their **Subsidiaries**, as the case may be, owns or holds a valid license to use all right, title and interest in and to such Intellectual Property and PET Business Information.

2.9. **Accounts Receivable**. All accounts receivable and other receivables of the **PET Business** listed in **Schedule 2.9**, and all such receivables arising since the date thereof until the **Closing**, represent and will represent *bona fide* claims against debtors for sales made, services performed or other charges arising on or before the **Closing**, and are collectible within 180 days and through normal means of collection.

2.10. **Inventories**. The inventory included on the **Closing Date Balance Sheet** consist of items of a quality and quantity usable and saleable in the ordinary course of the **PET Business**,

11

except for obsolete and out of specification items, which have been written off or written down on the applicable books and records, as the case may be. All finished goods inventories not written off have been priced at the lower of cost or market; all other inventories have been priced at actual cost. There shall be no change in the method of valuing inventory from 31 March 2003 to the **Closing Date Balance Sheet.**

2.11. <u>Contracts and Commitments</u>. <u>Schedule 2.11</u> contains a list which identifies and briefly describes all written contracts, agreements, leases, guarantees or commitments (the "**Constituent Documents**") relating to the **PET Business** to which the **Sellers or Subsidiaries** are parties or by which the **Sellers or Subsidiaries** may be bound: **(a)** involving the payment by or to the **PET Business** of more than United States dollars $50,000 in any twelve (12)-month period; **(b)** which may not be terminated by the **Sellers or Subsidiaries** on less than ninety (90) days' prior notice; or **(c)** which are otherwise material to the operation of the **PET Business** or in any of the **Subsidiaries**; or **(d)** which contain a provision which might restrict or prevent the assignment or transfer of such **Constituent Document**. Each such contract, Constituent Document was entered into in the ordinary course of the business, is in full force and effect, valid and enforceable in accordance with its terms, constitutes a legal and binding obligation of the respective parties thereto, is not the subject of any threat or notice of breach, any actual breach, notice of default, termination or partial termination, and, in the case of **Assets** at third party sites, provides for access to the third party premises and protection for or recovery of **Assets** at risk in the event of customer distress. The **Sellers and Subsidiaries** have complied in all material respects with the provisions of each such Constituent Document.

Except as otherwise set forth in **Schedule 2.11**, neither the execution and delivery of this **Agreement** or the Local Agreements nor the consummation by the **Sellers** of the transactions contemplated hereby and thereby, will **(x)** conflict with or result in any breach of any provision of the **Constituent Documents** of the **Sellers** or the **Subsidiaries**; **(y)** result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any of the **Constituent Documents**; or **(z)** violate any order or any law applicable to **Sellers** or the **Subsidiaries**.

2.12. <u>Litigation</u>. Except as disclosed in <u>Schedule 2.12</u>, there is no litigation, action, suit, arbitration, or other legal or regulatory proceeding or governmental investigation pending or, to the **Best Knowledge of Sellers**, threatened by or against the **Subsidiaries** which may result in any liability to **Buyer** or **Vinisa**, **Uruguay Preform** and **Tamboré**, or on the **Closing Date** to **Newco** or **Newco II**, or which otherwise affects **Buyer's** ability to perform its obligations under this **Agreement**.

2.13. <u>Permits and Licenses</u>. On the Closing, the **Subsidiaries** held and **Newco** and/or **Newco II** will hold or will have applied for the transfer of, all required permits, licenses, approvals and authorizations from all governmental or regulatory or environmental authorities which are necessary to conduct the **PET Business**, except to the extent that the failure to hold such permit, license, approval or authorization does not have a material adverse effect on the **PET Business**. As of the date hereof, all of such permits, licenses, approvals and authorizations are in full force and effect. All of such permits, licenses, approvals and authorizations are listed on <u>Schedule 2.13</u> and **Sellers** or the **Subsidiaries** shall have applied for such to be assigned to **Buyer** prior to or at the **Closing** in a legally valid way.

2.14. <u>Taxes</u>. The **Sellers and Subsidiaries**, as the case may be, have filed or caused to be filed (on a timely basis since their incorporation) with respect to the **PET Business** all tax returns that are or were required to be filed by them and have paid all **Taxes** required to be paid by them, and no such amounts are past due or delinquent as of the date hereof. All taxes

expected to be payable by the **Sellers** and the **Subsidiaries** based on the results of operations of the **PET Business** to March 31, 2003 have been properly accrued on the **Final Pricing Date Balance Sheet** and through to **Closing**. Except as set forth on **Schedule 2.14**, neither the **Sellers**, nor the **Subsidiaries** are a party or subject to any assessment, collection or pending action, proceeding or claim which in any way may result in any liability to **Buyer** or **Vinisa**, **Uruguay Preform**, **Tamboré**, or **Newco** or **Newco II**. For purposes of this **Agreement**, "**Taxes**" shall mean any taxes, fees, levies, duties, charges or similar assessments (including interest, penalties and additions) imposed by or payable to any governmental or other taxing authority, whether federal, state, local or otherwise, including, without limitation, income, withholding, excise, *ad valorem*, value added, real and personal property, sales, use, employment, services and other taxes of any kind or nature.

2.15. <u>Environmental Matters</u>. Except as set forth in the **Schedule 2.15**, in respect of the **PET Business**:

(a)    The **Sellers** and the **Subsidiaries** (including their predecessors in interest) and the facilities related to the **Assets** and **PET Business** are, and, at all times have been, in compliance in all material respects with applicable **Environmental Law** and **Health & Safety Law**;

(b)    Neither the **Sellers** nor any of the **Subsidiaries** has received any actual or threatened **Order**, notice, citation, directive, inquiry, summons, warning or other communications from: (i) any **Governmental Authority** or private citizen, whether acting or purporting to act in the public interest or otherwise; (ii) the current or prior owner, occupant or operator of any facility related to the **PET Business** or the **Assets**; or (iii) any other **Person** to whom any of the **Sellers** or the **Subsidiaries** (including their predecessors in interest) could reasonably be held liable, alleging (x) any violation of or failure to comply with any **Environmental Law** or **Health & Safety Law**, or (y) any obligation to undertake or bear all or any part of the cost of (A) addressing, resolving, or compensating any **Person(s)** for costs, liabilities, damages, losses, and expenses arising under or pursuant to the requirements of any **Environmental Law** or any **Health & Safety Law**, or (B) any **Environmental Investigation** or remediation or cleanup with respect to any facility related to the **PET Business** or the **Assets** in which any of the **Sellers** or the **Subsidiaries** (including their predecessors in interest) has or has had an interest, or with respect to any facility or disposal location to which any of the **Sellers** or the **Subsidiaries** has transported, arranged for the transport of, disposed of, or arranged for the recycling or disposal of any **Hazardous Substance**.

(c)    The **Sellers** or the **Subsidiaries** have obtained all **Environmental Consents** and **Health & Safety Consents** required for their current operations and their current use, interest in, and operation of the facilities related to the **PET Business** or the **Assets**. All such **Environmental Consents** and **Health & Safety Consents** are in good standing, and the **Sellers** or the **Subsidiaries** are in compliance in all material respects with the terms and conditions of such **Environmental Consents** and **Health & Safety Consents**.

(d)    There are no pending or, to the knowledge of **Sellers** or the **Subsidiaries** any threatened claims, litigation or liens resulting from any **Release** of any **Hazardous Substance** or arising under or pursuant to any **Environmental Law** or **Health & Safety Law** affecting any of the **Subsidiaries** or any facility related to the **PET Business** or the **Assets** which any of the **Subsidiaries** (including their

13

predecessors in interest) has or has had an interest.

(e)   Except in compliance with applicable **Environmental Law and Health & Safety Law**: (i) there is no **Hazardous Substance** present on or in the **Environment** at, or from any facility related to the **PET Business** or the **Assets**, including any **Hazardous Substance** contained in landfills, land deposits, dumps, or **Released** to or deposited or located in land or water thereon, and (ii) the **Sellers** or the **Subsidiaries** have not conducted any **Hazardous Activity** at any facility related to the **PET Business** in which any of the **Sellers** or the **Subsidiaries** (including, to the knowledge of **Sellers**, their predecessors in interest) has or has had an interest.

(f)   There has been no **Release** and, to the knowledge of **Sellers** and the **Subsidiaries**, there is presently no **Threat of Release** of any **Hazardous Substance** at or from any facility related to the **PET Business** or the **Assets**, nor, to the knowledge of **Sellers** or the **Subsidiaries**, has there been any **Release** at any facility or disposal location to which any of the **Sellers** or the **Subsidiaries** (including their predecessors in interest) has transported, arranged for the transport of, disposed of, or arranged for the recycling or disposal of any **Hazardous Substance**.

(g)   To the knowledge of **Sellers** and the **Subsidiaries**, there are no aboveground or underground storage tanks in or at any facilities related to the **PET Business** from which there has been any **Release** of any **Hazardous Substances**.

(h)   To the knowledge of **Sellers** and the **Subsidiaries** neither **Sellers** nor any **Subsidiary** has manufactured or sold any asbestos or any asbestos containing material.

2.16.   **Labor Related Matters.** Each employee of the **PET Business** and of **Vinisa, Uruguay Preform, Tamboré** and **Newco** to be transferred to the Buyer, is, and as of the **Closing Date** will be, regularly registered as such in the proper registry books, together with his corresponding salary, all in compliance with applicable laws and regulations. The **Sellers** and the **Subsidiaries** have obtained, as the case may be, all registrations and filings and have taken all necessary actions required under all applicable social security and labor laws regulations with respect to such employees. Except as set forth on **Schedule 2.16(A)**, neither **Vinisa**, nor **Uruguay Preform** is a party to any collective bargaining agreement or agreement of any kind with any union or labor organization relating to the **PET Business**. **Tamboré** is and **Newco** (if applicable) will be party to the collective bargaining agreements attached hereto as **Schedule 2.16(B)**. Other than as set forth on **Schedule 2.16(C)**, none of the Sellers, **Vinisa**, nor **Uruguay Preform**, nor **Tamboré** nor **Newco** is party to any labor dispute which may create a liability to Buyer or to Vinisa, or Uruguay Preform, or Tamboré or Newco.

2.16.1.   **Employees List.** **Schedule 2.16.1.** attached hereto and made a part hereof contains a complete and accurate list of the following information for each employee or officer of the **PET Business** and/or of **Vinisa, Uruguay Preform, Tamboré** and **Newco** to be transferred to the Buyer including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since March 31, 2003; vacation accrued; and benefits and stability by force of law.

No employees of the **PET Business** to be transferred to the Buyer

14

and/or of **Vinisa, Uruguay Preform, Tamboré** or of **Newco**, have special employment contracts, nor are there any employees or consultants or independent workers rendering services to it under special conditions that may give rise to a material liability not included in the **Financial Statements** of the **PET Business** in accordance with the **Agreed Accounting Policies.**

All compensation and **Employee Benefits**, including salary and social security liabilities, vacation entitlements, holiday pay and other ordinary labor benefits related to the employees listed on **Schedule 2.16.1** has been properly accrued at appropriate levels on the **Final Pricing Date Balance Sheet** and through to the **Closing.**

**2.16.2.** Employee Benefits. Schedule 2.16.2. contains a complete and accurate list of all employee benefits extended to the employees of the **PET Business** and/or **Vinisa, Uruguay Preform, Tamboré**, or **Newco** which are presently in force, as well as a detailed description thereof (the "**Benefit Plans**"). **Vinisa, Uruguay Preform, Tamboré**, and **Newco** have performed all of their obligations under the **Benefit Plans,** there are no unfunded or underfunded defined benefit **Benefit Plans,** and the financial statements of the **PET Business** reflect all such obligations and liabilities under the **Benefit Plans**, except obligations which, if not performed, or entries which, if not made, would not have a material adverse effect to the **PET Business** or to **Vinisa, Uruguay Preform**, or **Tamboré**, or **Newco**. No statement, written or oral, has been made by **Vinisa, Uruguay Preform**, or **Tamboré**, or **Newco** to any person with regard to any **Benefit Plans** or other benefit obligation that was not in accordance with the **Benefit Plans** and that could have a material adverse economic consequence to the **PET Business** or to **Vinisa, Uruguay Preform, Tamboré, Newco** or to **Buyer. Vinisa, Uruguay Preform, Tamboré,** and **Newco** have paid all amounts due to their respective severance authorities.

**2.16.3.** Pension Plan. There are no unfunded or underfunded pension plans relating to employees to be transferred to **Buyer.** Effective as of the **Closing, Sellers** and the **Subsidiaries** shall have taken all such actions as may be necessary in relation to the employees to be transferred to **Buyer** or to whom **Buyer** designates, under the pension plan currently maintained with **Alcoa Previ - Sociedade De Previdencia Privada,** to terminate such employees relationship with such plan so that **Buyer** or **Vinisa, Uruguay Preform, Tamboré** or **Newco** shall have thereafter no employer contribution obligations to such plan or to any other substitutive pension plan in connection with the employees transferred to **Buyer.**

**2.17.** Books and Records. The books of account, minute books, and other records of **Vinisa, Uruguay Preform, Tamboré, Newco** and **Newco II** which have been made available to **Buyer** are complete and correct in material respects and have been maintained in accordance with customary business practices and with all applicable laws. The minutes of the meetings of **Vinisa, Uruguay Preform, Tamboré, Newco** and **Newco II** reflect accurate and complete records of all meetings held by the shareholders, and corporate actions taken by the shareholders and the officers of **Vinisa, Uruguay Preform**, or **Tamboré** or **Newco** or **Newco II.**

**2.18. [intentionally omitted]**

**2.19.** No Undisclosed Liabilities. To the **Best Knowledge** (defined, for the purposes of this **Agreement**, as a party's actual knowledge, or such knowledge as a party so situated should have known through the exercise of reasonable diligence with an understanding of the business in question) of the **Sellers**, except as set forth in Schedule 2.19, the **Sellers** and the **Subsidiaries**

have no material liabilities or obligations of any nature whether absolute or accrued, contingent or otherwise) or claims pending related to the **PET Business**, except for liabilities or obligations required **(a)** as of the **Effective Date** by Alcoa's accounting policies to be reflected or reserved against in the **Preliminary Pricing Date Balance Sheet**, or **(b)** as of the **Closing Date** by the **Agreed Accounting Policies** to be reflected or reserved against in the **Final Pricing Date Balance Sheet**.

2.20. No Material Adverse Change. Since March 31, 2003, to the **Best Knowledge of Sellers**, there has not been any adverse change in the business, operations, properties, prospects, assets or conditions of the **Assets**, the **Shares** and the **PET Business** that would be materially adverse to the PET Business taken as a whole (material adversity being defined for the purposes of this Section 2.20 as a reduction in the EBITDA of the **PET Business** of greater than ten percent (10%) as compared to the budgeted EBITDA for the period between April 1, 2003 and the Closing Date attached as *Schedule 2.20*), and no event has occurred or circumstance exist that may result in such a material adverse change to the PET Business taken as a whole, other than any change or effect arising out of: general economic conditions or conditions affecting companies generally in the industries in which the **PET Business** operates (including fluctuating conditions resulting from cyclicality, seasonality or weather patterns affecting the **PET Business**, including its customers or suppliers) or the economy of the countries in which the **PET Business** operates or the world economy as a whole.

2.21. <u>Disclosure.</u>

(a)    No representation or warranty in this **Agreement** omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)    There is no fact known to **Sellers** or to the **Subsidiaries** (other than general economic or industry conditions) that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the **PET Business** that has not been set forth in this **Agreement** or that has not previously been disclosed to the **Buyer**.

2.22. <u>Absence of Certain Changes and Events.</u>

2.22.1.    Except as set forth in *Schedule 2.22.1* since March 31, 2003 through the Closing, there has not been any:

(a)    declaration or payment of any dividend or other distribution or payment in respect of the **Shares**;

(b)    amendment to the by-laws of Vinisa, Uruguay Preform, Tamboré, **Newco** or **Newco II**, other than to convert certain of them to limited liability companies;

(c)    payment or increase by Vinisa, Uruguay Preform, Tamboré, **Newco** or **Newco II** of any bonuses, salaries, or other compensation to any shareholder or quotaholder or (except in the ordinary course of business) director, officer, or employee or entry into any employment, or similar contract with any director, officer or employee;

(d)    adoption of or change in any **Benefit Plan** or pension plan.

16

2.22.2.    Since March 31, 2003 through the Closing, the **PET Business** has been conducted only in the ordinary course and there has not been any:

(a)    sale (other than sales of inventory in the ordinary course of business), lease or other disposition of any material assets or property of the **PET Business**;

(b)    cancellation or waiver of any claims or rights with a value to the **PET Business** other than compromises of trade disputes on reasonable commercial terms;

(c)    material transactions (including intercompany transactions) other than on an arms length basis, excluding transactions within the **PET Business**;

(d)    damage to or destruction or loss of any material asset or property of the **Assets** not covered by insurance, materially adversely affecting the properties, assets, business, financial condition or prospects of the **PET Business**;

(e)    capital contributions to, or investments in, or any other business acquired, including by merger or consolidation except for those strictly necessary to validly implement any pre-**Closing** structuring, including the creation of **Newco and Newco II**;

(f)    indebtedness for borrowed money or entry into any operating leases other than in the ordinary course of business consistent with past practice;

(g)    guarantee, standby letter of credit, mortgage, security document or similar document securing any **Assumed Liability**;

(h)    alteration of polices with respect to the payment of accounts payable and the collection of accounts receivable;

(i)    work stoppage, labor strike or other material labor problems;

(j)    change in any of their accounting methods and practices or those of the **PET Business**;

(k)    revaluation of any material assets and properties; and

(l)    corporate or legal restructuring of the **Subsidiaries** or the **PET Business** other than as contemplated hereby.

2.23.    Financial Statements.

(a)    As of the **Effective Date**, Schedule 2.23 contains a preliminary combined balance sheet of the **PET Business** as at March 31, 2003 that has been prepared in good faith in accordance with Alcoa's applicable accounting policies (the "**Preliminary Pricing Date Balance Sheet**"). The **Preliminary Pricing Date Balance Sheet** fairly presents in all material respects the financial position of the **PET Business** as at March 31, 2003.

17

(b)    As of the **Closing Date**, <u>Schedule 2.23</u> contains a final combined balance sheet of the PET Business as at March 31, 2003 that has been prepared in good faith in accordance with the **Agreed Accounting Policies** (the "**Final Pricing Date Balance Sheet**"). The **Final Pricing Date Balance Sheet** fairly presents in all material respects the financial position of the PET Business as at March 31, 2003.

(c)    Schedule 2.23 contains unaudited income statements for the **PET Business**, Vinisa, Uruguay Preform and Tamboré for the fiscal year ended in 31 December 2002 (the "**Financial Statements**"). Such **Financial Statements** (including the notes thereto, if any) in all material respects accurately reflect the financial conditions and operations of the PET Business, **Vinisa, Uruguay Preform**, and Tamboré, as at the respective dates of and for the periods referred to in such **Financial Statements**, in accordance with Alcoa's applicable accounting policies.

2.24.    <u>Tax Benefits.</u>  **Vinisa, Uruguay Preform, Tamboré** and **Alcoa Aluminio** have complied with all material obligations under the projects whereby each of **Vinisa, Uruguay Preform, Tamboré** and **Alcoa Aluminio** have been granted the tax benefits related to the **PET Business** and listed in <u>Schedule 2.24</u> (the "Tax Benefits"). As of the Closing Date, the Tax Benefits are in full force and effect for **Vinisa, Uruguay Preform** and **Tamboré** (subject to final approval from the tax authorities). In respect of Newco, the transfer of such benefits from **Alcoa Aluminio** shall have been applied for. **Sellers** agree to use their best efforts to cooperate with **Buyer** in working with the relevant authorities to assure that the **Tax Benefits and Tax Incentives** will be transferred to **Buyer** or to whom **Buyer** designates after the **Closing Date**.

2.25.    <u>No Other Warranties or Representations.</u>  **Sellers** and **Buyer** specifically acknowledge that **Sellers** are selling and **Buyer** is purchasing the **PET Business** and, as such, is buying an on-going business, including acquiring certain businesses, assets, obligations and liabilities set forth in this agreement. **Buyer** acknowledges that, except for the representations and warranties contained in this **Agreement**, the PET Business and the purchased assets are being conveyed on an "**AS IS, WHERE IS, WITH ALL FAULTS**" basis. **Seller** makes no representation or warranty, express or implied, except as set forth in this **Agreement**. **Buyer** has inspected, has had an opportunity and will continue to have the opportunity to inspect the purchased **Assets**, obligations and liabilities and is not relying on any representations or warranties of any kind whatsoever, express or implied, from **Seller**, its agents or representatives, as to any matters concerning the same except as provided in this **Agreement** and in the Local Agreements. Nothing herein contained is intended to create any third party beneficiary rights.

SECTION 3.    <u>REPRESENTATIONS AND WARRANTIES OF BUYER.</u>

Buyer hereby represents and warrants as follows:

3.1.    <u>Organization and Good Standing.</u>  Buyer is a corporation duly organized, validly existing and in good standing under the laws of Australia.

3.2.    <u>Power and Authorization.</u>  Buyer has full corporate power and authority to enter into this **Agreement**, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this **Agreement** by **Buyer** and **Buyer's** performance of its obligations thereunder have been duly authorized by all necessary corporate

action on the of **Buyer**. No other action is necessary to authorize the execution, delivery and performance of this **Agreement** by **Buyer**.

　　　3.3.　　Binding Effect.　　This **Agreement** constitutes the legal, valid and binding obligations of **Buyer** enforceable in accordance with its terms.

　　　3.4.　　No Violation, Consents. Neither the execution and delivery of this **Agreement** by **Buyer** nor the performance by **Buyer** of its obligations thereunder will:

　　　(a)　　violate or conflict with any provision of the By laws of **Buyer**;

　　　(b)　　violate, breach or otherwise constitute or give rise to a default under any material contract, commitment or other obligation to or by which **Buyer** is a party or is bound;

　　　(c)　　violate or conflict with any statute, ordinance, law, rule, regulation, judgment or order of any court or other governmental or regulatory authority to which **Buyer** is subject; or

　　　(d)　　except as set forth on Schedule 3.4, require any consent, approval or authorization of, notice to, or filing or registration with any third party, court or governmental or regulatory authority.

　　　3.5.　　Seller's Representations Modified by Buyer's Best Knowledge.　To the Best Knowledge of **Buyer**, except as set forth in Schedule 3.5, (a) the **Sellers'** representations and warranties made in this **Agreement** are true and correct, and (b) to the **Best Knowledge** of **Buyer**, there are no consequences of any fact which would put **Sellers** in breach of any of **Sellers'** representations and warranties made in this **Agreement**.

　　　3.6.　　Litigation and Proceedings.　　There are no material claims, actions, suits, proceedings or investigations, judicial or administrative, pending or to the **Best Knowledge of Buyer**, threatened against **Buyer** which seek to restrain, prohibit or invalidate the transactions contemplated by this **Agreement**.

　　　3.7.　　Availability of Funds.　**Buyer** will have available on the **Closing Date** sufficient funds to enable it to consummate the transactions contemplated by this **Agreement**.

　　　3.8.　　Employee Compensation.　**Buyer** and/or **Vinisa**, or **Uruguay Preform**, or **Tambore**, or **Newco** shall have responsibility for salary and social security liabilities, vacation entitlements, holiday pay and other ordinary labor benefits of employees of the **Subsidiaries**, including any employees transferred.

**SECTION 4.**　　　**COVENANTS OF SELLERS PENDING CLOSING.**

　　　**Sellers** agree that from the **Effective Date** until the **Closing**, , **Sellers** shall comply with the following:

　　　4.1.　　Conduct of the PET Business Pending Closing.

19

(a)     <u>Conduct of the PET Business</u>. Sellers shall carry on and shall cause the Subsidiaries to carry on the PET Business in the usual, regular and ordinary course, will preserve the present organization of the PET Business, and will use its best efforts to keep available the services of the present officers and employees of the PET Business and to preserve the PET Business' goodwill, the **Assets**, the **Shares** and the PET Business' relationships with customers, suppliers and others having PET Business dealings with them.

(b)     <u>Maintenance of Properties</u>. Sellers and the **Subsidiaries** will maintain the **Assets** consistent with past practices, and in the same general conditions as evident to Buyer at the occasion of the plant due diligence visits.

(c)     <u>Insurance.</u> Sellers will maintain and keep in full force and effect all of the insurance currently maintained by them with respect to the **PET Business** and to the **Assets**.

(d)     <u>Disposition of Assets</u>. Sellers will not nor cause the **Subsidiaries** to sell, mortgage, pledge or otherwise transfer or dispose of any tangible or intangible asset used in the operation of the PET Business or enter into any agreement with respect to the foregoing, other than inventory in the ordinary course of business and sales of other assets which are not material to the operation of the **PET Business**, individually or in the aggregate.

(e)     <u>Compensation.</u> Sellers will not increase the benefits or other compensation payable or to become payable to any director, officer or employee of the **PET Business** (other than general increases in compensation to employees of the **PET Business** in the ordinary course of business), increase any payment of or commitment to pay any bonus, profit sharing or other extraordinary compensation to any employee of the **PET Business**, or enter into any agreement with respect to the foregoing.

(f)     <u>Contracts</u>. Except in the ordinary course of the **PET Business** on a basis consistent with past practices, Sellers and the **Subsidiaries** will not enter into any contract or agreement of any kind.

(g)     <u>Protection of Confidential Information and Trade Secrets</u>. Sellers will continue to protect all confidential information and trade secrets of the **PET Business**.

(h)     <u>Other Actions</u>. Sellers and the Subsidiaries will not take any action that would, or could reasonably be expected to, result in any representation or warranty contained in this **Agreement** concerning the **Assets**, the **Shares**, the **PET Business** or any of the **Subsidiaries** becoming untrue in any respect.

    **4.2.**    <u>Access to the PET Business</u>. As of the signing hereto, **Sellers** shall permit **Buyer**, and its representatives, agents, counsel and accountants, to have reasonable access at all reasonable times to the premises, PET Business, properties, **Assets**, financial statements, contracts, books, records and working papers of, and other relevant information pertaining to, the PET Business, the **Shares** and the **Assets**, and to cause their officers and employees to furnish to **Buyer** and its representatives, agents, counsel and accountants, such financial and operating data and other information with respect to the PET Business, properties, **Assets** and **Shares**, as **Buyer** may reasonably request for the purposes of consummating the transaction hereunder, and

that is consistent with applicable laws.

    **4.3**    <u>Creation of New Companies</u>. Prior to the **Closing Date**, **Alcoa Aluminio** will create two new legal entities, a Brazilian limited liability company and a Brazilian corporation. Prior to the **Closing Date**, **Alcoa Aluminio** will contribute the PET assets located in Queimadaos, Itapissuma, Suape and Brasilia, Brazil, to the newly formed limited liability company. **Alcoa Aluminio** will then contribute the quotas of the limited liability company to the new Brazilian corporation.

SECTION 5.    <u>CONDITIONS TO OBLIGATIONS OF BUYER</u>.

    All of the obligations of **Buyer** under this **Agreement** are subject to the fulfillment prior to or at the **Closing** of each of the following conditions, any of which may be waived in writing by **Buyer** in its sole discretion:

    **5.1.**    <u>Representations and Warranties</u>. All representations and warranties of **Sellers** contained in this **Agreement** or made pursuant hereto shall be true and correct as of the **Closing** as if made at and as for such time.

    **5.2**    <u>Performance of Agreements</u>. **Sellers** and the **Subsidiaries** shall have fully performed and complied with all agreements and conditions required by this **Agreement** to be performed or complied with by it prior to or at that **Closing**.

    **5.3.**    <u>Consents and Approvals of Third Parties</u>. All material consents and authorizations and approvals to the transactions contemplated by this **Agreement** that are required pursuant to the terms of any material **Agreement** or arrangement relating to the **PET Business** or the **Assets** shall have been duly requested, applied for and/or obtained.

    **5.4.**    <u>No Injunctions</u>. No preliminary or permanent injunction or other by federal or state court which prevents the consummation of the transactions contemplated by this **Agreement** shall have been issued and remain in effect, and no action to obtain any such injunction or order shall have been filed and remain pending.

    **5.5.**    <u>Baesa Contract</u>. The supply contract with Baesa in Argentina shall have been renewed in a manner consistent with the discussions of the parties and the draft dated June [3], 2003, a copy of which has been provided to the Buyer.

    **5.6.**    <u>Permits and Licenses</u>. **Newco** shall have applied for all required permits, licenses, approvals, authorizations and registrations from all governmental or regulatory authorities which are necessary to conduct the **PET Business**, including, without limitation, the authorization to be benefited from the same tax incentives current applicable to **Alcoa Aluminio's PET Business**.

    **5.7.**    <u>Antitrust Approvals</u>. Except for the authorization of the Brazilian Antitrust Agency ("CADE"), any other waiting periods applicable to the transactions contemplated by this **Agreement** under Argentinean competition or antitrust laws shall have expired and all necessary governmental authorizations or approvals in respect of such competition or antitrust laws shall have been obtained; provided that **Buyer** may waive this condition with respect to any waiting periods which will extend beyond the **Closing Date**.

    **5.8**    <u>Transition Agreements</u>. Sellers shall have provided **Buyer** with the **Transition**

21

Agreements, as defined below, satisfactory to the **Buyer**, which shall provide, among other things, appropriate provisions for leased space, utilities, shared services such that the **PET Business** can be operated in substantially the same manner as it was operated by **Sellers** or the **Subsidiaries**, as the case may be.

**5.9    Delivery of Tax Incentives and Tax Benefits**.  The **Tax Incentives** and related **Tax Benefits** which have been available to **Vinisa, Uruguay Preform, Tamboré and Alcoa Aluminio** shall be in full force and effect as of the **Closing Date**, shall not have been modified in a manner that is adverse to **Buyer's** interests, and transfer to **Buyer** or **Buyer's** designee at **Closing** will have been applied for.

**5.10    Resolution of Panamco Claims**.  **Sellers** and/or **Alusud Colombia** shall have received from **Panamco**, a customer of **Alusud Colombia**, documentation evidencing the final resolution (at no further cost or expense to **Buyer**) of claims asserted by **Panamco**, and provided such to **Buyer**.

**5.11    Agreement on the Agreed Accounting Principles and the Final Pricing Date Balance Sheet**.  **Buyer** and **Sellers** shall have agreed on the **Agreed Accounting Principles** as well as on the **Final Pricing Date Balance Sheet**.

**5.12    Transition Agreements**.  **Sellers** shall have provided **Buyer** with the **Transition Agreements**, as defined below, which must be satisfactory to the **Buyer**.

## SECTION 6.    CONDITIONS TO OBLIGATIONS OF SELLERS.

All of the obligations of **Sellers** and the **Subsidiaries** under this **Agreement** are subject to the fulfillment prior to or at the **Closing** of each of the following conditions, any of which may be waived in writing by **Sellers** and the **Subsidiaries**:

**6.1.    Representations and Warranties**.  All representations and warranties of **Buyer** contained in this **Agreement** or made pursuant hereto shall be true and correct as of the **Closing** as if made at and as of such time.

**6.2    Performance of Agreements**.  **Buyer** shall have fully performed and complied in all material respects with all agreements and conditions required by this **Agreement** to be performed or complied with by it prior to or at that **Closing**.

**6.3    Local Agreements**.  **Buyer** shall have provided **Sellers** with the **Local Agreements**, as defined below, which must be satisfactory to the **Sellers**.

## SECTION 7.    OTHER COVENANTS.

**7.1.    Brokers, Expenses**.  Each **Party** hereto hereby represents and warrants to the other **Party** hereto that it has not retained any broker or intermediaries in connection with the transactions contemplated by this **Agreement** that would be entitled to a fee based on **Closing** of this transaction. Each **Party** hereto shall pay its own fees and expenses (including the fees and expenses of its attorneys, accountants, financial advisors and other professionals) incurred in

connection with this **Agreement** and all transactions contemplated hereby.

**7.2.** <u>Antitrust Approval</u>. The Parties agree that, if and where required by applicable law, **Buyer** and **Sellers** shall submit the transaction contemplated herein to the approval of the Antitrust Agency of the jurisdiction where the applicable law requires. **Sellers** agree and undertake to cooperate with **Buyer** in regard to the approval of the transaction by the competent antitrust authorities, and to supply, during the term provided for by law, all the information and documents required in relation to the **PET Business**, the **Shares**, and the **Assets**. The costs of each required filing shall be borne by **Buyer** and **Sellers** evenly.

**7.3.** <u>Best Efforts. Further Assurances</u>. Subject to the terms and conditions contained herein, each of the **Parties** hereto agrees to use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary or advisable under applicable laws to consummate and make effective the transactions contemplated by this **Agreement**. **Seller** and **Buyer** shall keep the other reasonably informed of the status of matters relating to the completion of the transactions contemplated hereby and work cooperatively in connection with obtaining all required approvals or consents of any **Governmental Authority**. In that regard, each party shall without limitation: **(a)** promptly notify the other of, and if in writing, furnish the other with copies of (or, in the case of material oral communications, advise the other of) any communications from or with any **Governmental Authority** (whether domestic or foreign) with respect to the transactions contemplated by this **Agreement**; **(b)** permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written (or any material proposed oral) communication with any such **Governmental Authority**; **(c)** not participate in any meeting with any such **Governmental Authority** unless it consults with the other in advance and to the extent permitted by such **Governmental Authority** gives the other the opportunity to attend and participate thereat; **(d)** furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and any such governmental authority with respect to this Agreement; and **(e)** furnish the other with such necessary information and reasonable assistance as **Seller** and **Buyer** may reasonably request in connection with its preparation of necessary filings or submissions of information to any **Governmental Authority**. **Seller** and **Buyer** may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this section as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient unless express permission is obtained in advance from the source of their materials (**Seller** and **Buyer**, as the case may be) or its legal counsel.

**7.4.** <u>Publicity</u>. From and after the date of this **Agreement** and until the **Closing**, each Party hereto agrees to obtain the approval of the other **Party** prior to issuing any press release, written public statement or announcement with respect to the transactions contemplated by this **Agreement**; provided, however, that the provisions of this Section 7.4 shall not prohibit either **Party** hereto from making any such release, statement or announcement if, upon advice of counsel, such **Party** believes that it is required to do so under any applicable law or regulation, and such **Party** shall use reasonable efforts to notify the other **Party** thereof prior to making such release, statement or announcement.

**7.5.** <u>Additional Documents</u>. Sellers, the Subsidiaries and Buyer shall supply such other documents as **Buyer** and **Sellers** or the **Subsidiaries** may agree are necessary for the purpose of: **(i)** evidencing the accuracy of any of **Sellers'** or **Buyer's** representations and warranties; **(ii)** evidencing the performance by **Sellers** or **Buyer** or the **Subsidiaries** of, or the compliance by **Sellers** or **Buyers** or the **Subsidiaries** with, any covenant or obligation required to

be performed or complied with by **Sellers** or **Buyer** or the **Subsidiaries**; or **(iii)** evidencing the satisfaction of any condition referred to in this Section; or **(iv)** otherwise facilitating the consummation or performance of any of the contemplated transactions.

**7.6.    Local Agreements.** **Sellers** and **Buyer** acknowledge that local agreements will be executed, between the competent **Buyer** and **Sellers'** entities, in each jurisdiction where **Assets** and/or **Shares** are being sold ("**Local Agreements**"). Each **Local Agreement** will be substantially similar to the form attached hereto as <u>Schedule 7.6</u>, and will set forth additional terms and conditions related to the specific transaction which takes place under its jurisdiction.

**7.7.    Transition Agreements.** **Sellers** and **Buyer** will execute, on **Closing**, the transition agreements substantially similar to the form attached hereto as <u>Schedule 7.7</u> ("**Transition Agreements**").

**7.8.    [intentionally omitted].**

**7.9.    Itapissuma Tax Benefits.** **Alcoa Aluminio** will apply to get clearance from ADENE so that **Newco** and/or **Buyer**, as the case may be, will enjoy the same level of tax benefits currently granted to **Alcoa Aluminio's** **PET Business**. If so requested by ADENE, **Alcoa Aluminio** agrees to utilize its tax incentive reserve to increase capital up to the amount required by ADENE, currently estimated at US$400,000

**7.10   Liabilities.** **Buyer** agrees to pay, as they become due, all debts and liabilities of the **PET Business** arising out of **Buyer's** ownership or operation of the **PET Business** after the **Closing Date**. **Buyer** understands and agrees that from and after the Closing, except as specifically provided in this **Agreement** to the contrary, **Seller** will have no liability nor responsibility for the **Assumed Liabilities**.

**7.11   Offers of Employment.** **Buyer** agrees to offer employment or legally or customarily required severance package to all of the employees of the **PET Business** on substantially comparable terms and conditions of employment, including compensation and benefits, as they currently enjoy.

**7.12 Books and Records.** **Buyer** shall retain all books and records relating to operation of the **PET Business** for all periods from January 1, 1996 up to and including the **Closing Date** in a readily retrievable location for a period of ten years from the **Closing Date**, and thereafter may destroy such books and records only after having notified **Seller** of its intention to do so and having offered to provide **Seller**, as applicable, with copies or the original of such books and records.

# SECTION 8.   INDEMNIFICATION.

**8.1.    Indemnification by Sellers.** Subject to Section 8.4(a) hereof, **Sellers**, hereby indemnify and agree to promptly defend and hold harmless **Buyer** or the actual buyer of the **PET Business Shares and Assets** as appointed by **Buyer**, and **Vinisa, Uruguay Preform, Tamboré** and **Newco II** from and against any and all claims resulting in costs, expenses (including, without limitation, attorney's fees and court costs if **Buyer** prevails), judgments, penalties, fines, damages, losses and liabilities (collectively, "**Losses**", the burden of proving that such Losses were actually incurred is upon the claiming **Party**) incurred by any of them resulting from any of the following:

24

(a)    any inaccuracy in, or the breach of, any representation or warranty made by **Sellers** herein or in any Exhibit, Schedule, document or agreement executed by **Sellers** and delivered to **Buyer** pursuant hereto;

(b)    any breach of any covenant or agreement of **Sellers** contained herein or in any Exhibit, Schedule, document or agreement executed by **Sellers** and delivered to **Buyer** pursuant hereto;

(c)    any debts, claims with respect to products sold or services provided, including claims for personal injuries or damages based on allegedly non-conforming or defective products or services, liabilities, penalties, fines, **Taxes** or, judgements relating to, the **Assets**, the **Shares**, **Vinisa**, **Uruguay Preform**, **Tamboré**, **Newco** and **Newco II** arising from acts, facts, activities or events occurring prior to the **Closing**, including any products manufactured and delivered or services performed on or prior to the **Closing Date**;

(d)    any liabilities or claims appearing on, or which, based upon the **Seller's Best Knowledge**, should have appeared on, **Schedule 2.19**;

(e)    any liabilities which were not accounted for in accordance with the **Agreed Accounting Policies** on the **Final Pricing Date Balance Sheet** or on the **Closing Date Balance Sheet**;

(f)    any liabilities disclosed by **Buyer** on **Schedule 3.5**; or

(g)    any claims made against **Buyer** by creditors of **Sellers** and/or the **Subsidiaries** under any applicable bulk sales law.;

*provided, however*, that **Buyer** shall not be entitled to claim **Losses** under this Section 8.1 based on any fact or circumstance to the extent such claim is a breach of **Section 3.5**.

8.2.    <u>Indemnification by Buyer</u>. Subject to Section 8.4(b) hereof, **Buyer** hereby indemnifies and agrees to promptly defend and hold harmless **Sellers** from and against any and all **Losses** incurred by **Sellers** resulting from to any of the following:

(a)    any inaccuracy in, or breach of, any representation or warranty made by **Buyer** herein or in any Exhibit, Schedule, document or agreement executed by **Buyer** and delivered to **Sellers** and/or **Alcoa** pursuant hereto;

(b)    any breach of any covenant or agreement of **Buyer** contained herein or any Exhibit, Schedule, document or Agreement executed by **Buyer** and delivered to **Sellers** and/or **Alcoa** pursuant hereto; or

(c)    any debts, claims with respect to products sold or services provided, including claims for personal injuries or damages based on allegedly non-conforming or defective products or services, liabilities, penalties, fines, **Taxes** or, judgments relating to, the **Assets**, the **Shares**, **Vinisa**, **Uruguay Preform**, **Tamboré**, **Newco** and **Newco II** arising from acts, facts, activities or events occurring after the **Closing**, including any products manufactured and delivered or services performed after the **Closing Date**.

25

8.3.  Administration of Claims.

(a)  Whenever any claim shall arise for indemnification under this Section 8, the party entitled to indemnification (the "**Indemnified Party**") shall promptly notify the other party (the "**Indemnifying Party**") of the claim and, when known, the facts constituting the basis for such claim. In the event of any claim for indemnification thereunder resulting from or in connection with any claim or legal proceeding by a person who is not a party to this Agreement (a "**Third Party Claim**"), such notice shall also specify, if known, the amount or a good faith estimate of the amount of the liability arising therefrom. The foregoing notwithstanding, the lack of notification by Buyer to Seller or vice versa shall not exempt **such a Party** from their indemnification obligations hereunder.

(b)  The Indemnified Party shall not settle or compromise or voluntarily enter into any binding Agreement to settle or compromise, or consent to entry of any judgment arising from, any such claim or proceeding except in accordance with this Section. With respect to any **Third Party Claim**, the Indemnifying Party shall undertake the defense thereof by representatives of its own choice reasonably satisfactory to the Indemnified Party; *provided, however,* that the Indemnified Party will be entitled to defend, rather than tendering defense of, any Third Party Claim from a current and/or continuing customer that, for reasons of the nature of the dispute and/or the importance of the customer it considers to be commercially sensitive (a "**Commercially Sensitive Claim**"). The Indemnified Party or any other party shall have the right to participate in any such defense of a **Third Party Claim** with counsel of its own choice at its own expense. In the case of a **Commercially Sensitive Claim**, the Indemnifying Party will promptly reimburse the Indemnified Party for the reasonably and prudently incurred expenses of the Indemnified Party in defending the **Commercially Sensitive Claim**, and shall have the right to participate in any such defense of a **Commercially Sensitive Claim** with counsel of its own choice at its own expense. In the event the **Indemnifying Party**, after half of the period for the presentation of a defense against any such **Third Party Claim**, fails to begin to diligently defend it (or at any time thereafter ceases to diligently defend it), the **Indemnified Party** will have the right to undertake the defense, compromise or settlement of such **Third Party Claim** on behalf of, and for the account of, the **Indemnifying Party** at the expense and risk of the **Indemnifying Party**.

8.4.  Limitation on Indemnification Obligation.

(a)  Except for any **Losses** relating to a breach of the warranties contained in Section 2.2 and Section 2.7 that the Shares and Transferred Assets, respectively, will be conveyed free and clear of any **restriction** (to which **Losses** none of the limitations below will apply), and except with respect to any **Losses** relating to **Taxes**, to which only the limitation contained in Section 8.4(a)(iii) below will apply):

(i)  Sellers shall not have any liability pursuant to Section 8.1 hereof unless the aggregate amount of all **Losses** payable pursuant to Section 8.1 hereof is at least US$250,000; and then only to the extent such **Losses**, in the aggregate, exceed US$250,000; and

(ii)  Sellers shall not be liable for any **Losses** involving amounts below

26

US$50,000; and none of such amounts shall be computed for the purposes of determining the amount provided for in (i) above; and

(iii) Sellers' total liability for all **Losses** will not exceed US$ 32,500,000.

(b) Notwithstanding the provisions of Section 8.2 hereof, **Buyer** shall not have any liability pursuant to Section 8.2 hereof unless the aggregate amount of all **Losses** payable pursuant to Section 8.2(a) hereof is at least US$250,000; and then only to the extent such claims, in the aggregate, exceed US$250,000.

(c) Sellers or **Buyer** shall only be liable for any **Losses** in case a claim by the other party or a **Third Party Claim**, in each case through an appropriate judicial or administration proceeding, is made before December 31, 2005, except that **(I)** for **Labor** and **Tax Losses** the period of the Statute of Limitation applicable in the jurisdiction where the **Labor** or **Tax Losses** has occurred shall apply; and **(II)** for Environmental and Health and Safety matters indemnified under Section 8.6, the period shall run through the date that is the 6th anniversary of the Closing Date.

(d) <u>Additional Limits.</u> Notwithstanding any other provision of this **Agreement**, the amount of any **Losses** for which indemnification is provided under this Section 8 will be net of (I) any amount actually received by the **Indemnified Party** or paid to **Third Parties** on behalf of **Indemnified Party** under insurance policies of the **Indemnifying Party** with respect to such **Losses** (and the **Indemnified Party** will be required to submit a claim under such insurance policies with respect to such **Losses**), (II) any Tax savings attributable to any deduction, expense, loss, credit or refund to the Indemnitor or its affiliates when incurred or received as a result of the **Losses** and (III) the amount of any benefit to, or saving for, the **Indemnified Party** as a result of the payment or settlement of any item giving rise to such claim.

(e) For the avoidance of doubt, in determining the liability of an **Indemnified Party** for **Losses** hereunder, only the actual losses incurred by **Indemnified Party** shall be taken into account and not any potential or actual reduction in value of the **PET Business** and **Indemnifying Party** shall in no event be liable for any consequential damages including but not limited to lost profits and other business opportunities or any internal costs and expenses incurred by **Indemnified Party** or the **PET Business**.

8.5. <u>Employees Litigation.</u> In the event that the employees of the **PET Business** or any employees of the **Subsidiaries**, file claims, after the **Closing Date**, against **Buyer** or and/or of **Vinisa, Uruguay Preform, Tamboré,** or **Newco** relating to their period of work with the **Sellers** or the **Subsidiaries**, before the **Closing Date**, the following shall apply:

(a) **Buyer** shall notify **Sellers** of such claims;

(b) **Sellers** shall fully cooperate in all aspects in the preparation of the defense, petitions, appeals, hearings, etc.; the control over the claim shall remain with **Buyer** or **Vinisa, Uruguay Preform, Tamboré,** or **Newco;** and

(c) **Buyer** shall not settle any labor claim for which the **Subsidiaries** are liable without Seller's approval, which shall not be unreasonably withheld; should **Buyer** settle any such claim without such approval, the Seller shall be released from its

27

responsibility thereunder.

**8.6.** __Environmental, Health and Safety Indemnity__

(a)    Subject to the monetary and time limitations in Section 8.4 above, from and after the **Closing**, **Sellers** shall indemnify and hold harmless the **Buyer** from and against any and all cash costs of remediation required by, or fines or penalties actually assessed by, a **Governmental Authority** to the extent that they arise from:

(i)    a breach of the representations and warranties set forth in Section 2.15; or

(ii)    the violation of any **Environmental Law** or **Health and Safety Law** by **Sellers** or by the **Subsidiaries** in operating the **PET Business** prior to or on the **Closing**;

*provided, however*, that Buyer shall not be entitled to claim **Losses** under this Section 8.6 based on any fact or circumstance to the extent such fact or circumstance is a breach of **Section 3.5.**

**8.7**    __UPSA Letter of Credit Indemnification.__    **Sellers** hereby agree to indemnify and hold **Buyer** harmless from any liability of **Uruguay Preform** to Pepsi Cola Manufacturing Company of Uruguay S.A. above the amount of US$720,000 secured by the existing **Uruguay Preform** letter of credit; *provided, however*, that this indemnity will apply only to the obligations of Uruguay Preform under the Lease and Service Agreement dated April 1, 2001, as amended by that Amendment of Lease and Service Agreement dated March 31, 2003, and will not apply in the case of a breach by Buyer or Uruguay Preform of such obligations following the **Closing.**

**8.8**    __Relation to Local Agreements.__    As between the **Buyer** and the **Sellers**, Alcoa Aluminio hereby agrees to be responsible for any claims against the **Sellers** in connection with the **Local Agreements**, whether or not Alcoa Aluminio is actually a party to the **Local Agreement** in question.

## SECTION 9.    TERMINATION.

**9.1.**    __Termination.__    This **Agreement** and the transactions contemplated hereby may be terminated by either party prior to the **Closing**, as follows:

(a)    __Mutual Consent.__    By mutual consent in writing of both **Buyer** and **Sellers** hereto;

(b)    __Material Information.__    By **Buyer**, if **Sellers** fails to disclose any material information or provides materially inaccurate or misleading information regarding the same; or

(c)    __Failure to Comply with Closing Conditions.__    By **Buyer** or **Sellers** and/or **Alcoa**, if any of the parties fail to comply with one of the Closing Conditions established in Sections 5 and 6 of this **Agreement.**

**9.2.**    __Cut-Off Date.__    If the **Closing** shall not have occurred on or before August 31, 2003, either party hereto may terminate this Agreement by delivering written notice thereof to the other party hereto.

9.3. <u>Effect of Termination</u>. If this Agreement is terminated pursuant to Section 9.1(a) or 9.2, all rights and obligations of **Sellers** and/or **Alcoa** and **Buyer** thereunder shall terminate, and no party hereto shall have any further liability or obligation thereunder to the other party hereto.

SECTION 10. <u>MISCELLANEOUS</u>.

10.1. <u>Notices</u>.

(a)     All notices, consents, requests and other communications herein shall be in writing and shall be sent by hand delivery, by certified or registered mail (return-receipt requested), or by recognized national overnight courier service as set forth below:

If to **Buyer**:
Amcor PET Packaging
10521 S. Highway M-52
Manchester, MI 48158
Facsimile: +1 734 428 4623
Attn.: General Counsel

With a copy to:
Amcor PET Packaging
10521 S. Highway M-52
Manchester, MI 48158
Facsimile: +1 734 428 4623
Attn.: Kirby Losch

If to **Sellers**:
Alcoa Alumínio S.A.
Av. Maria Coelho Aguiar, 215
Jd. São Luis - Bloco C
São Paulo, BR-05804-900
Brazil
Facsimile: + (55-11) 3741-6000
Attn.: General Counsel

With a copy to:
Alcoa Inc., Corporate Development Department
201 Isabella Street
Pittsburgh, PA 15212-5858
U.S.A.
Facsimile: +(1 412) 553-4820
Attn.: A. I. Schmidt

(b)     Notices delivered pursuant to this Section shall be deemed given: (i) at the time delivered, if personally delivered; (ii) at the time received, if mailed; and (iii) two (2) business days after timely delivery to the courier, if by overnight courier service.

(c)     Any party hereto may change the address to which notice is to be sent by written notice to the other party in accordance with this Section 10.1.

29

**10.2.  Non Competition, Non Solicitation.**

    **10.2.1. Non-Competition Acknowledgment.**  **Sellers**  and/or  **Alcoa** acknowledges that an important part of the benefit that **Buyer** will receive in connection with the contemplated transactions is the ability to carry on the **PET Business** free from competition by **Sellers** and/or **Alcoa**, its affiliates and its shareholders as described in Sections 10.2.2 and 10.2.3 below.

    **10.2.2. Non-Competition Obligation.**  In order that **Buyer** may enjoy such benefits, for a period of five (5) years following the **Closing Date**, **Sellers**, their affiliates and shareholders (and their respective successors and assigns) will not, in South America, engage or have any ownership interest in any corporation, partnership or other business entity that engages, directly or indirectly, in the development, manufacturing and selling of any activity related to the current **PET Business** of **Sellers** (primarily PET preforms and bottles for soft drink and water applications) (the "**Non-Compete Sphere**") or assist any other person or entity to do so; **provided, however,** that **Seller** shall not be deemed to be in non-compliance if it or its affiliates or shareholders purchases an entity that derives 10% or less of its revenue in the **Non-Compete Sphere**, provided that **Buyer** is given the first right of refusal to purchase the portion of the business in the **Non-Compete Sphere** on reasonable commercial terms.

    **10.2.3. Breach Penalty.**  In the event of any breach of any obligation under this Section 10.2.2, the breaching party shall pay as a penalty to **Buyer** the amount which may be awarded by an arbitrator pursuant to the provision of Section 10.3.

    **10.2.4. Non-Solicitation.**  For a period of two (2) years from and after the **Closing Date**, none of **Sellers** or their affiliates will, directly or indirectly, solicit or cause to be solicited any of **PET Business** directors, officers or employees transferred to the **Buyer**, for the purpose of employing or otherwise retaining the services of such directors, officers or employees without the prior written consent of the **Buyer**; **provided, however,** that nothing in this Section shall be deemed to prohibit any such person or entity from engaging in generalized searches for employees through media advertisements or head-hunting activities not directed specifically to employees of **Buyer**.

**10.3.  Dispute Resolution.** All disputes arising out of or in connection with the interpretation, application or enforcement of this **Agreement** shall be settled by arbitration as follows:

    (a)    The arbitration shall be conducted in New York, State of New York, United States of America, at the International Chamber of Commerce, pursuant to the commercial arbitration rules of such Chamber in effect at the time the arbitration is commenced, before a sole arbitrator mutually chosen by the parties.

    (b)    If the parties cannot reach an agreement on the appointment of the sole arbitrator, the arbitration will be conducted by a panel of three (3) arbitrators. In this case, each of the parties involved in the dispute shall appoint one arbitrator and the panel chairman shall be appointed by the International Chamber of Commerce.

    (c)    The arbitration shall be pursued and brought to conclusion as rapidly as possible

    (d)    The decision of the arbitrators, which may include interest, shall be final, binding and enforced in any court of competent jurisdiction by either party.

(e)     The prevailing party shall be awarded reasonable attorneys' fees, expert witness costs and expenses, and all other costs and expenses incurred in connection with such proceedings, unless the arbitrators shall for good cause determine otherwise.

10.4.  Entire Agreement. This Agreement, including all **Exhibits** and **Schedules** hereto (all of which are incorporated herein by this reference), and the **Local Agreements** contain the entire agreement and understanding concerning the subject matter hereof between the parties hereto.

10.5.  Waiver and Amendment. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless confirmed in writing. No waiver by either party hereto of any term or provision of this **Agreement** or of any default thereunder shall affect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar. This **Agreement** may not be modified or amended except by a writing executed by both parties hereto.

10.6.  Severability. If any provision of this Agreement shall be held void, violable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and, accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, violable, invalid or inoperative provision had not been contained herein.

10.7.  Governing Law. Exclusively for the purposes of obtaining prior, previous, binding or temporary injunction orders, the parties hereby elect the laws of the State of New York, with the exclusion of any other, no matter how privileged it may be. This **Agreement** shall be governed by and construed in accordance with the laws of the State of New York.

10.8.  Assignment.  Neither party may assign this **Agreement** or any rights and obligations arising out of this **Agreement**, in whole or in part, without the prior written consent of the other party.

10.9.  Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.10  Transfer Taxes - General. Notwithstanding anything herein to the contrary, all foreign, federal, state and local transfer, stamp, vehicle, sales and use, goods and service tax, value added tax, real estate transfer taxes, and any and all notarial fees imposed or incurred in connection with the consummation of the transactions contemplated by this Agreement shall be borne by **Buyer**, except those costs related to the creation and capitalization of **Newco** and **Newco II** and any non-resident capital gains taxes, which shall be borne exclusively by **Sellers**. For purposes of this Section 10.10, "non-resident capital gains taxes" means any tax imposed by a country upon non-residents in respect of the transfers of shares of companies that are resident in the respective country imposing the tax.

10.11  Counterparts. The parties may execute this Agreement in one or more counterparts, each of which will be equally authentic.

IN WITNESS WHEREOF, the undersigned have caused their respective duly authorized
representatives to execute this Agreement as of the day and year first above written.

June 2, 2003.

ALCOA LATIN AMERICAN HOLDINGS CORPORATION

Josmar Varillo
President

ALCOA ALUMINIO S.A.

Josmar Varillo
President

AMCOR LIMITED

WILLIAM J. LONG
ATTORNEY IN FACT

TOTAL P.82

**Exhibit B, PART I**
**to Petition for Judgment**
**Confirming An Arbitration Award**



**International Chamber of Commerce**
*The world business organization*

## International Court of Arbitration • Cour internationale d'arbitrage

# AWARD

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14175/JB/JEM

### AMCOR LIMITED

**(Australia)**

**vs/**

### 1. ALCOA LATIN AMERICAN HOLDINGS CORPORATION

**(British Virgin Islands)**

### 2. ALCOA ALUMINIO S.A.

**(Brazil)**

This document is a certified true copy of the original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

# INTERNATIONAL CHAMBER OF COMMERCE

# INTERNATIONAL COURT OF ARBITRATION

### Final Arbitral Award

In the Matter of an Arbitration

Between :

AMCOR Ltd.

(hereinafter, «Claimant » or «AMCOR »)

AND

1. ALCOA Latin American Holdings Corporation

   (hereinafter «Respondent 1» or «ALCOA Holdings »)

2. ALCOA Aluminio S.A.

   (hereinafter « Respondent 2 » or « ALCOA Aluminio »)

Further, both the Respondent 1 and the Respondent 2 hereinafter collectively referred to as « Respondents » or « Alcoa »; and both the Claimant and the Respondents hereinafter collectively referred to as « Parties ».

ICC Arbitration  No. 14175/JB/JEM

I. Introductory

(i) On 28 December  2005  the Secretariat (the « Court Secretariat ») of the International Court of Arbitration of the ICC (the « ICC Court ») acknowledged receipt of an arbitration request (the « Request ») filed by the Claimant setting forth claims arising out of a certain « Acquisition Agreement » in and between Claimant and the Respondents  dated as of 2 June 2003, whereby the Claimant agreed to acquire from the Respondents all of the Respondents' assets in Latin America related to the Respondents' PET Business; i.e., the manufacture of preforms or molds made of Polythylene Terephthalate (PET) that are blown up into full-size plastic bottles used as containers for soft drinks (the « Agreement »).

(ii) This arbitration has been initiated pursuant to the arbitration clause found in Section 10.03 of the Agreement, that reads as follows: « *Dispute Resolution. All disputes arising out of or in connection with the interpretation, application or enforcement of this Agreement shall be settled by arbitration as follows: (a) The arbitration shall be conducted in New York, State of New York,*

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS,   07·03·2008

Jason A. FRY
Secretary General
ICC International Court of Arbitration

*United States of America, at the International Chamber of Commerce, pursuant to the commercial arbitration rules of such Chamber in effect at the time the arbitration is commenced, before a sole arbitrator mutually chosen by the parties. (b) If the parties cannot reach an agreement on the appointment of the sole arbitrator, the arbitration will be conducted by a panel of three (3) arbitrators. In this case, each of the parties involved in the dispute shall appoint one arbitrator and the panel chairman shall be appointed by the International Chamber of Commerce. (c) The arbitration shall be pursued and brought to conclusion as rapidly as possible. (d) The decision of the arbitrators, which may include interest, shall be final, binding and enforced in any court of competent jurisdiction by either party. (e) The prevailing party shall be awarded reasonable attorney's fees, expert witness costs and expenses, and all other costs and expenses incurred in connection with such proceedings, unless the arbitrators shall for good cause determine otherwise».*

(iii) The Claimant is AMCOR Limited, a company organized and existing under the laws of Australia and headquartered in Abbotsford, Victoria, Australia, that conducts its PET business though its subsidiary in the United States of America, Amcor PET Packaging, U.S.A. Inc., a corporation organized and existing under the laws of Michigan, U.S.A., with offices at 935 Technology Drive, Suite 100, Ann Arbor, Michigan 48108-8919. U.S.A.

(iv) The Respondent 1 is ALCOA Latin American Holdings Corporation, a corporation organized and existing under the laws of the British Virgin Islands headquartered at Romasco Place, Wickhams Cay 1, P.0.Box 3410, Road Town, Tortola, British Virgin Islands. The Respondent 2 is ALCOA Aluminio S.A., a corporation organized and existing under the laws of Brazil headquartered at Av. Maria Coelho Aguiar 215 Jd. São Luis-Bloco C.; São Paulo, BR-05804-900 Brazil.

(v) The Claimant is represented by Tab K. Rosenfeld Esq. and Steven M. Kaplan Esq. Rosenfeld & Kaplan, L.L.P.,535 Fifth Avenue,10th Floor,New York, New York 10017 U.S.A. Telephone: 1 212 682 14 00. Facsimile:1 212 682 11 00.E-mail: steve@rosenfeldlaw.com; tab@rosenfeldlaw.com.

(vi) The Respondents were initially represented by Kevin J. Walsh Esq. and Paul Cohen Esq. Leboeuf, Lamb, Greene & Macrae, L.L.P.; 125 West 55th Street, New York, New York 10019-5389, U.S.A.Telephones: 1 212 424 85 45/83 20 (direct). Facsimile: 1 212 424 85 00/649 11 85 (direct). E-mail: Kwalsh@llgm.com; pcohen@llgm.com. During the arbitration, as informed by letter of 24 January 2007, the law firm Hunton & Williams L.L.P. joined the arbitral proceedings as co-counsel and Mr. B. Donovan Picard Esq., Hunton & Williams L.L.P., 1900 K Street NW, Washington D.C. 20006, U.S.A.; telephone : 202 955 1500; facsimile: 202 861 3660; e-mail: dpicard@hunton.com became lead counsel on behalf of the Respondents. Later in the proceedings, by letter of 1 October 2007, counsel to the Respondents informed that all correspondence to the Respondents was to be sent from then on to the attention of J. Michael Showalter Esq., Hunton & Williams L.L.P., Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219-4074; telephone : 804-788 8200; facsimile: 804-788 8218; e-mail: mshowalter@hunton.com.

(vii) By letter dated 28 December 2005, the Court Secretariat notified the Request to the Respondents.

(viii) By letter dated 2 February 2006, the Court Secretariat granted the Parties an extension of time until 22 February 2006 for the Parties to agree on a Sole Arbitrator and the Respondents an extension of time until 2 March 2006 to file an answer to the Request.

(ix) By letter dated 7 March 2006, the Court Secretariat acknowledged receipt of the Respondents' answer and counterclaim (the « Answer and Counterclaim »); and granted thirty days for the Claimant to file a Reply to the Counterclaim (the « Reply »).

(x) By letter dated 9 March 2006, the Court Secretariat took note of the Parties' agreement that the language of the arbitration be English.

(xi) By letter dated 14 March 2006, the Court Secretariat informed the confirmation by the Secretary General of the International Court of Arbitration of ICC of Dr. Horacio Alberto Grigera Naón as Sole Arbitrator upon the joint nomination of the Parties.

(xii) On 7 April 2006 the Sole Arbitrator issued a Provisional Timetable and Procedural Order No. 1 regarding the scheduling and organization of the arbitral proceedings.

(xiii) On 2 May 2006 Terms of Reference were signed by the Parties and the Sole Arbitrator. By letter of 24 May 2006 the Court Secretariat confirmed that the Terms of Reference had been transmitted to the ICC Court.

(xiv) Between May 2006 through the beginning of the hearing on the merits held on 5-9 March 2007 in New York, N.Y.(the « Hearing »), the Parties raised a considerable number of different issues concerning, among other things, the rescheduling of the arbitral proceedings, the settlement of some of the claims submitted to arbitration and the production of evidence, which gave rise to various teleconferences held by the Sole Arbitrator and the Parties, communications to the Parties setting forth orders, directions and determinations of the Sole Arbitrator, and the issuance by the Sole Arbitrator of Procedural Orders 2-5, the last one dated 1 March 2007.

(xv) By Procedural Order No. 4 of 2 February 2007, the Sole Arbitrator acknowledged the Parties' agreement to withdraw, with prejudice, the following claims and counterclaims from this arbitration: Claimant's Fourth, Fifth, Ninth and Tenth Claims, the portion of the Claimant's Seventh Claim relating to a « ...potential tax liability of US$ 793,800.00 arising from a pre-Closing resin purchase in the amount of US$ 2,385,000.00 which was not a transaction in the ordinary course of business... » (see para. 7 below), and all of the Respondents' Counterclaims (Counterclaims First, Second and Third) (see para. 5 below).

(xvi) Pursuant to the Sole Arbitrator's orders and directions, the Parties filed the following memorials: on 15 November 2006 the Claimant submitted a Claims Memorial and the Respondents submitted a Counterclaims Memorial; on 24 January 2007 the Claimant submitted an Answer Memorial to the Counterclaims Memorial and the Respondents submitted an Answer Memorial to the Claims Memorial; on 12 February 2007 the Claimant and the Respondents submitted Reply Memorials to their opponents' Answer Memorials just mentioned, followed on 25 February 2007 by Sur-Reply Memorials.

(xvii) Pursuant to the Sole Arbitrator's directions during the Hearing, on 14 March 2007 the Claimant's expert Stephen W. Shulman filed a supplemental expert witness statement setting

forth a recalculation of the Claimant's damage claims concerning lost Brazilian preform sales, followed by written comments dated 16 March 2007 on such statement by the Respondents' expert witness Dr. Michael Salve.

(xviii) Also in accordance with the Sole Arbitrator's directions pursuant to Article 31 of the Rules of Arbitration of the International Chamber of Commerce (the « ICC Rules »), on 6 April 2007 the Parties made submissions on their respective legal assistance and representation fees and costs as well as on cost and fee allocation in this arbitration. On 12 April 2007 the Claimant sent a letter in response to the Respondents' 6 April 2007 considerations on the Claimant's position regarding allocation of legal and fees costs and the Claimant's entitlement to be reimbursed for its legal costs and fees. Also on 12 April 2007 the Respondents made a further submission regarding the allocation of costs in this arbitration and the Claimant's statement of costs.

(xix) By communication to the Parties dated 20 October 2007 the Sole Arbitrator declared these arbitral proceedings closed pursuant to Article 22(1) of the ICC Rules.

(xx) The ICC Court granted several extensions for rendering a Final Award in this arbitration, the last one, until 30 April 2008, having been notified by the Court Secretariat by letter of 21 January 2008 addressed to the Sole Arbitrator.

II. The Parties' Respective Positions

    A. Claimant's Position

1. The Parties' respective positions as provided at the point of executing the Terms of Reference are set forth below.

(a) Claimant's Claims For Relief

2. The Claimant's Claims for Relief are as follows.

First Claim For Relief

Pursuant to the Agreement, Alcoa was not permitted, except in the ordinary course of business, to modify customer payment terms from the execution of the Agreement until the closing contemplated in the Agreement, or « Closing ». Amcor contends that in contravention of the Agreement, from 1 April 2003 through the date of the Closing on 1 October 2003 (the « Closing Date »), Alcoa modified the Agreement by extending the payment terms for certain customers both in Brazil and Argentina. Amcor asserts that Alcoa did so in order to induce its customers to increase the amount of preforms they were purchasing from Alcoa prior to the Closing, and that were it not for this modification of payment terms, Alcoa's customers would not have purchased the same amount of preforms, much of which would otherwise have been purchased post-Closing. Amcor further asserts that as a direct result of Alcoa's modification of its payment terms prior to the Closing, Amcor was deprived of substantial sales from the PET Business in the months immediately following the Closing, causing damage to Amcor believed to be in excess of US$ 750,000.00.

## Second Claim For Relief

Amcor contends in this claim that Alcoa breached the Agreement by failing to disclose that an equipment lease dated 29 October 2001 with Frevo Brasil Industria de Bebidas Ltda. (« Frevo ») (such lease agreement hereinafter referred to as the « Frevo Lease ») which was being acquired from Alcoa as part of the PET Business, was substantially in arrears, that Frevo was delinquent in a number of its monthly lease payments, and that Frevo had placed Alcoa on notice that it contested the validity of the terms of the Frevo Lease and the amounts due thereunder. Amcor further contends that Alcoa, in clear violation of the Agreement, knowingly and intentionally failed to disclose to Amcor that Frevo had commenced a legal action against it or that Frevo was contesting in court the validity of both the future lease payments due as well as all past due arrears. The Frevo Lease provided for monthly payments of approximately US$ 64,700.00 and was due to run for sixty (60) months following the Closing. Amcor valued the Frevo Lease and the equipment subject to the Frevo Lease (the « Frevo Equipment ») as assets in connection with its purchase of Alcoa's PET South-American Business. Since the Closing, Amcor has not received any lease payments from Frevo. As a result of the loss of both lease payments, and the value of the lease, Amcor has been damaged in an amount believed to be in excess of US$ 3,200,000.00.

## Third Claim For Relief

Amcor's third claim is based on the failure of Alcoa to deliver to Amcor « good, valid and marketable title » to the Frevo Equipment at Closing, as represented and warranted in the Agreement. At the time of the Closing, the fair market value of the Frevo Equipment was approximately US$ 2.6 million. By virtue of having been deprived of this equipment, Amcor has been injured in an amount believed to be at least US$ 2,600,000.00.

## Fourth Claim For Relief

This claim arises from the erroneous payment by Vonpar Refrescos S/A of 608,283 Brazilian Reais (« R$ »), equal to approximately US$ 265,336.00, to Alcoa for sums which were due to Amcor. Since the commencement of this arbitration, Amcor has received the payment from Vonpar and, accordingly, this claim has been satisfied.

## Fifth Claim For Relief

This claim arises from Alcoa's failure to transfer a forklift, with a value of approximately US$ 53,000,00 to Amcor in conjunction with the sale of assets pursuant to the Agreement. Pursuant to the Agreement, Alcoa was required to transfer at the Closing all equipment used in the PET Business, including « all assets located at each facility » used in the PET Business. The forklift at issue was used by Alcoa prior to the Closing in connection with the PET Business. Alcoa has asserted that it is prepared to transfer title of the disputed forklift to Amcor. Amcor is unaware of such transfer.

## Sixth Claim For Relief

This claim arises from Alcoa's failure to disclose to Amcor prior to the Closing that it did not hold title to a certain Trine 4500 labeling machine (the « Trine Machine ») being used at a Coca Cola facility in Brasilia, Brazil, in violation of Alcoa's representation that it had « good, valid and marketable title to all of their fixed assets, respectively, free and clear of all debt, liens, charges, security interests and other encumbrances ». Amcor further claims that Alcoa failed to disclose that Alcoa was an identified third party beneficiary on a lease for the Trine Machine, and obligated to make payments thereon. Amcor has been forced to make payments in excess of US$ 100,000.00 in connection with the Trine Machine, and is entitled to recovery of that amount from Alcoa.

## Seventh Claim For Relief

This claim seeks declaratory judgment that Alcoa is responsible for various potential tax liabilities, and is obligated to indemnify and defend Amcor on these claims, all of which arise exclusively out of pre-Closing operations. Specifically, Amcor seeks a determination that Alcoa is responsible for, and obligated to defend Amcor against: 1) a pending claim by the Brazilian tax authorities for approximately US$ 5.5 million arising out of a claim for state tax on operations in the State of Rio de Janeiro; 2) a potential tax liability of US$ 793,800.00 arising out from a pre-closing resin purchase in the amount of US$ 2,835,000.00 which was not a transaction in the ordinary course of business, and which may be deemed by the relevant taxing authority of Argentina to be a dividend payment designed to avoid the imposition of Argentine withholding taxes; and 3) the failure of Alcoa to register its wholly owned subsidiary, Vinisa Fueguina S.A. under Argentine law as a tax collector of certain excise taxes, as it was obligated to do under Argentine law, which creates a potential liability of US$ 1,400,000.00.

## Eighth Claim For Relief

This claim arises from Alcoa's continuing failure to deliver good and marketable title to certain real estate located in Queimados, Brazil (the « Queimados Property »), in violation of the representation and warranty contained in the Agreement that it held good and marketable title to the Queimados Property, « free and clear of all debt, liens, charges, security interests and other encumbrances ». Amcor alleges damages in an amount believed to be in excess of US$ 655,193.00 as a result of Alcoa's failure to deliver good and marketable title to the Queimados Property.

## Ninth Claim For Relief

This claim arises from Alcoa's pre-Closing overvaluation of certain inventory in Perú in violation of its obligation to account for all assets and liabilities in « accordance with, and on a consistent basis with Alcoa's applicable accounting policies and procedures ». Alcoa overvalued the inventory by US$ 120,000.00. Alcoa has stated that it will reimburse Amcor by this amount which, if paid, will serve to moot this claim.



Tenth Claim For Relief

In this claim Amcor seeks a declaratory judgment holding Alcoa responsible for any amounts due arising out of a pre-Closing dividend declared by Alcoa on its operations in Uruguay in the amount of US$ 4.8 million (the « Uruguay Dividend »). Alcoa paid US$ 4,150,000.00 million of the Uruguay Dividend, leaving a balance of US$ 650,000.00 that may be due and owing. Although Alcoa claims that this claim is not ripe because no entity has asserted a claim for the US$ 650,000.00, it has not consented to the requested relief, leaving Amcor with a potential liability for the unpaid balance.

Eleventh Claim For Relief

In this claim Amcor seeks recovery of prevailing party legal fees pursuant to Paragraph 10.3 e) of the Agreement.

(b)    Claimant's Reply to the Respondents' Counterclaims

3. The Claimant's Reply to the Counterclaims are set forth below.

First Counterclaim

Amcor contends that this counterclaim is moot.

Second Counterclaim

Amcor contends that this counterclaim is moot.

Third Counterclaim

Prior to this arbitration, Amcor was unaware that Alcoa has paid any tax liability in excess of the amount reimbursed by Amcor. Amcor has now reviewed the relevant records and determined that a tax reimbursement of approximately US$ 14,000.00, rather than US$ 16,790.00, is the appropriate amount due from Amcor to Alcoa based on the proper currency conversion rate.

B. The Respondents' Position

4. The Respondent's position regarding the Claimant's claims is as follows.

First Claim

Alcoa denies that it modified its policies with respect to customer payment terms outside the ordinary course of business. Alcoa also denies Amcor's claim that its actions adversely affected Amcor's revenue post-Closing by encouraging customers to purchase a greater volume of preforms from Alcoa prior to Closing.

Second Claim

Alcoa denies that it failed to disclose to Amcor the existence of an equipment lease to Frevo.
Alcoa affirmatively alleges that it complied with all applicable provisions of the Agreement with
respect to disclosure of matters relating to the Frevo Equipment.

Third Claim

Alcoa denies that Amcor has been deprived of title to the Frevo Equipment. Alcoa affirmatively
alleges that Amcor acquired title to the Frevo Equipment.

Fourth Claim

Alcoa contends that this is a post-Closing matter outside the scope of this arbitration. Alcoa
further contends that, in any event, it has returned all misdirected funds that are the subject of the
claim to the entity that mistakenly paid them to Alcoa. Alcoa therefore denies Amcor's
contention that it has withheld any receivables and contends that Amcor should pursue that entity
to retrieve its funds.

Fifth Claim

Alcoa contends that this claim is moot.

Sixth Claim

Alcoa denies that it is liable to Amcor for Amcor's post-Closing payment of US$ 100,000.00 in
connection with a pre-existing arrangement that Amcor chose to extend for its own business
reasons. Alcoa denies that it was obligated to list this arrangement on a schedule of leased assets
because the commercial arrangement in question was not a lease. Alcoa also denies that Amcor
was not apprised of the arrangement.

Seventh Claim

Alcoa denies that it is liable to Amcor for the tax assessments at issue associated with the PET
facilities. With respect to the alleged Brazilian tax claims, Alcoa contends that Amcor has
assumed liability for such explicitly disclosed and scheduled payments pursuant to the terms of
the Agreement. Amcor's other tax claims consist of speculative and unripe requests to adjudicate
liabilities that have yet to, and may never, materialize and therefore are not claims that resulted
in « Losses » under the Agreement.

Eighth Claim

Alcoa denies that it failed to deliver good and marketable title to the Queimados Property.
Amcor expressly agreed to release the funds withheld from Amcor's purchase price after Alcoa
had acquired title to the Queimados Property from its previous owner. Alcoa's retention of

receivables in an amount equal to the funds withheld was explicitly approved by local Amcor management pursuant to Alcoa's satisfaction of the conditions specified in a side agreement.

Ninth Claim

Alcoa contends that this Claim is moot.

Tenth Claim

Alcoa denies that Amcor is or will be liable to any entity for the claimed amount of US$ 650,000.00. The only entity that might make such a demand, Alusud Uruguay, has already indicated that it will not do so.

Eleventh Claim

Alcoa contends that Amcor should not be awarded attorney's fees.

(b)    The Respondents' Counterclaims and Relief Sought

5. The Respondents have filed the following Counterclaims.

First Counterclaim

Alcoa contends that Amcor withheld payment of US$ 462,857.00 for equipment associated with a PET facility in Chile because the equipment had been leased to a customer. Alcoa agreed to tender payment once the equipment was back in its possession. The equipment has been returned to Amcor, but Amcor has yet to tender payment as agreed.

Second Counterclaim

Alcoa claims that Amcor has wrongfully withheld US$ 587,000.00 in payment due to Alcoa in connection with tax credits associated with the Queimados Property. Amcor was aware that the value of the tax credits has been factored into the price for the Property, but nonetheless chose for its own undisclosed business reasons to take steps to make the facility ineligible for a substantial portion of those credits. Alcoa contends that Amcor is liable to Alcoa for the agreed-upon value of the Queimados Property, including the value of the tax credits, notwithstanding Amcor's post-Closing decision to compromise the value of those credits.

Third Counterclaim

Alcoa contends that Amcor is liable to Alcoa for the full tax payment made by Alcoa in connection with its sale to Amcor of its PET facility in Colombia. The tax payment amounted to US$ 151,000.00. For undisclosed reasons, Amcor failed to pay Alcoa US$ 16,790.00 of that US$ 151,000.00. Alcoa contends that Amcor owes Alcoa the remaining amount.

### III. Quantification of the Claimant's Claims for Relief Remaining in this Arbitration

6. From a comparative examination of the Terms of Reference and the Claimant's pleadings following the Terms of Reference, the quantification of the Claimant's Claims for Relief remaining in this arbitration is as follows:

(i) <u>First Claim for Relief</u> : US$ 967,659.00 or, alternatively, US$ 912,077.00.

(ii) <u>Second Claim for Relief</u> (including claims raised by the Claimant in its Claims Memorial and decided in this Final Award – see paras. 48-54 below – to be included in the Claimant's Second Claim for Relief), consisting – as decided further under paras. 47-53 below - of the following heads of claim:

a) <u>Frevo Lease post-Closing revenues claim</u>: (y) principal amount claimed: US$ 3,100,000.00 or, alternatively, US$ 3,400,000.00; (w) pre-judgment interest on principal amount claimed: US$ 476,144.00 or, alternatively, US$ 1,407,226.00.

b) <u>Frevo Agreement post-Closing revenues claimed</u>: y) principal amount claimed : US$ 1,100,000.00 or, alternatively, US$ 1,600,000.00 ; b) pre-judgment interest on principal amount claimed: US$ 236,000.00 or, alternatively, US$ 250,000.00.

(iii) <u>Third Claim for Relief</u> : amont claimed: US$ 2,600,000.00.

(iv) <u>Sixth Claim for Relief</u>: a declaration that Alcoa is to bear and pay all maintenance costs relating to the lease of the Trine Machine (quantified in the Request in excess of US$ 100,000.00) or the sum of R$ 62,500.00 plus interest thereon from the cancellation of the lease.

(v) <u>Seventh Claim for Relief</u>: a) a declaration that Alcoa shall defend and indemnify Amcor for the Argentine Vinisa Tax Liability, estimated by Amcor in the amount of US$ 1,500,000.00; b) a declaration that Alcoa is to defend and indemnify Amcor for the Brazilian Tax Liability, estimated by Amcor in the sum of US$ 5,500,000.00.

(vi) <u>Eighth Claim for Relief</u>: Restitution of a security holdback for an amount of R$ 1,500,000.00 (approximately equivalent to US$ 655,193.00).

### IV. Findings and Determinations of the Sole Arbitrator

7. All ensuing findings, determination and conclusions have been made on the basis of and after careful review of the entire arbitral record even in absence of specific references to such record in this Final Award.

### A. The Claimant's First Claim for Relief

8. In support of this Claim for Relief, the Claimant essentially relies on the following provisions of the Agreement:

**Section 2.22.2.**       *Since March 31, 2003, through the Closing, the* **PET Business** *has been conducted only in the ordinary course and there has not been any:*

*(.....)*

*(h) alteration of policies with respect to the payment of accounts payable and the collection of accounts receivable;*

*(....)*

9. The Respondents rely on the following text found in different provisions of the Agreement :

**8.2.  <u>Indemnification by Buyer.</u>** *Subject to Section 8.4(b) hereof,* **Buyer** *hereby indemnifies and agrees to promptly defend and hold harmless* **Sellers** *from and against any and all* **Losses** *incurred by* **Sellers** *resulting from any of the following:*

*(a) any inaccuracy in, or breach of, any representation or warranty made by* **Buyer** *herein or in any Exhibit, Schedule, document or agreement executed by* **Buyer** *and delivered to* **Sellers** *and/or* **Alcoa** *pursuant hereto;*

*(b) any breach of any covenant or agreement of* **Buyer** *contained herein or any Exhibit, Schedule, document or agreement executed by* **Buyer** *and delivered to* **Sellers** *and/or* **Alcoa** *pursuant hereto (......)*

**8.3. <u>Administration of Claims</u>**

*(a) Whenever any claim shall arise for indemnification under this Section 8, the party entitled to indemnification (the «***Indemnified Party***») shall promptly notify the other party ( the « Indemnifying Party ») of the claim and, when known, the facts constituting the basis for such claim. In the event of any claim for indemnification thereunder resulting from or in connection with any claim or legal proceeding by a person who is not a party to this* **Agreement** *(a « ***Third Party Claim***»), such notice shall also specify, if known, the amount or a good faith estimate of the amount of the liability arising therefrom. The foregoing notwithstanding, the lack of notification by* **Buyer** *to Seller or viceversa shall not exempt* **such a Party** *from their indemnification obligations hereunder.*

*(b)The* **Indemnified Party** *shall not settle or compromise or voluntarily enter into any binding* **Agreement** *to settle or compromise or consent to entry of any judgment arising from, any such claim or proceeding except in accordance with this Section. With respect to any* **Third Party Claim,** *the* **Indemnifying Party** *shall undertake the defense thereof by representatives of its own choice reasonably satisfactory to the* **Indemnified Party; provided, however,** *that the Indemnified Party will be entitled to defend, rather than tendering defense, of any Third Party Claim from a current and/or continuing customer that, for reasons of the nature of the dispute /and/ or the importance of the customer it considers commercially sensitive (a* **Commercially Sensitive Claim** *») (.....).*

**8.4. *Limitation on Indemnification Obligation***

*(........................................)*

***(e)*** *For the avoidance of doubt, in determining the liability of an **Indemnified Party** for losses hereunder, only the actual losses incurred by **Indemnified Party** shall be taken into account and not any potential or actual reduction in value of the **PET Business** and **Indemnifying Party** shall in no event be liable for any consequential damages including but not limited to lost profits and other business opportunities or any internal costs and expenses incurred by **Indemnified Party** or the **PET Business.** »*

10. The Claimant contends « *....that in the months prior to closing Alcoa intentionally pushed sales and that Alcoa experienced a dramatic increase in sales which resulted in a corresponding decrease in the sales by Amcor after closing(...) so Alcoa either collected on these extended sales from its customers prior to closing or collected these sums from Amcor at closing in the form of inventory...* » in violation of Section 2.2.2. of the Agreement[1]. To achieve this result, the Claimant further contends that, in disregard of its « *long-standing credit practices and policies* » (essentially during the three months preceding Closing) Alcoa removed credit ceilings and eased credit terms and conditions normally applicable to customers.

11. The Claimant argues that Section 8.2 of the Agreement and indemnification provisions thereunder only apply to third-party claims, i.e., when the buyer or « Indemnified Party » is subject to a third-party claim and the seller, or « Indemnifying Party » is called to indemnify or defend the buyer from such claim. Thus, other related provisions in the Agreement (such as Section 8.3.) and particularly Section 8.4 (e) of the Agreement excluding liability for lost profits, do not apply when the claim against the seller (Alcoa) is not a third-party claim but a direct claim brought by the buyer (Amcor) for a breach of covenant, including a breach of Section 2.22.2 of the Agreement.

12. According to the Respondents, there is no room for such a narrow reading of Section 8 of the Agreement, which would cover both seller's obligations to indemnify buyer for direct breaches of covenants or representations and warranties by the seller and third party claims brought against the buyer as a result of such or other breaches of the Agreement committed by the seller.

13. Under New York law (Court of Appeals of New York, *R/S Associates et al. v New York Job Development Authority* 98 N.Y.2d 29, 771 N.E.2d 240) words in a contract should be given their plain meaning. According to the Appellate Division, First Department, New York (*Hernán López et al. v Fernandito's Antique Ltd., et al.* 305 A.D.2d 218):
« *The objective of contract interpretation is to « determine what is the intention of the parties as derived from the language employe* » (cit. omitted). *Clear and unambiguous terms should be understood in ordinary, popular and non-technical meaning* ».

---

[1] Hearing transcript, 5 March 2007, at 95.

14. The Webster's II New Collegiate Dictionary defines as follows the verb « *indemnify* » :

« *To protect against damage, loss or injury. To make compensation for damage, loss or injury* »

In turn, the Black's Law Dictionary defines « *indemnify* » as follows[1] :

« *To reimburse (another) for a loss suffered because of a <u>third party's or one's own act or default</u>* »[2]

« *Indemnity* » is successively defined in this Dictionary as follows:

« *A duty to make good any loss, damage or liability incurred by another(...)* »

« *The right of an injured party to claim reimbursement for its loss, damage or liability from a person who has such a duty (....)* »

15. Such definitions do not necessarily or automatically limit the duties to indemnify under an indemnification stipulation to the compensation of damages or losses arising from third-party claims. Such duties may also extend to the compensation of direct damages or losses suffered by one contracting party (or Indemnified Party) because of the breach of covenants or representations and warranties by another (or Indemnifying Party) not resulting from the existence of third-party claims against the Indemnified Party or duties or liabilities from the Indemnified Party vis-à-vis « third persons ».

16. Against such backdrop, the broad and open-textured wording set forth in Section 8.2.(a) and (b) of the Agreement (reproduced in para. 9 above) may not be read only or just as referring to an indemnification obligation extended by Seller to Buyer in respect of possible third-party claims against Buyer the existence or filing of which would constitute a breach of covenants or warranties issued by the Seller to the Buyer under the Agreement and is to be read also as covering « direct » claims from Buyer to Seller for breach of covenants or representations and warranties from Seller to Buyer. Section 8.3. (a) of the Agreement setting forth a mechanism for notifying the existence of claims confirms this interpretation since it distinguishes « Third Party Claims » or claims from a person not a party to the Agreement from other claims.

17. Although Section 8.3.(a) of the Agreement also requires the indemnified party (e.g., Amcor) to promptly notify the indemnifying party (e.g., Alcoa) of the existence of direct claims from Amcor against Alcoa together with « *....the facts constituting the basis of such claim...* », such requirement is not – contrarily to Amcor's suggestion[3] - superfluous, « ridiculous » or incompatible with reading Section 8.2 of the Agreement as covering both direct claims between the parties for breach of covenants or representations and warranties and « indirect » claims

---

[1] Eighth Edition, 2004, at 783-784.

[2] Sole Arbitrator's emphasis.

[3] Amcor's Opening Statement, Hearing transcript for 5 March 2007, at 26-27.

between them (or claims from Amcor againt Alcoa originated in third party claims against Amcor). A reasonable interpretation would indicate that the requirement to give notice also of « direct » claims from one against the other could have the salutory effect of opening formal and informal venues for clarifying matters giving rise to differences, negotiations and perhaps peaceful settlement of disputes by the parties prior to or instead of submitting their differences to an adversarial proceeding such as arbitration.

18. The fact that Section 8.3 (a) of the Agreement further indicates that failure to provide such notice does not exempt the Indemnifying Party from its indemnifying obligations (and thus does not impair the Indemnified Party's right to go to arbitration) militates in favor of such interpretation. Accepting – as Amcor does[5] - that despite its opening sentence, Section 8.3.(b) of the Agreement only covers Third Party Claims, does not necessarily limit the rest of Section 8 to just indemnification obligations relating to Third Party Claims. Further, even in respect of « direct » claims the Indemnified Party's settlement or striking of compromises with third parties in connection with such claims is not indifferent to the Indemnifying Party (for instance, if such settlement or compromise could adversely affect the Indemnifying Party's rights to have recourse to a guarantor or an insurance company).

19. In light of the foregoing considerations, the Sole Arbitrator concludes that the Agreement's Section 8.4 (e) limiting an Indemnified Party's right to be compensated by an Indemnifying Party applies both to « direct » claims and « indirect » or Third Party based claims, and because of such limitation, an Indemnifying Party is not liable for lost profits under any such claims. The Claimant has characterized its First Claim for Relief regarding « pushed » or lost sales – rightly so – as lost profit claims resulting from sales allegedly lost to Amcor as a result of Alcoa conduct in breach of the Agreement[6]. A similar characterization of the Claimant's First Claim for Relief as lost profit claims is found in Mr. Stephen W. Shulman's expert witness statement of 13 November 2006 issued in support of Amcor's claims (such opinion, together with Mr. Shulman's opinion set forth in his reply expert witness statement dated 12 February 2007 hereinafter collectively referred to as the « Shulman Opinion »)[7]. Alcoa not being liable under Section 8 of the Agreement for lost profits derived from breach of covenants or representations and warranties thereunder, Amcor may not be allowed to prevail on its First Claim for Relief.

20. The findings and conclusions set forth above suffice to reject Amcor's First Claim for Relief, However, the Parties and their experts have devoted much time and effort to present their opposing positions as to whether in the pre-Closing period Alcoa departed from its existing business practices and policies and, thus, whether Alcoa should be liable for orchestrating « pushed sales » permitting it to unduly benefit from preform sales in Argentina and Brazil to the detriment of Amcor. Since the Parties have hotly debated this issue, the Sole Arbitrator believes he has the duty to set forth his findings in this respect, also adverse to allowing Amcor's First Claim for Relief.

---

[5] Amcor's Opening Statement, Hearing transcript for 4 March 2007, at 26.

[6] Amcor Claims Memorial, at 57.

[7] Mr. Shulman's first expert written statement, No. 2 at 1.

21．In support of its claims regarding lost preform sales in Argentina and Brazil after the Closing, the Claimant relies essentially on the Shulman Opinion and testimony from Mr. Matsumoto, Mr. Maggio and Mr.Vaz.

22. According to the testimony of Mr. Ricardo Vaz, Alcoa Aluminio S.A.'s Sales Manager until October 2003 (and since then employed by Amcor), the following Brazilian customers of Alcoa's Brazilian PET business enjoyed the following extensions of payment terms for June, July, August and September 2003 which deviate from Alcoa's standard practices:

(i) Convençao S.Paulo de Beb. E Conexos Ltda.: extensions ranging between 96 and 110 days (when over the previous three years such extensions had not exceeded 60 days);

(ii) Refrigerantes Convençao Rio Ltda.: extensions ranging between 105 and 147 days (when over the previous three years extensions did not exceed 75 days);

(iii) Refrigerantes do Triangulo Ltda.: extensions ranging between 71 and 92 days (when over the previous three years extensions did not go beyond 42 days);

(iv) Forro-Ind.Com.Prod.Alim.Bebidas Ltda.: extensions ranging between 45 and 75 days (when in the previous three years only one extension had extended to 45 days and the remaining were shorter);

(v) Sidney Dorre-Indust. De. Refrigerantes Ltda.: was granted in September 2003 a payment exension of 133 days when over the previous three years it enjoyed only one extension going up to 90 days and the remaining were shorter;

(vi) Sidore-Ind Com De Refrigerantes Ltda.: also enjoyed extended payment terms in September 2003 of 133 days, when in the previous three years only once a payment extension going up to 45 days and the rest were shorter; and

(vii) RV Nor Ind. E.Com.De Bebidas Ltda.: was provided with extended payment terms in July and August 2003 going to 90 days for each such month (when in the previous three years this customer was never granted extensions exceeding a 28-day period)[8].

In his witness statement, Mr. Baz relies on and cross-refers to the Claimant's Exhibit 66 setting forth payment terms for each customer's preform sales in Brazil for the periods considered.

23. The Claimant points out that average payment terms for all Alcoa preform sales in Brazil and Argentina for 2003 and for all Alcoa 484 customers in such countries do not show variations that may be globally considered as a historic departure from 2001-2003 payment terms average for preform sales in such countries[9]. However – the Claimant argues - payment terms were

---

[8] Vaz witness statement of 13 November 2006, at 4-5.

[9] Claimant's Exhibits 18 and 20 attached to the Shulman Opinion.

extended significantly for some of the 7 Argentine customers considered in the Shulman Opinion and most of the 7 Brazilian Alcoa customers in Brazil considered in Mr. Baz witness statement mentioned above and the Shulman Opinion, and that preform sales for such customers registered a substantial increase during September 2003; i.e., shortly before the Closing Date. As was made clear during the Hearing, the Claimant's analysis as to pre-Closing extended payment terms regarding such Argentine and Brazilian PET Business customers was actually and finally focused and exclusively narrowed down to the months of June-September 2003 (the « Pre-Closing Period »)[10].

24. The Shulman Opinion contends that actual pre-Closing August and September 2003 preform sales in Argentina and Brazil were abnormally high when compared with projected sales. The difference between projected and actual sales is the yardstick to measure the Claimant's damages originated in Alcoa's alleged breach. The Shulman Opinion is premised on the analysis of prefrom sales to seven Brazilian customers and seven Argentine customers – considered by Mr. Shulman as « ....key customers... » - and payment terms of the price for such sales granted by Alcoa to each such customer.

25. Mr. Shulman confirmed the Claimant's position that the allegedly abnormal increase in preform sales during August and September 2003 was caused both by extending the payment terms granted to preform customers in Argentina and Brazil and releasing credit ceilings otherwise applicable to such customers between June and September 2003[11]. In reaching such conclusion, Mr. Shulman accepts that he did not carry out an analysis establishing a causal nexus between payment terms and sales on one hand and what he characterizes as an abnormal increase in preform sales during the period being considered. However, he asserts that his analysis permits to prove that no other factor in the market place could have caused the increase in Alcoa's preform sales for Argentina and Brazil for the months of August and September 2003[12]. As a corollary, he concludes that only Alcoa's variation of payment terms and credit ceilings accounts for such increase.

26.  During the Hearing, Mr. Shulman said that the spike in Alcoa's preform sales during the Pre-Closing Period is not explained by changed market circumstances, since historically and during such period Alcoa's sales followed the marketplace conditions concerning the soft drink and mineral water sales, and such history and market conditions during August-December 2003 does not account for the alleged increase in Alcoa's preform sales in Argentina and Brazil, particularly in September 2003. Although he admits that at times during the August-December 2003 period Alcoa's preform sales in Argentina and Brazil also experienced a decrease, he explains that such decrease is the consequence of abnormal increase in sales during the previous month or months prompted by relaxed payment and credit conditions granted to customers for

---

[10] Claimant's closing oral statement, Hearing transcript, 9 March 2007, at 799.

[11] Hearing transcript, 6 March 2007, at 302. Claimant's counsel closing argument, Hearing transcript, 9 March 2007, at 798-799.

[12] Hearing transcript, 6 March 2007, at 304-306.

such period and that, in any case, the volume of such sales (for example, in September 2003) was larger that the volume of preform sales in September 2001 or 2002[13].

27. Mr. Shulman's analysis went through roughly two steps. As he explained during the Hearing when responding to questions from counsel and the Sole Arbitrator, as a first step he carried out what he designated as a « *regression* » or seasonality analysis, which would permit to track historic patterns for the sales of preforms in the Argentine and Brazilian markets. Such analysis, aimed at determining a pattern for Alcoa's actual regular cycle of actual preform sales or ordinary course of Alcoa's preform business in Argentina and Brazil during the period or periods under consideration, would also reflect the fluctuation in such sales for seasonality reasons. Mr. Shulman categorically asserts that such analysis was not used to forecast future sales, since the August through December 2003 sales were already known and permitted to establish the actual preform demand in such markets for such four month period[14]. As a result of such regression analysis, Mr. Shulman came up with what he characterized as an « adjusted monthly seasonal index » for Alcoas's preform sales in Argentina and Brazil for the months being considered. Essentially, he compared monthly sales in 2001 and 2002 with monthly sales in 2003, including September 2001, September 2002 and September 2003.

28. As a next step, Mr. Shulman compared Alcoa's actual preform sales for August-September 2003 with the adjusted monthly seasonal index for Alcoa's 2001 and 2002 preform sales coresponding to the months being considered (e.g., September 2001 and 2002). The difference between actual sales for the 2003 period prior to Closing under analysis and sales actually expected to take place on the basis of the seasonality analysis carried out for the same period in 2001 and 2002 yields (for example, if comparing seasonality for September 2001 and 2002 with actual sales in September 2003) the excess sales Alcoa benefitted from in such period through the extension of payment terms and the relaxation of credit ceilings prior to Closing applicable to Brazilian and Argentine customers, and that Amcor was deprived of had Alcoa not resorted to such practices to increase its pre-Closing sales. Mr. Shulman indicated that preform sales for the fourteen customers covered by his analysis represented approximately 17.20 % of Alcoa's preform sales in Argentina and Brazil prior to Closing during the period. However, in the case of Argentina, such sales would have represented, in September 2003, 58 % of the total Argentine preform sales for such month[15].

29. The Respondent relies on the expert opinion of Dr. Michael P. Salve (the « Salve Opinion ») to refute the Shulman Opinion. Based on reports on sales for 2002-2003 of PET packaging resin used as an essential input in the manufacturing of PET Products for South America published in a monthly newsletter issued by Tecnon OrbiChem, Dr. Salye identifies different factors accounting for the fluctuation of demand of PET products impacting on the demand of PET packaging resin, such as warmer weather in Brazil, economic crisis in Argentina, arrival of the summer/winter season, political instability in Brazil related to forthcoming

---

[13] Hearing transcript, 6 March 2007, at 307-320, 356.

[14] Hearing transcript, 6 March 2007, at. 300.

[15] Hearing transcript, 6 March 2007, at 338-343, 377.

elections, high unemployment and stagnant economy in Brazil. These reports finally characterized 2003 as a year without growth in the PET products industry in Brazil[16]. Dr. Salve concludes that the Shulman Opinion has failed to take into account such variables, fluctuating from month to month and affecting market conditions. Since the Shulman Opinion does not attempt to directly correlate sales volumes and payment terms, Dr. Salve concludes that Mr. Shulman's analysis and measurement of damages fails[17].

30. Dr. Salve also points out that the 7 Brazilian customers selected by Mr. Shulman to carry out his analysis account only for 17 % of Alcoa's total preform sales in Brazil in 2003. Although in the case of Argentina the seven customers selected account for 77.3 % of Alcoa's 2003 preform sales for Argentina, the largest customer (Quilmes BAESA), representing 44.4 % of such sales, had payment terms unchanged from July through November 2003. The Salve Opinion thus suggests that the customer sales selected by Mr. Shulman to carry out his analysis is not sufficiently demonstrative of the fluctuations in the pre-Closing sales of preforms attributed by Mr. Shulman to variations in the payment terms/credit ceilings granted by Alcoa[18].

31. Dr. Salve further points out that, in addition to the different climatic, economic and political factors not specifically taken into account by Mr. Shulman, there are months when sales to large customers increase despite a decrease in payment terms or vary substantially from month to month while payment terms remain constant. Dr. Salve emphasizes that Mr. Shulman failed, by not providing statistical support correlating payment terms with preform sales volume, to establish a causal relationship between payment terms and sales volumes.

32. In support of his analysis, Dr. Salve looked at each of the seven Brazilian customers taken into account by Mr. Shulman to draw his conclusions, with the following result[19]:

(i) Refrigerantes Convençao Rio: although for January-September 2001 payment terms remained constant at 28 days, sales volumes fluctuated from 7.1 million to 2.2 million. In April 2003 payment terms increased from 29 to 72 days while sales volumes decreased from 3.5 million to 2.1 million. For August-September 2003 payment terms first decreased and then increased, each with increases of sales volumes;

(ii) Refrigerantes Do Triangulo Ltda.: sales volumes fluctuated considerably though December 2000-May 2001 while payment terms remained constant;

(iii) Refrigerantes Maraja Ltda.: sales volumes fluctuated between March 2002 and January 2003 while payment terms remained constant. For July, August and September 2003 payment terms

---

[16] Salve Opinion, at 4-10.

[17] Salve Opinion, at 11.

[18] Salve Opinion, at 11-13.

[19] Salve Opinion, at 15-16.

successively increased and decreased while sales volumes continued to decrease along the same period;

(iv) Sidore-Ind Com de Refrigerantes Ltda.: payment terms remained constant at 30 days for the October 2000 to August 2002 period while sales volumes fluctuated (increased) between October 2001 and March 2002;

(v) Convençao S. Paulo Ltda sales for the months of July, August and September 2003 decreased while payment terms first increased and then decreased;

(vi) Sidney C. Dore-Indust.De Refrigerantes Ltda's sales volume increased between October 2002 and April 2003 while payment terms remained constant; and

(vii) Forro saw a fluctuation in sales volumes between June and August 2001 while payment terms remained constant.

33. Dr. Salve also looked at each of the Argentine customers considered by Mr. Shulman (although Mr. Shulman indicated during the Hearing that he had excluded Quilmes Baesa from his damage calculations[20]), as follows[21]:

(i) Quilmes-Baesa payment terms remained constant from May to December 2001 while sales volumes fluctuated considerably during the same period. For July-November 2003 payment terms remained constant while sales volumes fluctuated considerably;

(ii) Coca Cola Polar's payment terms remained practically unchanged from August 2000 to December 2001 while sales volumes fluctuated considerably during the period or in the six month period following it (through May 2002 despite payment terms set at 15 days;

(iii) Reginald Lee's payment terms during the twelve month period through December 2001 remained unchanged despite an abrupt change in volumes sold during the same period. The same is true for the period between June 2002 and April 2003;

(iv) Licores Nordeste's payment terms for July 2002 and April 2003 and September and November 2003 remained constant despite substantial variations in sales volumes;

(v) Coca Cola Femsa's payment terms increased between April and June 2003 although sales volumes drecreased during the same period;

(vi) available data for Producto de Agua show that sales volumes for 2002 and 2003 were not determined exclusively by payment terms; and

---

[20] Hearing transcript, 6 March 2007, at 348-353

[21] Salve Opinion, at 16-17.

(vii) Eco de los Andes's payment terms remained constant between October 2002 and March 2003 while sales volumes decreased. Although between July and November 2003 it benefited from extended payment terms, sales volume fluctuated withing the period between 0.4 and 0.9 million.

34. Mr. Baz testified that he had negotiated extension of payment terms and release of credit limits only in connection with the Brazilian customers referred to in his witness statement[22]. Although Mr. Shulman indicates that he considered both the alleged impact of extended payment terms and release of credit limits on preform sales to such customers and 7 Argentine customers, the Shulman Opinion essentially concentrated its analysis of the impact of extended payment terms on increased sales. Specifically, Mr. Shulman confirmed that as far as Brazil is concerned he relied on Mr. Vaz witness statements and that his analysis did not extend to the 484 Alcoa preform customers for Brazil and Argentina[23].

35. Therefore, it is in order to look first at the information provided by the Claimant in its Exhibit 66 regarding the Brazilian market, that reflects collections reports provided by Alcoa by comparing sales payment terms data from years 2000-2003, and upon which both Mr. Vaz's testimony and the Shulman Opinion relied. Although the Claimant stated that: « *Other Brazilian clients beyond the specific examples given by Vaz were also provided with extension of credits and afforded an increased buying power that required the enlargement of their payment terms* »[24] and Mr. Shulman testified, when asked about whether the Alcoa preform customers in Brazil taken into account in his Opinion were limited to the seven customers identified by Mr. Vaz he answered that[25]:

« *No. It's about – it is a calculation of them plus others that -*

**_Question_** : *And do we know which others ?*

**_Answer_** : *We didn't identify in our report which others* ».

36. Mr. Shulman did clarify that his *damage* analysis was not limited to such customers, but included all of Alcoa's customers for the period October-December 2003 and Amcor's customers for the period October 2003-December 2003[26]. However, for determining whether *extended payment terms* granted to preform customers in Argentina and Brazil deviate or not from Alcoa's past practices, the information in the record concerns such fourteen customers only. Thus, only such information for which evidence has been joined to the record – i.e., the

---

[22] Vaz witness statement, at 3-4.

[23] Hearing transcript, 6 March 2007, at 304

[24] Amcor Reply Claims Memorial, fn.1 at 4.

[25] Hearing transcript, 6 March 2007, at 341.

[26] Hearing transcript, 6 March 2007, at 346.

fourteen Brazilian and Argentine customers identified below - will be considered in the making of findings and the elaboration of conclusions in this Final Award at least in connection with whether extension of payment terms in the Pre-Closing Period – June-September 2003 – constituted or not a conduct of Alcoa's PET Business for Argentina or Brazil not « ....*in the ordinary course...* » or « *.....an alteration of its [Alcoa's] policies with respect to the payments of accounts payable and the collection of accounts receivable....* ».

37. Consequently, the first task of the Sole Arbitrator is to determine if the extension of payment terms and relaxation of credit limits invoked by the Claimant in connection with such customers constitute a departure from Alcoa's current business practices or policies or are not in the ordinary course of the PET business. Only if such answer is an affirmative one it is to be determined whether such increase or relaxation caused an unwarranted pre-Closing increase in preform sales in Brazil or Argentina for such customers, a matter at the center of the Shulman and Salve Opinions. When carrying out his analysis of Alcoa's business practices as to payment term extensions granted to Alcoa's preform customers in Argentina and Brazil, the Sole Arbitrator shall take into account, on a comparative basis, all annual information made available to him, that in the case of the Brazilian customers exclusively covers years 2000-2003, and in the case of the Argentine customers only covers years 2001-2003. In the view of the Sole Arbitrator, a comparison of information in the record limited to the years 2002 and 2003 is not sufficiently indicative of a departure of Alcoa's existing practices or policies as to the granting of payment terms to preform customers in Argentina or Brazil.

38. An analysis of the available information regarding Brazilian customers in the Claimant's Exhibit 66 referred to before leads to the following findings in respect of whether the extension of payment terms granted departs or not from prior Alcoa's business practices:

(i) In the case of Sidney C. Dore Indust. De Refrigerantes maximum extensions of payment terms in June (45 days); July (45 days); August (50 days) 2003 do not appear as excessive or unprecedented (e.g., in 2002 such extensions went up to a 70-day maximum for each of the same months, which represented more than a 100% payment terms increase in respect of June-August 2001). Although in September 2003 the maximum extension went to up to 133 days, it is observed that it does not appear to have been historically unusual to see payment maximum extensions for such customer and for such month substantially exceed those granted for the same month in the preceding year (e.g., a maximum extension of 90 days was granted in September 2001, when the maximum credit extension for such customer in September 2000 went only up to 30 days). Although average payment terms extensions for September 2003 for this customer substantially exceeded the corresponding average payment terms extensions it enjoyed in previous years, this is not equally true for the months of June, July or August 2003. Thus, no conclusive finding that there was a Pre-Closing Period deviation from Alcoa's existing practices may be made on the basis of this information.

(ii) The case of Refrigerantes Maraja Ltda. does not support the Claimant's position. Historic data in the record show that although the maximum and average payment terms for preform sales for this customer in 2003 are in general more extended than in 2002, this phenomenon is not limited to June-September 2003 and is also present in the preceding 2003 months (prior to

the Pre-Closing Period), which suggests the adoption of a payment terms or credit strategy in connection with this customer unrelated to the Closing.

(iii) In the case of Convençao S. Paulo Ind. De Beb. e Conexos Ltda., maximum payment terms for June 2003 almost doubled those granted to this customer in June 2002. Although payment terms for this customer averaged 60 days in this latter month, the average for June 2003 went up to 95 days. However, a comparison of data for June 2001 and 2002 already showed an increase in maximum and average payment terms for this customer in the range of 100 % or more for such month from one year to the other. Also, in September 2001 maximum payment terms reached 60 days and averaged 39 days, while in September 2000 maximum and average payment terms equaled 12 days. Finally, a comparison between maximum payment terms between 2000 and 2001 for June-September shows increases in payment terms often doubling or more than doubling payment terms for such months between 2000 and 2001. If one looks at average payment term increases by comparing both years and months, the same trend (except for June) is noticed. Such fluctuations suggest the existence of seasonal or other factors concerning this customer which may be present for such month of the year leading to exceptional extensions of payment terms. Thus, the information available does not permit to conclude that, in the case of this customer, Alcoa deviated during the Pre-Closing Period from its past current credit practices as to payment terms prompted by the sale of its Brazilian preform business to Amcor.

(iv) As far as Refrigerantes Convençao Rio Ltda. is concerned, although in June-September 2003 maximum and average payment terms for this customer were very substantially extended when compared with payment terms for this customer for the same months in 2002, this phenomenon is by no means unprecedented, since the same may be said when comparing payment terms for this customer in 2000 and 2001. Thus, the information provided does not permit to conclude that Alcoa deviated from its previous business practices in connection with this customer.

(v) Although it may be observed in respect of Refrigerantes do Triangulo Ltda. that maximum and average payment terms for this customer in July-September 2003 grew very substantially when compared to similar information for the same 2002 months, the same may be said for July-August 2002 when compared to July-August 2001. Even assuming (it is not clear if blanks showing on Exhibit 66 signify lack of availability of payment terms information for such month and year for such customer) that in September 2002 no payment terms extensions were granted to this customer (which contrasts with the 71-day maximum extension granted to it in September 2003), extensions were granted to this customer in September 2000 and September 2001, although not exceeding a 28 day maximum. On the basis of this information, the Sole Arbitrator is not prepared to conclude that the absence of payment term extensions in 2002, or the difference between maximum time extensions granted to this customer in 2000, 2001 and 2003, or the other information provided in connection therewith, denote a departure by Alcoa of its previous business practices regarding this customer.

(vi) For the months of June-September 2003 increases in the extension of average and maximum payment terms granted to Sidore-Ind. Com.de Refrigerantes Ltda. was of some significance for August and significantly higher for September when compared to similar months in 2002. However, when comparing the same years, this customer was historically granted substantially extended maximum and average payment terms for January, February, April and May, and such

trend was maintained through the end of each year. Although particularly in September 2003 the extension of payment terms for this customer was significant, and when comparing August 2002 and August 2003 average extension of payment terms for this customer went from 30 to 40 days, such isolated circumstances do not suffice to concluding on a departure by Alcoa of its ongoing business practices prior to the Pre-Closing Period.

39. A similar analysis carried out in respect of Alcoa's Argentina preform sales (based on average payment terms estimates relied upon in Mr. Shulman's opinion of 13 November 2006) yields the following findings:

(i) According to the Claimant, preform sales payment terms to Eco de los Andes during the Pre-Closing Period fluctuated between 35 and 45 days, whilst in June-August 2002 they remained constant at 15 days and no extension was granted for September 2002. However, in June-September 2001 preform sales payment terms for this customer remained constant at 45 days (in accordance with the maximum range reached in the Pre-Closing Period)[27]. In the opinion of the Sole Arbitrator, Pre-Closing Period payment terms for 2003 may not be characterized as a departure from Alcoa's business practices just because they do not mirror payment terms for preform sales during the previous year.

(ii) In the case of Licores Nordeste, Pre-Closing payment terms for June-September 2003 oscillated between 21 and 30 days, whilst in 2002 they oscillated between 15 and 20 days. Not only does there seem to be no abrupt departure between practices regarding the granting of payment terms to this customer for these same months in 2002 and 2003, but payment terms for this customer for June-September 2001 fluctuated between 30 and 32 days (superior to 2003)[28]. No departure from previous Alcoa's business practices may be detected in respect of this customer either.

(iii) Payment terms for Reginald Lee for June-September 2003 varied between 54 and 60 days, which almost doubled payment terms of 30 days uniformly granted to this customer for the same period in 2002. However, in 2001 this customer enjoyed uniform payment terms of 60 days, not only for June-September 2001, but for all of 2001[29]. It should be noted that there is no objective evidence in the record permitting to relate extended payment terms for 2001 for this or other Alcoa Argentine preform customers to the extreme Argentine financial crisis affecting the Argentine economy, since although the financial situation of Argentina was already deteriorating in 2001 and even before, the crisis erupted only in December 2001 and peaked in 2002, when the real downturn in the Argentine economy took place[30]. Further, the Sole Arbitrator is unable to conclude on a deviation from Alcoa's business practices regarding the granting of payment term extensions just by looking at historical data concerning one year only.

---

[27] Claimant Exhibit 11.

[28] Claimant Exhibit 12.

[29] Claimant Exhibit 13.

[30] Mr. Shulman's expert opinion of 13 November 2006, at 7-8.

(iv) Payment terms for Coca Cola Polar for Pre-Closing Period months June-August 2003 fluctuated between 15-17 days, which did not differ substantially from payment terms of 10-19 days granted to the same customer for the same months – of 15-19 days – for the same 2002 period. Such payment terms for September 2003 extended to 39 days, whilst they only went to 15 days in September of the previous year. However, throughout 2001 such payment terms remained uniform for this customer at 60 days [31] (as indicated before, since the existing record in this arbitration does not permit to conclude on an Argentine financial crisis adverse impact on PET Argentine Business payment terms before December 2001, those extended payment terms may not be objectively explained because of the critical situation of Alcoa Argentine preform customers allegedly prompted by the crisis). Thus, the historic information available does not permit to conclude that Alcoa departed from its existing payment terms practices in connection with this customer either.

(v) The same considerations set forth under preceding subparagraph (iv) lead to the same conclusions in connection with Coca Cola Femsa, with payment terms for June-September 2003 fluctuating between 33 and 56 days and uniform 60-day payment terms throughout 2001 [32].

(vi) Mr. Shulman acknowledged that Quilmes/Baesa was not included in his damages computation because Quilmes/Baesa continued to buy under a five-year contract granted to this customer fixing its payment terms after Closing [33]. However, information regarding this customer is not supportive of Claimant's arguments that Argentine customers' payment terms during the Pre-Closing Period departed from Alcoa's policies. Section 5.5. of the Agreement (listing the « *Conditions to Obligations of Buyer* ») evidences the approval by Amcor of terms and conditions applicable to Quilmes/Baesa. This Section provides that « *The supply contract with Baesa in Argentina shall have been renewed in a manner consistent with the discussions of the parties and the draft dated June [3], 2003, a copy of which has been provided to the Buyer* ». There is no objective evidence in the record suggesting that the Quilmes/Baesa contract finally entered into with Alcoa did not comply with such draft or terms and conditions. There is no objective evidence either that Amcor resorted to this provision not to honor or to repudiate its obligations as Buyer under the Agreement (e.g., by alleging that the contract finally entered into with Quilmes/Baesa was « *not consistent with the discussions of the parties* »), or any reasonable explanation for Amcor finally signing the Agreement without objecting to such provision despite Amcor's Vice President and General Manager, Diversified Products Division Mr. Kirby Losch's testimony that he « *....specifically told Alcoa that we found the terms in general being offered to Baesa to be unacceptable* »[34]. It has not been disputed that this customer represents nearly half of the 2003 combined volume of preform sales of the 14 costumers selected by Amcor as basis for

---

[31] Claimant Exhibit 14.

[32] Claimant Exhibit 15.

[33] Claimant Exhibit 16.

[34] Losch Reply Witness Statement, no. 37 at 16.

its claims for both the Brazilian and Argentine markets". The record shows that: (i) the Quilmes/Baesa preform sales contract terms and conditions were subject to analysis by and discussions between Amcor and Alcoa prior to the execution of the Agreement; and (ii) those discussions concerned pricing but not payment terms". According to Mr. Shulman's analysis, such payment terms for the pre-Closing, June-September 2003 period, fluctuated between 39 and 45 days. However, although for the same period in 2002 payment terms for this customer fluctuated between 15 and 30 days, in 2001 payment terms remained fixed at 45 days from April to December 2001. The fact that Amcor did not object to the extended payment terms granted to this customer during the Pre-Closing Period despite being substantially longer than (and some of them more than doubling) those granted to the same customer for the same period in 2002 evidences that such extensions, for this or any other customer of the South American PET Business under consideration, do not constitute a deviation from Alcoa's past business practices.

40. Only in the case of the Brazilian customer Forro Inc. Com. Prod. Alim. Bebidas Ltda., although average payment terms for June 2003 were shorter than for June 2002, average and maximum payment terms in July-September 2003 appear considerably higher than payment terms for the same months in 2001-2003". However, the payment terms information provided in connection with this customer does not appear to cover the months of July-August 2002 and 2003, nor the months of June-September 2000, a circumstance rendering difficult a historic comparison of payment terms. Be it as it may, the isolated situation concerning this customer does not permit to conclude that the extension of payment terms for the remaining 13 Brazilian and Argentine customers referred to above or the entire 484 customers in both the Brazilian and Argentine Alcoa prefrom markets constituted a deviation of historic Alcoa's payment terms practices as an Alcoa pre-Closing strategy to make gains on preform sales that would have otherwise corresponded to Amcor. Finally, there is no serious allegation or support either for the proposition that Alcoa deviated from general market standards for the conduct of PET businesses – including payment term standards applied to customers - in South-America or elsewhere.

41. The next issue is whether pre-Closing overrides of credit limits deviated from Alcoa's existing business practices. Since there is no evidence that Pre-Closing Period credit limit overrides were granted to Alcoa's Argentine customers despite the fact that apparently the Shulman Opinion relied on the existence of such overrides in connection with both Argentine and Brazilian preform customers, only Brazilian customers will be considered.

42. In this respect, Mr. Tiniti Matsumoto, Jr., former General Manager of Alcoa's packaging division, testified that when it came to extending payment terms to Alcoa's preform customers, the decision to resort to such procedure was taken by management, and not by the credit or commercial sales department provided that ensuing extensions did not exceed the credit limits

---

" Alcoa's Answer Memorial of 24 January 2007, at 16.

" Alcoa's Exhibits 2 and 3 (communications exchanged between Mr. Kirby Losch of Amcor and Ms. Irene Schmidt from Alcoa).

" Claimant Exhibit 66.

for such customer³⁸. Mr. Matsumoto also testified that no business overrides of credit limits (i.e., decisions by Alcoa's business management to extend credit limits for preform customers and for a limited period of time beyond those fixed by Alcoa's credit department) were implemented prior to March 2003, that such procedure was only applied to Brazilian customers, and that the override could not exceed 50 % of the credit granted by the credit department to the customer being considered³⁹.

43. Although Mr. Matsumoto only recalled his granting of business overrides of credit limits in connection with « Refrigerantes Convençao Rio » and « Refrigerantes Convençao São Paulo », the converging testimony of Mr. Vaz and of Mr. Osvaldo Maggio (former Alcoa Senior Credit Analyst in Alcoa's Credit and Collection Department, not called for cross-examination at the Hearing) indicates that all seven Brazilian customers identified above benefitted from credit limits business overrides. Mr. Matsumoto's recollection was that the remaining five Brazilian customers were not granted credit improvements (for instance, by extending payment terms) beyond the credit limits already fixed by Alcoa's credit department, and that the credit business overrides were only reserved for large customers⁴⁰.

44. Be it as it may, assuming that credit limits business overrides were granted to all seven Brazilian customers mentioned above, it is fair to conclude that the introduction and application of the override procedure in and after March 2003 constitutes a departure of Alcoa's current business practices or policies observed in the period 2000-2002.

45. It has been concluded, however, that the extension of payment terms to Alcoa's Brazilian customers during June-September 2003 did not infringe Alcoa's pre-existing practices (and, thus, that increases in sales of preforms by Alcoa in Brazil in the Pre-Closing Period resulting from such payment terms extensions are not in breach of the Agreement). In view of such conclusion, it is not possible for the Sole Arbitrator to identify and isolate, on the basis of the evidence in the record, a causal nexus permitting to relate the relaxation by Alcoa of credit limits through specific business overrides granted to the seven Brazilian customers to the increase of preform sales to such customers during the Pre-Closing Period or to conclude that such increase would be solely or predominantly attributable to such overrides abstraction made of the extension of payment terms for such customers by Alcoa or market conditions concerning preform sales to such customers or other factors, circumstances or situations more generally affecting the Brazilian Pet Business.

46. Thus, the Claimant's First Claim for Relief is to be rejected also for the reasons set forth in paras. 20-45 above.

---

³⁸ Matsumoto testimony, hearing transcript for 7 March 2007, at 642, 616.

³⁹ Matsumoto testimony, hearing transcript for 7 March 2007, at 604-609.

⁴⁰ Matsumoto testimony, hearing transcript for 7 March 2007, at 625-643.

B. The Claimant's Second and Third Claims for Relief

47. The following provisions of the Agreeement or related documentation are concerned by these Claimant's Claims for Relief:

a) Provisions in the Agreement

*Section 1.3. Assumption of Liabilities by Buyer. At the Closing, Buyer shall assume the liabilities and obligations of the Sellers arising out in the ordinary course of business with respect to the PET Business which have been disclosed to Buyer and are required to be accounted for by in accordance with Alcoa's applicable accounting policies as defined to, and mutually agreed with, Buyer and as noted in a line item basis review of the Preliminary Pricing Date Balance Sheet as defined below ( the « Agreed Accounting Policies » ) or (a) which arise with respect to any acts that arise or events that occur after the Closing under the contracts being assigned to Buyer hereunder and otherwise with respect to events related to those contracts arising after the Closing or (b) which arose from acts or events that occurred prior to the Closing that were incurred by the PET Business in the ordinary course of business consistent with past practices, except for the conditions that Sellers expressly represent, warrant and indemnify Buyer against under the terms of this Agreement (« Assumed Liabilities » ).*

*Section 1.5.7. Review of the Closing Date Balance Sheet. Seller will prepare and have its auditor audit the Closing Date Balance Sheet using the Agreed Accounting Policies, and will provide the Closing Date Balance Sheet within thirty (30) days after the Closing. To assist Buyer in its review of the Closing Date Balance Sheet , Seller and Seller's auditor will provide full access to Buyer and Buyer's representatives to its records and working papers relating to the Closing Date Balance Sheet and its staff who assisted in their preparation. Buyer shall review the Closing Date Balance Sheet which shall be completed not later than thirty (30) days following the delivery of the Closing Date Balance Sheet. There shall be a further period of thirty (30) days to raise and resolve any disputes; any such disputes may arise only on the basis that the Closing Date Balance Sheet did not use the same policies and procedures in effect for the Final Pricing Date Balance Sheet or as otherwise specifically provided for in the Agreement. If an agreement cannot be reached by the Parties within such thirty (30) day period, the Parties agree to the timely appointment of an internationally recognized independent public accounting firm to decide the matters in dispute (as an expert, not as an arbiter), such decision to be given within thirty (30) days. The decision of the public accounting firm shall be final and binding. In the event the decision from the independent public accounting firm is that and adjustment should be paid by one Party to the other as a resolution of the matters in dispute, such adjustment shall be paid within three (3) business days of the receipt of the decision by the Party obligated to make the payment.*

*Section 2.7. The Assets. Schedule 2.7.(A) describes the fixed assets component(....)(the « Fixed Assets »). The Fixed Assets constitute and include all of the assets which are used or employed solely in connection with operation of the PET Business in a manner consistent with past operations. As of the date hereof Sellers (....) have, and as of the Closing shall have good, valid and marketable title to all of their Fixed Assets , respectively free and clear of all debt, liens,*

*charges, security interests and other encumbrances, including any minority interests or liabilities.*

**Section 2.11.** <u>Contracts and Commitments.</u> *Schedule 2.11 contains a list which identifies and briefly describes all written contracts, agreements, leases, guarantees or commitments (the « Constituent Documents ») relating to the PET Business to which the Sellers or Subsidiaries are parties or by which the Sellers or Subsidiaries may be bound: (a) involving the payment by or to the PET Business of more than United States dollars $ 50,000 in any twelve (12)-month period; (b) which may not be terminated by the Sellers or Subsidiaries on less that ninety (90) days' prior notice; or (c) which are otherwise material to the operation of the PET Business or in any of the Subsidiaries; or (d) which contain a provision which might restrict or prevent the assignment or transfer of such Constituent Document. Each such contract, Constituent Document was entered into in the ordinary course of the business, is in full force and effect, valid and enforceable in accordance with its terms, constitutes a valid and binding obligation of the respective parties thereto, is not the subject of any threat or notice of breach, any actual breach, notice of default, termination or partial termination, and, in the case of Assets at third party sites, provides for access to the third party premises and protection for or recovery of Assets at risk in the event of customer distress. The Seller and the Subsidiaries have complied in all material respects with the provisions of such Constituent Document.*

*Except as otherwise set forth in Schedule 2.11, neither the execution and delivery of the Agreement or the Local Agreements nor the consummation by the Sellers of the transactions contemplated hereby and thereby, will (x) conflict with or result in any breach of any provision of the Constituent Documents of the Sellers or the Subsidiairies which may result in any liability to Buyer or Vinisa,Uruguay Preform and Tamboré or on the Closing Date to Newco or Newco II , or which otherwise affects Buyers's ability to perform its obligations under this Agreeement.*

**Section 2.12.** <u>Litigation.</u> *Except as otherwise set forth in Schedule 2.12 , there is no litigation, action, suit, arbitration or other legal or regulatory proceeding or governmental investigation pending or, to the Best knowledge of the Sellers, threatened by or against the Subsidiaries which may result in any liability to Buyer or Vinisa Uruguay Preform and Tamboré or on the Closing Date to Newco or Newco II, or which otherwise affects Buyer's ability to perform its obligations under this Agreement.*

**Section 2.19.** <u>No Undisclosed Liabilities</u> *. To the Best Knowledge (defined for the purpose of this Agreement, as a party's actual knowledge, or such knowledge as a party so situated should have known through the exercise of reasonable diligence with an understanding of the business in question) of the Sellers, except as set forth in Schedule 2.19 , the Sellers and the Subsidiaries have no material liabilities or obligations of any nature whether absolute or accrued, contingent or otherwise) or claims pending related to the PET Business, except for labilities or obligations required (a) as of the Effective Date by Alcoa's accounting policies to be reflected or reserved against in the Preliminary Pricing Date Balance Sheet, or (b) as of the Closing Date by the Agreed Accounting Policies to be reflected or reserved against in the Final Pricing Date Balance Sheet.*

**Section 2.25** <u>*No Other Warranties or Representations*</u> . (....) *Buyer* acknowledges that, except for the representations and warranties contained in this *Agreement*, the *Pet Business* and the purchased assests are being conveyed on an « *AS IS, WHERE IS, WITH ALL FAULTS* » basis. *Seller* makes no representation or warranty, express or implied, except as set forth in this *Agreement*. *Buyer* has inspected, has had an opportunity and will continue to have the opportunity to inspect the purchased *Assets*, obligations and liabilities and is not relying on any representations or warranties of any kind whatsoever, express or implied, from *Seller*, its agents or representatives, as to any matters concerning the same except as provided in this *Agreement* and in the *Local Agreements*.(....).

**Section 2.9.** <u>*Accounts Receivable*</u> . All accounts receivable and other receivables of the *PET Business* listed in <u>*Schedule 2.9*</u> , and all such receivables arising since the date thereof until the *Closing*, represent and will represent bona fide claims against debtors for sales made, services performed or other charges arising out on or before the *Closing*, and are collectible within 180 days and through normal means of collection.

**Section 3.5.** <u>*Seller's Representations Modified by Buyer's Best Knowledge*</u> .To the *Best Knowledge of Buyer*, except as set forth in <u>*Schedule 3.5*</u>, (a) the *Sellers'* representations and warranties made in this *Agreement* are true and correct and (b) to the *Best Knowledge of Buyer*, there are no consequences of the fact which would put *Sellers* in breach of any of *Sellers'* representations and warranties made in this *Agreement*.

**Section 4.1 (a).** *Sellers* agree that from the *Effective Date* until the *Closing Sellers* shall comply with the following (......) <u>*Conduct of the PET Business*</u>. *Sellers* shall carry on and shall cause the *Subsidiaries* to carry on the *PET Business* in the usual, regular and ordinary course, will preserve the present organization of the *PET Business*, and will use its best efforts to keep available the services of the present officers and employees of the *PET Business'* and to preserve the *PET Business* goodwill, the *Assets*, the *Shares* and the *PET Business's* relationships with customers, suppliers and others having *PET Business* dealings with them.

b) Provisions in the « Summary of Significant Accounting Policies For Closing Date Balance Sheet » (the « Significant Accounting Policies »).

*Allowance for Doubtful Accounts*

*Alcoa's policy with respect to the allowance for doubtful accounts allows operating locations to establish an allowance for doubtful accounts based upon the specific identification method. The specific identification method employed by PET in determining its allowance for doubtful accounts is as follows :*

| | |
|---|---|
| Customers with accounts over 180 days | 100% of the total value |
| Customers with accounts over 180 days Which checks are held as a guarantee | 100% of the total value |
| Customers with accounts less than 180 | Provision to be based on Alcoa |

*Days for which there is a known*          *management estimate*
*Collection problem*

*The following account receivable balances are to be excluded from the Closing Date Balance
Sheet and will not transfer to the Buyer :*

*. Customers with accounts over 180 days for which collateral is held.*
*. Customers whose accounts have been renegotiated and are paying under a payment plan*
*. Customers under creditors' arrangement.*

*(........).*

48. As a preliminary matter, it is to be determined whether the Claimant's Third Claim for
Relief, as reformulated in the Claims Memorial, is or is not covered by the Terms of Reference.

49. The Respondents argue that the Claimant's Third Claim for Relief as originally set forth in
the Terms of Reference was abandoned by the Claimant in its Claims Memorial. As defined
originally in the Terms of Reference, this Claim was based on Alcoa's failure to deliver to
Amcor a valid marketable title to the Frevo Equipment at Closing and its quantum was fixed in
the range of approximately US$ 2,600,000.00. The Respondents contend that the Claimant's
Third Claim of Relief as re-defined in the Claimant's Claim Memorial is a new claim not
contemplated in the Terms of Reference, the incorporation of which in these proceedings has not
been sought either in terms of Article 19 of the ICC Rules. Subsidiarily, the Respondents request
that should the Third Claim of Relief as re-defined be admitted in these proceedings, that it be
rejected on the merits for the same reasons pleaded by the Respondents that command the
rejection of the Claimant's Second Claim for Relief.

50. It is true that in its Claims Memorial the Claimant does not refer anylonger to its claim for
the alleged failure of Alcoa to deliver marketable title to the Frevo Equipment. Instead, the
Claimant claims that the same breach of warranties by Alcoa pleaded by the Claimant in respect
of the Frevo Lease also extends to the Frevo Agreement[41]. The Claimant's Third Claim for
Relief, redefined in the Claims Memorial as an alleged breach of the Frevo Agreement, seeks
compensation from Alcoa for the loss of preform sales to Frevo during the 28-month duration of
the Frevo Agreement calculated by the Claimant in US$ 1,600,000,00[42]. The Terms of Reference
do not include any Claimant's claim referred to the Frevo Agreement or damages suffered by
Amcor in connection with such Agreement occasioned by Alcoa conduct. The Claimant's Reply
Claims Memorial does not refer to the Claimant's Third Claim of Relief – as originally
formulated in the Terms of Reference – either.

51. The Sole Arbitrator finds that, if compared to the Claimant's original Third Claim for Relief
as set forth in the Terms of Reference, the Claimant's Third Claim for Relief as set forth in its
Claims Memorial is a substantially different claim. However, the Claimant's opening and closing

---

[41] For example, Claim Memorial at 48.

[42] Claim Memorial at 57.

oral statements in the Hearing[43] clearly indicate that the Claimant's Third Claim for Relief (based on the alleged failure by Alcoa to transfer good and marketable title on the Frevo Equipment to the Claimant at at Closing because clouded by the existence of the Frevo Lawsuit) is maintained as originally stated in the Terms of Reference and that such Claim for Relief has not been abandoned.

52. Despite such circumstance, in its substance, the Claimant's Third Claim of Relief as presented for the first time in a drastically reformulated form in the Claims Memorial may not be considered a new claim not covered by the Terms of Reference, since it essentially arises from the same breaches of warranties allegedly committed by Alcoa in connection with the Frevo assets covered by the Claimant's formulation of its Second Claim for Relief in the Terms of Reference. There is undoubtedly a close relationship between the Frevo Lease on the basis of which the Second Claim for Relief has been presented and the Frevo Agreement, under the provisions of which preforms needed for the manufacturing process using the Equipment leased to Frevo were supplied, and it appears that the same breaches of warranties pleaded by Amcor concern both the Frevo Lease and the Frevo Agreement. This is supported by the undisputed assertion of the Claimant that « ...*The Equipment Lease Agreement incorporated the terms of the prior Supply Agreement between Alcoa and Frevo, as amended...* »[44] (as indeed appearing at Clause Seventh, Paragraphs Second and Third of the Frevo Lease)[45], and the fact that Clause Fourth of the Frevo Lease specifically provides that « *The **equipment** is intended to enable **LESSOR** to supply PET preforms to **LESSEE** as set forth in specifice agreement , and **LESSEE** is not allowed to use any preforms supplied by third parties in said equipment, under pain of termination of this agreement* ».

53. Thus, the Sole Arbitrator concludes that the Claimant's Third Claim for Relief as presented in the Claimant's Claims Memorial (the « Reformulated Claim for Relief » ) originates in breaches already covered by the Terms of Reference, does not constitute a new claim under Article 19 of the ICC Rules and is in reality part of the quantification of the Claimant's Second Claim for Relief. Since the Parties have had sufficient opportunity to join argument and evidence in the course of these proceedings in connection with both the Claimant's Second Claim of Relief and the Claimant's Reformulated Claim for Relief, both will be dealt with and decided together as one and the same Claimant's Second Claim for Relief. Thus, whilst the Claimant's Second Claim for Relief will include the Claimant's post-Closing lost revenue claims relating to the Frevo Lease and the Frevo Agreement, the Claimant's Third Claim of Relief will remain in this arbitration as originally formulated, i.e., based on Amcor's allegation that it did not receive good and marketable title to the Frevo Equipment.

54. Also, the Sole Arbitrator notes that the Claimant stated in its closing statement at the Hearing that the Third Claim for Relief is « *an alternative pleading* », that would only remain should the

---

[43] Hearing transcript, 5 March 2007, at 94-95; 9 March 2007, at 861-863.

[44] Claim Memorial at 21-22.

[45] Alcoa's Exhibit 27.

Claimant not prevail on the Second Claim for Relief for « ...*the 5 $ million plus interest...* »[46] i.e., the Claimant's Second Claim for Relief including, as decided above, the Claimant's claim for post-Closing lost revenues under the Frevo Lease and the Frevo Agreement. However, the Sole Arbitrator will jointly analyze and decide on the merits of the Claimant's Second and Third Claims for Relief.

55. It is undisputed that by May 2003 Frevo was in arrears on its pre-Closing payments to Alcoa both under the Frevo Lease and the Frevo Agreement (such payments, collectively, the « Frevo Receivables »). Exchanges between Frevo and Alcoa and internal analysis by Alcoa of the Frevo situation ensued. As a result, Alcoa took action against Frevo by protesting (or formally requesting payment and declaring in default) Frevo Receivables indebtedness with intervention of Brazilian notary publics. On 11 July 2003 Frevo made a payment proposal towards the cancellation of the Frevo Receivables then outstanding, that although accepted by Alcoa, was never honored by Frevo.

56. On or about 8 September 2003, Messrs. Vaz and Matsumoto were copied an e-mail from Ms. Gloria Ciasa, an employee in Alcoa's Credit and Collection Department, indicating that Frevo had made an application before the Brazilian courts (a « *Sustaçao do Protesto* ») to suspend Alcoa's collection efforts through protests with Brazilian notary public intervention. Later in September 2003, Ms. Ciasa informed, also via e-mail copied, among others, to Messrs. Matsumoto and Vaz, that following Frevo's application before the Brazilian courts, collection efforts covered by protests against Frevo by Alcoa were being judicially suspended. In view of such circumstance and the failure of further negotiations with Frevo, on 18 September 2003 Alcoa hand-delivered to Frevo an « Extra Judicial Notice » signed by Mr. Ricardo Vaz (the « Vaz Notice ») whereby because of failure to make lease payments under the Lease Agreement corresponding to the months of March-July 2003, the Frevo Lease was rescinded and the immediate return of the leased equipment by Frevo to Alcoa was requested.

57. As a result of internal doubts in Alcoa as to how to deal with the Frevo situation in view of the forthcoming sale to Amcor of the Brazilian PET Business, the opinion of Alcoa's corporate controller, Mr. Rogerio Santos, was requested. On 25 September 2003 Mr. Santos sent the following e-mail to all those involved in the Frevo account[47]:

« *People, considering this client's situation, we have to include it in the Closing and pass it on to Amcor, but we have to make a provision for losses, because we are aware of the difficulties to receive what is due. This is clearly described in the Accounting Procedures. I understand that to keep this receivable in our possession, we should negotiate a form to receive so that we can keep it in our accounting/financial books. See below what says the Accounting Procedures:*

*I take this opportunity to recommend a detailed analysis of the other clients that do not have a PDD (« Allowance for Doubtful Accounts ») but which may be in a similar situation (delinquent delays that not yet exceeded 180 days, but we are aware of any problems under any nature)* »

---

[46] Hearing transcript, 9 March 2007, at 973-974.

[47] Claimant's Exhibit 109 (original in Portuguese).

58. The Claimant contends that there is no evidence that the detailed analysis recommended by Mr. Santos was effectively carried out. In any case, the Claimant argues that by failing to disclose the facts and circumstances relating to the Frevo Lease and the Frevo Agreement described above, the Respondents infringed Sections 2.11 and 2.12 of the Agreement and the Significant Accounting Policies (reproduced in their relevant parts in para. 47 above). In essence, the Claimant alleges that, despite the warranties set forth in such provisions, the Respondents failed to disclose to Amcor facts and circumstances indicating that the Frevo Lease was not in full force and effect, nor constituted a binding and legal obligation for the parties thereto and, further, that the Frevo Lease was the subject of threats or notice of breach, an actual breach had been committed in respect of such Lease, such Lease had been the subject of a notice of default and termination, and prior to Closing there were pending litigation, suits and legal actions concerning the Frevo Lease. The Claimant also contends that such disclosure was mandated by the Significant Accounting Policies since the Frevo Receivables, although less than 180 days in arrears, had given rise to collection problems, and Frevo was a customer the accounts of which had been renegotiated and were subject to a payment plan.

59. The Claimant points out that for those reasons it rejected Ms. A. Irene Schmidt's – Alcoa's Director of Corporate Development - letter dated 24 December 2003 in which Ms. Schmidt denied any obligation to disclose the situtation affecting the Frevo Receivables because they were not overdue 180 days at Closing (despite the fact that they were encountering payment problems). Also, in further support of its position that the Respondents infringed their disclosure obligations under the Agreement, the Claimant refers to Mr. Losch's letter to Ms. Schmidt of 23 July 2004 in which Mr. Losch indicated that on 30 September 2003 (one day prior to 1 October 2003 or « Closing Date »), Frevo filed a legal action against Alcoa (the « Frevo Lawsuit ») challenging the validity of the Frevo Lease under the allegation, *inter alia*, that the leased machines were overvalued.

60. In response, the Respondents argue that all claims or differences regarding Frevo were finally settled among the Parties when, on 15 July 2003, the Claimant proceeded, pursuant to an agreement previously reached with the Respondents as a result of a meeting held in Miami on 8 April 2004 (the « Miami Meeting »), to adjust in Amcor's favor the working capital of the acquired business in connection with pre-Closing Frevo Receivables by US$ 1,126,000.00, i.e, by reducing the value of such Receivables to zero. By granting such adjustment, Alcoa met Amcor's request to do so set forth in a letter from Mr. Losch to Ms. Schmidt dated 3 December 2003[48]. This readjustment was intended to take care of Amcor's argument that the Frevo Receivables constituted a *« known collection problem »* and, for this reason, that Alcoa should have valued them at zero in the Closing Date Balance Sheet. The Respondents say that by Amcor postponing after the Miami Meeting their Frevo-related additional claims and failing to include them in discussions leading to the Miami Meeting settlement in connection with such assets and relating to the same alleged breach, the Claimant is estopped from raising such claims thereafter.

61. The Respondents also contend that the Claimant acted in bad faith in breach of the Agreement first, by not including claims presently covered by what has become their Second

---

[48] Claimant's Exhibit 113 (attachment to Mr. Losch's letter of 3 December 2003.

Claim for Relief in the Miami Meeting settlement discussions, and second, by introducing such claims on 23 July 2004, shortly after such settlement had been finalized and implemented through the working capital adjustement described above. Finally, the Respondents assert that the working capital readjustment made pursuant to the Miami Meeting settlement agreements was granted by Alcoa against the Claimant's commitment to work together with Alcoa in efforts to collect from Frevo the Frevo Receivables subject to such working capital adjustment. However, the Respondents say that Amcor ceased to honor its obligations to cooperate with the Respondents in recovering such amounts as soon as US$ 1,126,000.00 (for the Frevo Receivables computed at zero for working capital purposes) were transferred or credited to Amcor. By so doing, Amcor breached a good faith and fair dealing covenant under New York law also estopping Amcor from seeking damages in connection with the Frevo Lease or the Frevo Agreement.

62. Consequently, the Respondents say that since the Claimant did not honor its obligations to cooperate with the Respondents in obtaining compliance by Frevo with its obligations under the Frevo Lease and the Frevo Agreement and also did not raise its claims relating to lost post-Closing preform sales under the Frevo Agreement and lost post-Closing Frevo Lease payments as part and parcel of the settlement negotiations regarding the Frevo assets that led to the Alcoa-Amcor agreements at the Miami Meeting, the Claimant is estopped from claiming damages associated therewith.

63. According to Alcoa, such cooperation was indeed indispensable, since after Closing Alcoa no longer owned the Frevo Receivables, the Equipment leased to Frevo, and had transferred its rights as lessor under the Frevo Lease to Amcor. The Respondents further say that had they known that Amcor was planning to introduce additional claims arising out of the same assets and not willing to honor its obligations to cooperate with the Respondents in the pursuit of claims against Frevo, the Respondents would have never acceded to settle at the Miami Meeting the working capital claims asserted by Amcor in connection with the Frevo Receivables. Finally, the Respondents point out that although more than three years have elapsed since the Closing, Amcor, as only owner of the Frevo Receivables, the Frevo Equipment and as lessor under the Frevo Lease, has done nothing to mitigate damages by, for example, seeking to repossess the leased equipment or satisfaction from Frevo for overdue accounts receivable.

64. The Respondents deny not having disclosed delays in collecting the Frevo Receivables since on 24 September 2003, prior to Closing and in compliance with the Agreement, they provided Amcor with an updated version of Schedule 2.9 to the Agreement listing accounts receivable, including all overdue Frevo Receivables, their pending amount and due dates which, according to the Claimant, required disclosure of changes in price terms and delinquent payments. Since such disclosure took place timely (one week prior to Closing Date), Section 3.5. of the Agreement (reproduced under para.47 above) precludes Amcor from raising any claims in this connection.

65. The Respondents further deny that the fact that Alcoa sought to protest Frevo's delinquent payments with Brazilian notary publics or other collection actions against Frevo gave rise to disclosure obligations under the Agreement or the Significant Accounting Policies, since such actions are normal collection practices in Brazil to induce customers like Frevo to honor their

debts. The Respondents indicate that customers like Frevo – middle-size companies labeled as « B-Brands » - often seek to delay payments as a financing device permitting them to get extra days of interest-free money without thereby attempting or intending to repudiate their contractual obligations. The Respondents assert that the Vaz Notice belonged to such practices and was never intended to rescind the Frevo Lease but was only another means to put pressure on Frevo to pay, as evidenced by the fact that Alcoa never attempted to repossess the equipment leased to Frevo and attempted further negotiations with Frevo to resolve the problem. The Respondents point out that Alcoa did not infringe any pre-Closing disclosure obligation under the Agreement by not revealing the existence of the Frevo Lawsuit, since notice of such Lawsuit was not served on Alcoa until 4 November 2003 ; i.e., after the Closing Date.

66. The Sole Arbitrator observes that although the Significant Accounting Policies reproduced at para. 47 above have become the Agreed Accounting Policies referred to in Section 1.3 of the Agreement and were attached to Mr. Losch's e-mail to Ms. Schmidt of 10 July 2003 as well as to Mr. Losch's letter to Ms Schmidt of 30 January 2004", such circumstances do not mean that provisions for the allowance of doubtful accounts for determining the final price payable by Amcor to Alcoa for the South-American PET Business constitute representations or warranties binding on Alcoa, the infringement of which would give rise to Alcoa's liability for breach of warranties under the Agreement.

67. Indeed, the only consequence derived from such Agreed Accounting Policies provisions are essentially of accounting nature, e.g., a provision in the Closing Date Balance Sheet based on a (Alcoa) management estimate (in the case of debts overdue for less than 180 days but presenting collection problems) or outright exclusion from the Closing Date Balance Sheet and non-transfer to Amcor (if the account is under a creditors' arrangement). None of such consequences redounds to the imposition on Alcoa of specific disclosure obligations in respect of such indebtedness or of representations or warranties specifically concerning it.  Therefore, the mere fact that Frevo Lease or Frevo Agreement accounts fall under such provisions does not bring about a breach of Alcoa's representations or warranties under the Agreement, although it may bring about the provisioning in or exclusion of pre-Closing receivables from the Closing Date Balance Sheet. Section 2.19 of the Agreement (reproduced under para. 47 above) does not permit to reach a different conclusion, since it refers to liabilities or obligations on Alcoa to be disclosed under Alcoa's Agreed Accounting Policies, and not to doubtful accounts receivable owing to Alcoa under such Policies.

68. The only disclosure obligation of Alcoa regarding pending accounts is set forth in Section 2.9 of the Agreement (reproduced in para. 47 above). In accordance with such provision, Alcoa disclosed the Frevo Receivables under the Frevo Lease and the Frevo Agreement shortly before Closing, which then complied with the requirement of being collectible within 180 days set forth in such Section for being included in such disclosure. It is not then possible to accept that non-disclosure by Alcoa of indebtedness not more than 180 days overdue but subject to collection problems or to a payment plan constitutes a breach of Alcoa's representations and warranties under the Agreement.

---

" Claimant's Exhibit 78; Respondents' Exhibit 33..

**Exhibit B, PART II**
**to Petition for Judgment**
**Confirming An Arbitration Award**

69. A different conclusion may be reached, however, in connection with Section 2.11 of the Agreement (reproduced in para. 47 above). Pursuant to such provisions, Alcoa is to submit to Amcor a Schedule 2.11 detailing contracts relating to the PET Business being transferred. Under such provision, Alcoa represents that each contract listed in Schedule 2.11 « ...*is not the subject of any threat, or notice of breach, any actual breach, notice of default, termination or partial termination.* Alcoa included the Frevo Lease and the Frevo Agreement in such Schedule 2.11[50].

70. In this latter connection, the Sole Arbitrator finds that:

(i) systematic protests before a Brazilian Notary Public of the Frevo indebtedness to Alcoa (a course of action putting Frevo on notice that it had defaulted on its obligations regarding such indebtedness);

(ii) re-negotiations of the payment terms and conditions of the Frevo Lease between Alcoa and Frevo, agreement on a payment plan, and later Frevo default in complying with such payment plan (as evidenced by internal e-mail exchanges between Antonio Gilberto da Silva and Gloria Ciasca of Alcoa[51] and testimony received in the Hearing on the merits[52]);

(iii) judicial proceedings initiated by Frevo at the Brazilian courts with the effect of neutralizing or paralyzing the Alcoa notary public protests against Frevo (*Medida Cautelar de Sustaçao do Protesto*[53]*)*; and

(iv) delivery by Alcoa to Frevo of an extrajudicial notice terminating the Frevo Lease and demanding return to Alcoa of the leased equipment[54], an unprecedented course of action in connection with this customer[55],

evidence that, indeed, Frevo was in actual breach of the Frevo Lease and the Frevo Agreement and had defaulted on its obligations under such Agreements prior to Closing. Such being the case, those agreements should not have been included in the Schedule 2.11 transmitted to Amcor. By including the Frevo Lease and the Frevo Agreement in such Schedule, Alcoa engaged in misrepresentations infringing the Agreement's Section 2.11.

71. The general disclosure of overdue Frevo Receivables set forth in Schedule 2.9 of the Agreement made available to Amcor one week prior to the date of Closing does not satisfy the

---

[50] Claimant Exhibit 80.

[51] Claimant's Exhibits 104 and 105.

[52] Mr. Matsumoto's testimony, Hearing transcript for 7 March 2007, at 680-686.

[53] Claimant's Exhibit 84.

[54] Claimant's Exhibit 107.

[55] Mr. Matsumoto's testimony, Hearing transcript for 7 March 2007, at 676.

specific disclosure and information obligations on Amcor required by warranties set forth in the Agreement's Section 2.11. Such disclosure not having taken place as mandated by the Agreement, « as is » and « best knowledge » provisions under the Agreement (respectively, its Section 2.25 and its Section 3.5 reproduced in para. 47 above) cannot be invoked against Amcor.

72. However, such conduct of Alcoa and the impact of any failure to disclose the circumstances set forth above must be assessed in light of Alcoa's obligations under Section 4.1 (a) of the Agreement (reproduced in its relevant parts under para. 47 above) to preserve the South American PET Business goodwill and its relationships with customers. In this connection, it is also required to precisely identify and assess the circumstances specifically relied upon by the Claimant causing the damages the compensation of which is sought by the Claimant pursuant to its Second Claim for Relief and determine the degree in which such circumstances account for the damage allegedly caused and whether proof of such damages has been joined. Further, another issue requiring attention is whether there are other circumstances that may be characterized as a breach of the Claimant's representations and warranties also under the Agreement's Section 2.11 or, otherwise, under its Section 2.12. To elucidate these matters, the Sole Arbitrator will primarily look at the conduct of the Parties as the events leading to the disputes presently in arbitration unfolded and will first consider the last issue set forth above.

73. Indeed, Amcor is premising its claims against Alcoa for damages relating to Amcor's alleged loss of post-Closing Frevo Lease and Frevo Agreement revenues on the existence of the Frevo Lawsuit or on Alcoa's failure to disclose the existence of such Lawsuit to Amcor despite the fact that, although filed on 30 September 2003 against Alcoa, was only known to Alcoa, according to the record, on 4 November 2003; i.e., after the Closing Date.

74. This results from Mr. Losch's letter of 23 July 2004 to Ms. Schmidt. In this letter, Mr. Losch clearly relates the cessation of payments under the Frevo Lease as from 30 September 2003 (and thus the cessation of future post-Closing lease Frevo revenue to Alcoa) exclusively to the Frevo Lawsuit filed on such date, as follows:

*« As a result, lease payments under this agreement have not been made by Frevo since September 30, 2003. The Frevo issues give rise to claims under Sections 2.7, 2.11 and 2.12 of the Agreement. The stream of future lease payments was material to Amcor's valuation of the transaction.... ».*

This is further confirmed – much later - by Mr. Losch's e-mail of 17 August 2004 to Ms. Schmidt[46], in which he writes :

*« I believe some of the confusion stems from the other Frevo issue of stopping lease payments on Sept 30 2003 which we view as a separate issue »*

Because of the inextricable relationship between the Frevo Lease and the Frevo Agreement alleged by the Claimant and described in para. 52 above, it may be inferred that the Frevo Lawsuit is also the cause of the suspension of post-Closing payments under the Frevo Agreement

---

[46] Claimant Exhibit 119.

and, accordingly, of the alleged loss to Amcor of post-Closing Frevo Agreement revenue. Indeed, the suspension of payments under the Frevo Lease is expressly requested as *ex parte* interim injunctive relief by Frevo in its initial brief under the Frevo Lawsuit[17]. Also, the existence of the Frevo Lawsuit is the basis for the Claimant's Third Claim of Relief premised on the Claimant's allegation that such Lawsuit prevents or adversely affects a delivery to Amcor of good, valid and marketable title on the Frevo Equipment.

75. However, no evidence has been joined to the record that by the Closing Date Alcoa was aware of the Frevo Lawsuit challenging the validity of the Frevo Lease and claiming ownership of the Frevo Equipment. Objective evidence shows, on the contrary, that the Frevo Lawsuit was notified to Alcoa, post-Closing, on 4 November 2003[18]. Under the Agreement, Alcoa does not have any disclosure obligations regarding information Alcoa did not have access to pre-Closing Date (1 October 2003).

76. Mr. Lucas Tavares Bueno, a Brazilian attorney who assisted Amcor in connection with Amcor's acquisition of the Alcoa South-American PET Business and continued to provide legal assistance to Amcor in respect of certain post-Closing issues, testified that the *Sustaçao do Protesto* (or suspension of the protests made by Alcoa against Frevo) « *...also serves as notice to the creditor that a subsequent court claim will be filed within thirty days to contest and permanently prevent the creditor's collection efforts.... ».* On such basis, Mr. Tavares Bueno asserts that Alcoa was thus put on notice that within such delay Frevo would file a lawsuit « *...contesting the validity of any debt owed by Frevo to Alcoa »*[19] . In his witness statement of 23 February 2007, Mr. Sampaio Doria, a Brazilian attorney who is Alcoa's Latin America's tax manager testified, on the contrary, that although the failure to file a suit by the party requesting the suspension of a protest within thirty days would lead to an automatic termination of the suspension, there is no legal requirement to file such a suit within such period. He further indicated that in practice no suits ensue from a *Sustaçao do Protesto* either because the debtor pays or simply applied for the suspension to gain time to pay or negotiate settlement[20]. Mr. Doria's testimony implies that the failure to introduce a lawsuit by the party obtaining the suspension of a protest within the thirty – day period does not jeopardize such party's legal rights or defenses.

77. No expert witness evidence on Brazilian law has been joined to the proceedings regarding the legal effects of a *Sustaçao do Protesto* or its relationship with future and related legal proceedings or claims or their admissibility. Mr. Tavares Bueno has not testified as expert witness on Brazilian law. Even if his position were to be accepted, there is no way that Alcoa

---

[17] Claimant Exhibit 84.

[18] Certificate of service of process of the Frevo Lawsuit on Alcoa Aluminio S.A. carried out on 4 November 2003 by the *Oficial de Justiça* Artur Queiros Nunes Paes in the person of Alcoa Aluminio S.A.'s legal representative, Respondents' Exhibit 30.

[19] Mr. Tavares Bueno reply witness statement of 9 February 2007, No.8, 10, at 3-4.

[20] Mr. Sampaio Doria's written witness statement of 23 February 2007, No. 11 at 5.

could have predicted the nature and scope of the Frevo Lawsuit challenging, both retroactively and for the future, the validity of the Frevo Lease, subsidiarily purporting to re-characterize, also both retroactively and for the future, the legal nature and effects of the Frevo Lease, asserting ownership rights on the Frevo Equipment, and further requesting (and obtaining) the suspension of post-Closing payments under the Frevo Lease. There is no reason to believe – since the *Sustaçao do Protesto* only concerned protests regarding pre-Closing Frevo Receivables - that when learning about the suspension of the protests Alcoa could have reasonably foreseen an ensuing lawsuit from Frevo not limited to the Frevo Receivables subject to the protests the suspension of which had been obtained by Frevo.

78. Consequently, the Sole Arbitrator concludes that the introduction of the Frevo Lawsuit was not foreseeable to Alcoa either because of pre-Closing difficulties in collecting Frevo Receivables or because of the *Sustaçao do Protesto* proceedings triggered by Frevo prior to the Closing. Thus, the Frevo Lawsuit was not an eventuality or contingency requiring disclosure by Alcoa under Section 2.19 of the Agreement referred to before. Accordingly, it is further concluded that Alcoa has not infringed Section 2.12 of the Agreement (reproduced in para. 47 above) requiring disclosure by Alcoa of any litigation threatened against Alcoa and, of course, Section 2.11 is not relevant in this connection, since this provision is not concerned with actual or threatened court or arbitral proceedings against the Seller.

79. There is no evidence either that the Frevo Lawsuit is legally sound or validly based on wrongful Alcoa conduct or that Alcoa could have reasonably prevented or avoided the filing of such Lawsuit. It is true that, prior to the Closing Date, the Vaz Notice communicated to Frevo Alcoa's unilateral and out of court termination of the Frevo Lease and requested the return of the Frevo Equipment. However, by the date Mr. Losch sent his 23 July 2004 letter to Alcoa, Mr. Vaz had long been in Amcor's payroll[61] and Amcor's due diligence regarding the acquisition of the Brazilian assets, including any cooperation of Mr. Vaz in Amcor's assessment of Alcoa's pre-Closing conduct regarding the sale of the Brazilian PET Business to Amcor, was most likely already finalized. Despite such circumstance, Mr. Losch does not make any reference whatsoever to such termination by Alcoa of the Frevo Lease in its correspondence relating to its post-Closing lost revenues claims relating to the Frevo Lease.

80. On the other hand, the legal status or effects of the Vaz Notice under Brazilian law remains unclear since there is no judicial decision by the Brazilian courts confirming that such termination was validly made or has legally taken place and, clearly, it has not led to a repossession of the Frevo Equipment. Further, the very existence of the Frevo Lawsuit necessarily evidences that such termination has not been accepted by Frevo since Frevo is requesting either that the Frevo Lease be declared invalid from its inception and considered a purchase agreement as a result of which Frevo has already acquired final title on the Frevo Equipment or, alternatively, that it remains valid and enforceable except that the lease payments are to be retroactively reduced. Also, Alcoa has asserted that Mr. Vaz extrajudicial termination

---

[61] Mr. Vaz testimony at the Hearing, 5 March 2007, at 223 : « *Since October 1st [2003], I established everything and start working at Amcor, and Amcor already had a sales structure ready and I started – I became part of the structure* ».

of the Frevo Lease was just a part of a strategy aimed at forcing Frevo to come to terms and honor its pending obligations.

81. That such was the real purpose of the Frevo Lease extrajudicial termination – a bargaining device aimed at prompting Frevo to further negotiations rather than at extinguishing the Frevo Lease – seems to be confirmed by the conduct of the Parties, including Amcor's undertaking as a part of the settlement reached with Alcoa in the Miami Meeting to continue negotiations with Frevo, despite Mr. Vaz's termination of the Frevo Lease, in order to induce Frevo to honor its obligations thereunder and under the Frevo Agreement and the absence of any attempts by either Alcoa or Amcor to repossess the Frevo Equipment. In light of such circumstances, the record does not allow to assign any relevant adverse effects on possibly Amcor's post-Closing right to revenues from the Frevo Lease or the Frevo Agreement to Alcoa's unilateral termination of the Frevo Lease prior to Closing pursuant to the Vaz Notice. The same may be said of the Pre-Closing protests and negotiations carried out by Alcoa with Frevo or renegotiation of the payment terms of the Frevo Receivables, that may be reasonably considered as Alcoa conduct in compliance with its obligations under Section 4.1(a) of the Agreement (reproduced in para. 47 above) to preserve the PET Business goodwill and customer relationships, particularly if, as undisputed evidence in the record shows, Frevo had been a customer of the Alcoa Brazilian PET Business for about seven years and, despite incurring in payment arrears in the past, it had always finally honored its obligations.

82. Moreover, the record does not contain elements permitting to assess whether the Frevo Lawsuit has chances of success, is soundly based on fact or law and, thus, even if it were hypothetically assumed that Amcor's Second Claim for Relief or Third Claim for Relief were to be accepted, whether the amounts claimed by Amcor thereunder may be considered realistic or, indeed, whether the record is ripe for such quantification absent a final determination of the Frevo Lawsuit by the Brazilian courts. There is nothing in the record permitting to conclude that Frevo is insolvent or is subject to insolvency proceedings triggered by any of the Parties to this arbitration or third parties, and it may be premature to finally catalogue the Frevo assets as non-performing. No information is available on the record as to the present situation of the Frevo Lawsuit or whether such Lawsuit has been already determined on the merits or not.

83. For the same reasons it is not possible to conclude either that the pre-Closing breaches of Section 2.11 of the Agreement by Alcoa alleged by Amcor in connection with the Frevo Lease and the Frevo Agreement show a sufficient causal nexus with Amcor's post-Closing damages allegedly suffered in connection with the Frevo assets. Further, if such breaches are taken in isolation of the initiation of the Frevo Lawsuit (not giving rise, as decided, to a breach of the Agreement by Alcoa) it is not possible to identify the impact of such breaches on lost post-Closing revenues to Alcoa under the Frevo Lease or the Frevo Agreement for the purpose of quantifying any allegedly ensuing damages.

84. Thus, Amcor's Second Claim for Relief seeking compensation for post-Closing damages or losses premised on Alcoa's breach of warranty for non-disclosure of circumstances relating to the alleged non-performing nature of the Frevo assets, including the filing and existence of the Frevo Lawsuit, are to be rejected. Since: (i) the Claimant's Third Claim for Relief is based on the damage to Amcor's right to receive good, valid and marketable title to the Frevo Equipment at

Closing brought about by the Frevo Lawsuit; (ii) Alcoa did not infringe Section 2.12 of the Agrement in connection with the Frevo Equipment (because it did not know at Closing about the Frevo Lawsuit); (iii) it has been further concluded that Alcoa has not committed any breach of the Agreement through its conduct (actions or inaction) relating to the Frevo Lawsuit or its coming into existence; and (iv) there is no evidence that at Closing the Frevo Equipment was subject to any « ....*debt, liens, charges, security interests* » or « *other encumbrances* »,  the Claimant's Third Claim for Relief is to be rejected as well.

85. The findings, reasoning and conclusions set forth above suffice for not allowing the Claimant's Second and Third Claims for Relief, which are rejected on those bases. In addition, Alcoa is also entitled to prevail on its equitable estoppel defense in respect of such Claims for Relief.

86. The Claimant refers to *Richard B. v. Sandra B.B., Supreme Court of New York, New York County, 162 Misc. 2d 123 ; 615 N.Y.S.2d 955 ; 1994 N.Y. Misc. LEXIS 326* to characterize the notion of estoppel relevant for this arbitration. In such decision, equitable estopppel is characterized as follows:

« ...*is the principle by which a party is absolutely precluded from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another who had a right to rely upon such words or conduct, to believe and act upon them, thereby changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed (57 NY Jur 2d, Estoppel, Ratification and Waiver, § 13, at 17-18 ;§15). The doctrine holds a person to representations made or positions assumed where inequitable consequences would otherwise result to another who has in good faith relied on them. « It concludes the truth in order to prevent fraud and falsehood and imposes silence on a party only when in conscience and honesty he should not be allowed to speak »(28 Am Jur 2d, Estoppel and Waiver, §28, at 630) (...) It should not be used as a shield of protection for fraudulent conduct (see generally 28 Am Jur 2d. Estoppel and Waiver, § 28 ; General Stencils v. Chiappa, 18 NY2d 125 [1966] ; Isaacson v. Slote, 60 Misc 2d 1 [1969]».*

87. In support of their equitable estoppel defense, the Respondents rely, among other cases, on *Helen J. Walls v. Richard Levin et al., 150 A.D. 2d 873; 540 N.Y.S.2d 623 ;1989 N.Y. App. Div. LEXIS 5470.* In its relevant part, this decision recites as follows:

« *Equitable estoppel prevents one from denying his own expressed or implied admission which has in good faith been accepted and acted upon by another. The elements of estoppel are with respect to the party estopped: (1) conduct which amount to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to himelf: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position ».*

88. Both characterizations of equitable estoppel set forth above will be taken into account when considering below the Parties' respective position regarding this defense.

89. It is undisputed that the Claimant's Second Claim for Relief is not a working capital adjustment claim to account for valuation or pricing issues relating to pre-Closing Frevo Receivables, which are dealt with through Closing Date Balance Sheet adjustments. Although such Second Claim for Relief also relates to the Frevo Lease and the Frevo Agreement, it refers to the value of post-Closing Frevo Lease revenues or post-Closing Frevo Agreement preform sales, allegedly lost to Amcor because of the alleged Frevo assets' non-performance. In truth, numeorus references in the Claimant's pleadings and in the Shulman Opinion in this respect and one of the alternatives for quantifying those alleged losses proposed both by the Claimant and Mr. Shulman may lead to understanding that through its Second Claim for Relief the Claimant is seeking loss profit compensation precluded – as the Sole Arbitrator has found – by Section 8.3 (b) of the Agreement. However, the Claimant also argues that the value of such future revenue (or the profit expected from it) constituted in fact a substantial part of the price paid by Amcor for the Frevo assets. Under such theory rather than seeking a loss profit compensation, the Claimant would be requesting to be compensated for the excess price paid for assets that have proven to be non-performing for reasons that should have been disclosed to the Claimant prior to the Closing, when the price for such assets was paid to Alcoa. In the Claimant's own words[2]:

« (...) *Amcor is not seeking consequential damages. Never has. Amcor suffered damages the day the contract closed when it paid for the Frevo agreements that were worthless on the day they were bought. All its damages were set and closed at the closing. They got a non-performing asset* ».

90. On such basis, the Claimant contends that any agreements reached by Alcoa and Amcor at the Miami Meeting to adjust the working capital because of non-performing pre-Closing Frevo Receivables do not preclude Amcor's claims regarding the value (or loss of value) of the Frevo Lease and the Frevo Agreement as determined by looking at their post-Closing expected revenue flow. As already seen, the Respondents disagree.

91. The Respondents argue that a central part of the Miami Meeting arrangement was that the Respondents would continue to put pressure on Frevo to obtain the fulfilment by Frevo of its obligations under the Frevo Lease and the Frevo Agreement and that, in exchange for the valuation at zero of the pre-Closing Frevo Receivables, the Claimant would assist the Respondents in such efforts, including by actively participating in legal actions against Frevo. The Respondents point out that the active participation of the Claimant in such attempted negotiations was indispensable given the fact that, at Closing, the Frevo Lease, the Frevo Agreement, the Frevo Equipment and the Frevo Receivables had been transferred to the Claimant. According to the Respondents, also pursuant to such agreement, should the collection/negotiation attempts with Frevo fail, the Respondents would take back the Frevo assets transferred to them by the Claimant at Closing.

92. The Claimant denies that its undertaking to assist Alcoa in efforts to obtain Frevo's compliance: (i) was in exchange for the US$ 1,126,000.00 working capital adjustment; or (ii) included actual participation in legal proceedings against Frevo without an undertaking from

---

[2] Hearing transcript, 5 March 2007, at 79.

Alcoa that it would hold Amcor harmless in connection with such proceedings and making clear that such participation would not constitue a waiver of Amcor's post-Closing Frevo assets-related claims against Alcoa for lost revenues.

93. According to the Agreement (Section 1.5.7 reproduced in para. 47 above), within 30 days of the Closing Date Alcoa had to prepare a Closing Date Balance Sheet. The purpose of such Balance Sheet is to establish the pre-Closing assets and liabilities situation of Alcoa's South-American preform business sold to Amcor and, accordingly, the liabilities and obligations assumed by Amcor in connection with Alcoa's South-American PET Business (Section 1.3 of the Agreement).

94. On the basis of this Balance Sheet, a Final Pricing Date Balance Sheet was prepared establishing the final price to be paid by Amcor to Alcoa for the latter's South-American PET Business initially estimated in a Preliminary Pricing Balance Sheet (Section 1.5.8 of the Agreement[63]). Such balance sheets were not to be prepared exclusively in connection with working capital assets, but were to cover all types of assets, including fixed assets as, indeed, was confirmed by Ms. Schmidt's testimony at the Hearing, undisputed in this respect:

*Q. What did you understand to be the items to be covered by the scope of paragraph 1.5.7. ? It says Review of Closing Date Balance Sheet. What is encompassed within the closing date balance sheet that was subject to this review ?*

*A. Both the working capital items that we just discussed and fixed assets as well. All the normal elements of a balance sheet.*

The Closing Date Balance Sheet had, then, to include assets such as the Frevo Receivables arising out of the Frevo Lease, the Frevo Agreement and the Frevo Equipment as Closing Date Balance Sheet assets or items.

95. Clearly, the preparation of the Closing Date Balance Sheet has the purpose of evaluating the economic situation of Alcoa's South-American PET Business on the basis of information available to both Parties in compliance with warranties and disclosure obligations under the Agreement. Any discrepancy or disputes regarding such information was to be raised within the time limits set out in Section 1.5.7 of the Agreement (i.e., in the case of Amcor, within 30 days the Closing Date Balance Sheet shall have been provided to Amcor by Alcoa). It is undisputed that the Closing Date Balance Sheet was received by Amcor on 4 November 2003[64].

96. The Agreement does not contain a deadline for raising a misrepresentation or a breach of warranty under the Agreement relating to any of the items set forth in the Closing Date Balance Sheet, nor require that such breach or breaches of the Agreement be raised within the time limits to question the Closing Date Balance Sheet. However, it is reasonable to expect such a breach to be raised promptly by the Buyer (for example, during the 30 day period provided in Section 1.5.7

---

[63] Also Ms. Schmidt's e-mail to Mr. Losch of 6/25/03, Claimant's Exhibit 76.

[64] Mr. Losch's letter to Ms. Schmidt of 3 December 2003, Claimant's Exhibit 113.

of the Agreement after release of the balance sheet to the buyer if known during or prior to such period) in order to permit an adjustment of the Closing Date Balance Sheet in a timely fashion and facilitate any concomitant correction of the final price to be paid for the Alcoa PET South-American Business. Such is particularly the case when – as it happens in connection with the claims concerning the Frevo assets – the working capital adjustments claims relating to the Frevo Receivables and the lost profit post-Closing claims asserted by Amcor are closely related and have as their common origin, from Amcor's perspective, Alcoa's failure to comply with disclosure obligations under the Agreement in connection with the Frevo Receivables, the Frevo Equipment, the Frevo Lease and the Frevo Agreement.

97. Indeed, the « Summary of Accounting Adjustments » attached to Amcor's Mr. Losch letter of 3 December 2003 (within the 30-day period afforded by Section 1.5.7 of the Agreement to raise issues relating to the Closing Date Balance Sheet) already shows Amcor's full awareness of the Frevo assets situation, including the existence of the Frevo Lawsuit against Alcoa and its likely adverse impact on post-Closing Frevo Lease payments[65] and, necessarily, on the legal status of the Frevo Lease, the Frevo Agreement and the Frevo Equipment. Since, as indicated above, the Closing Date Balance Sheet was presented to Amcor on 4 November 2003, Amcor could very well have raised at that point or shortly afterwards its Frevo claims regarding lost post-Closing Frevo revenues under the Frevo Lease and the Frevo Agreement and its claim concerning the Frevo Equipment, but chose not do so.

98. Except for what seems to have been a strategic choice by Amcor, no other reason has been joined to the record explaining why Amcor did not raise at that time – when pre-Closing non-disclosure allegedly giving rise to both pre- and post- Closing Frevo claims were necessarily raised to comply with time limitations set forth in the Agreement - its remaining Frevo-related claims. Such circumstance is all the more surprising when one cannot help noticing that those claims - US$ 3,154,000.00 claim for lost future post-Closing Frevo Lease revenues, US$ 1,600,000.00 claim for lost post-Closing revenue under the Frevo Agreement and US$ 2,600,000.00 claim relating to the Frevo Equipment – i.e., Amcor's largest, not merely declaratory, claims in this arbitration, are much more economically significant than the US$ 1,126,000.00 pre-Closing Frevo Receivables claim presented by Mr. Losch in its 3 December 2003 letter to Alcoa.

99. Mr. Losch chose not to raise such claims in that opportunity nor in the Miami Meeting held about six months later, that is also relevant for the analysis of whether Amcor is estopped from asserting its lost Frevo Lease and Frevo Agreement post-Closing revenue claims against Alcoa and its claim relating to the Frevo Equipment. The evidence in the record shows that this was not an inadvertent omission but an intentional decision of Amcor, as revealed by the following Amcor internal e-mail dated 2 April 2004 (few days before the Miami Meeting held on 8 April 2004) sent by Mr. Losch, which in its relevant part recites as follows:

*« What still is outstanding is contract breach issues which we have not formally flagged to them yet as we wanted to get the working capital issues out of the way first »*[66]

---

[65] *Ibídem*, Claimant's Exhibit 113, at 00391.

[66] Respondents' Exhibit 42.

100. Mr. Losch has asserted that he raised the existence of pending claims for post-Closing losses or damages relating to the Frevo assets during the Miami Meeting by then making clear to Ms. Schmidt « *that there were numerous other issues still to be resolved after we had finished the balance sheet review...* »[67]. However, in cross-examination, Ms. Schmidt testified that she did not recall Mr. Losch having made such statement during the Miami Meeting[68]. Further, Mr. Losch testified that a reference in an internal e-mail of Ms. Schmidt of 8 April 2003 (one year before the Miami Meeting) to what Ms. Schmidt then understood to be Amcor's assumption that Alcoa's « *.....machine rental revenue will disappear in the next few years* »[69] confirms that Alcoa was already aware of such claims even before the Miami Meeting. Mr. Losch equally testified that also « *...at other times...* » he raised with Alcoa the existence of other issues to be settled after the review of balance sheet pre-Closing issues[70].

101. In view of the contradicting testimonies of Mr. Losch and Ms. Schmidt on what (if anything) was discussed during the Miami Meeting in connection with Amcor's reservation of rights or intended claims concerning Frevo-related post-Closing losses or damages to Amcor, the Sole Arbitrator is inclined to assign decisive weight to Mr. Losch's statement in his e-mail of 2 April 2004, almost contemporaneous with the Miami Meeting and better reflecting the then actual situation and Parties' conduct than testimony received years after such situation or conduct existed or took place. The Sole Arbitrator therefore concludes that the evidence does not support Amcor's assertion that it « flagged » or raised with Alcoa any potential claims of Amcor for post-Closing losses or damages during the Miami Meeting or then made any reservation of rights regarding such claims.

102. The Sole Arbitrator further concludes that there is no specific and objective evidence regarding the other opportunities in which Mr. Losch would have raised such issues or made such reservation of rights prior to its letter of 23 July 2004 and before or after the Miami Meeting. Alcoa's awareness of other matters or claims not settled in the Miami Meeting or not relating to working capital issues, or of Amcor's concern that the lease rental revenue would not have a lasting duration does not suffice to conclude that Alcoa was specifically aware or made aware before such letter of the existence of possible claims regarding such Frevo-related post-Closing losses or revenues or the intention of Amcor to raise or pursue such claims. The variety of claims filed in this arbitration or withdrawn from it that do not relate to Amcor's working capital claims or Frevo assets post-Closing-related claims strongly leads to concluding that general and unspecified assertions or statements regarding claims still pending by or that would remain after settlement of pre-Closing working capital issues may not be understood as a concrete acknowledgment of, or reference to, pending or possible Amcor post-Closing claims for future lost revenues concerning the Frevo assets or claims or regarding Amcor's rights under the

---

[67] Mr. Losch's Reply Witness Statement, no. 20 at 9.

[68] Ms. Schmidt's testimony, Hearing transcript for 6 March 2007, at 434-435.

[69] Claimant's Exhibit 110.

[70] Mr. Losch's Reply witness statement of 12 February 2007, No. 3, at 2; No. 20 at 9.

Agreement to receive clean and marketable title on the Frevo Equipment. By not raising its Frevo-related additional claims in tandem with the pre-Closing Frevo Receivables claim, Amcor led Alcoa to reach its Miami Meeting settlement without allowing Alcoa to have in full view all the facts and circumstances having a relevant and even determinative impact on Alcoa's decision to accede to Amcor's demands and, finally, settle Amcor's pre-closing Frevo Receivables claims as requested by Amcor.

103.  In its Reply Memorial[71] Amcor insistently refers to Alcoa's *« fraudulent conduct »* or *« fraud »* to counter Alcoa's allegation that Amcor is estopped to assert its Second Claim for Relief. However, the record does not permit to conclude that any breach of Alcoa's obligations to disclose under the Agreement raise to the level of conduct that may be characterized as fraudulent conduct under New York law. The record does not show any specific proof or, indeed, allegation, specifically pleaded and asserted in detail, of Alcoa's fraudulent intent; i.e., a misrepresentation that is material, known to be false and made with the intent of inducing reliance (*Ross v. Louise Wise Services, Inc., 2006 NY Slip Op. 2803, 28 A.D. 3d 272, 289(N.Y. App. Div. 2006) ; Dowdell v. Greene County, 788 N.Y.S.2d 439, 441, 14 A.D. 3d 750, 751 (n.Y. App. Div.2005))*. A breach of a warranty under the Agrement or a failure to proceed in accordance with the Significant Accounting Policies relied upon by the Claimant in support of its claims is not synonymous of fraudulent conduct under New York law.

104. Alcoa also alleges that Amcor is estopped from asserting claims for Frevo assets lost post-Closing revenues  because the working capital adjustment granted by Alcoa as a result of the Miami Meeting was conditioned on Amcor's undertaking to help Alcoa in claims against Frevo, and that Amcor failed to honor such undertakings.

105. Such undertaking is best reflected in Ms. Schmidt's e-mail of 12 April 2004 to Mr. Kirby Losch (not objected by Mr. Losch), in which Ms. Schmidt writes the following :

*« Kirby – as agreed last Thursday, this is an attempt to simply memorialize the agreements we did (and didn't) reach during our meeting in Miami last Thursday. Please let me know if you have different notes/recollections.Thanks. I'm sure we all hope we can get everything resolved fairly quickly now.Thanks.Irene*

*We worked down the working capital adjustment request list supplied to Alcoa by Amcor end of January. I've followed the numbering scheme in my summary:*

*Brazil*

*1. A and B – Alcoa and Amcor will work together to get the customer (Frevo) to settle / negotiate the outstanding receivables for product supplied prior to the Closing. Should these joint negotiations not be fruitful, Alcoa will take back both receivables and pursue satisfaction of the claims.We agreed we might need to provide legal documentation allowing Alcoa to pull the machine, as it is not Amcor's property. Tiniti/Gianini will have accountability for this. »*

---

[71] At 38-40.

106. The reference to the Miami agreements is a reference to the settlement reached by Alcoa and Amcor in the Miami Meeting, as a result of which Alcoa acceded to adjust to zero the computation for working capital purposes of US$ 1,126,000,00, as requested by Amcor. It is then logical to infer that Amcor's undertaking to cooperate with Alcoa in obtaining payment by Frevo of such receivables and securing the return of the leased equipment was at the core of the settlement agreement reached with Alcoa in such Meeting.

107. Since Alcoa's participation in the Frevo Lease and in the Frevo Agreement – as well as title to the Frevo Equipment - had passed to Amcor at Closing[72], it is also logical to conclude that such undertaking included Amcor assuming an active role in assisting Alcoa in court proceedings involving Frevo. The fact that through the Frevo Lawsuit Frevo had taken to the Brazilian courts issues with obvious potentially damaging effects on the rights to the pre-Closing Frevo Receivables and the future Frevo post-Closing revenue from the Frevo Lease and the Frevo Agreement, as well as to the Frevo Equipment, is a strong indication that Amcor's cooperation was not limited to a mere participation in negotiation efforts.

108. However, during a meeting apparently held on 13 July 2004 – months after the 8 April 2004 Miami Meeting - Mr. Alvaro von Dreifus, Amcor's Local Manager in Brazil, informed Mr. Tiniti Matsumoto Jr of Alcoa that active Amcor participation in proceedings against Frevo could only be expected if Amcor would be held harmless should it be concluded that the Frevo Lease would be invalid or that the Frevo Equipment belonged to Frevo. Such remarks of Mr. Von Dreifus constituted a clear allusion to the Frevo Lawsuit against Alcoa.

109. Possibly prompted by such meeting, on 12 August 2004 Mr. Matsumoto (in response to an e-mail from Ms. Schmidt dated 15 July 2004) e-mailed Ms. Schmidt as follows:

*« (....) he [Dreifus] mentioned that Kirby [Amcor's Mr. Kirby Losch] has not authorized him to go ahead with this suit, since he would need a letter from Alcoa assuming the responsibility of a possible closing loss ( ?). So, any suggestion on how to proceed ? »*

Following such e-mail, Ms. Schmidt wrote to Mr. Losch seeking clarification as follows:

*« (...) I have to admit we're kind of confused by the Dreifus position. We have agreed to retain responsibility for these receivables and have agreed with Amcor to jointly pursue what is now your customer. Could you please give your local folks whatever authorization they seem to need ? I don't understand the issue. If we lose the suit, Alcoa is stuck with the receivables, as we agreed. Is Dreifus, or are you, asking for something more ? Thanks. Irene. »*

To which Mr. Losch replied as follows:

*« (...) We are not looking for something more. We did agree to assist Alcoa in collecting the Frevo receivables. However, we are not sure what this suit is about and what Amcor's role is in it. Can you or Tiniti share the plan with us ? I believe some of the confusion stems from the other Frevo issue of stopping lease payments on Sept 30 2003 which we view as a separate issue »*

---

[72] Ms. Schmidt's testimony, Hearing transcript for 6 March 2007, at 450.

110. From the above it is to be concluded that Amcor was conditioning an undertaking to assist Alcoa in its judicial efforts to obtain economic or legal redress from Frevo on a hold harmless or other sort of indemnity undertaking from Alcoa pursuant to which, should actions against Frevo fail, Alcoa would indemnify Amcor for any post-Closing loss to Amcor of Frevo lease payments ensuing from any possible Frevo success in the Frevo Lawsuit. Most likely, such undertaking would imply Alcoa's acceptance of Amcor's claim that Alcoa was liable to Amcor under the Agreement for post-Closing revenues relating to the Frevo assets, including the Frevo Equipment, eventually lost to Amcor should the Frevo Lawsuit prove successful.

111. This was made unmistakeably clear by Mr. Losch in his letter to Alcoa of 23 July 2004[73], that in its relevant part, recites as follows:

*« 4. Frevo lawsuit putting future blow machine lease revenues in jeopardy and encumbering the assets*

*On September 30 2003 Frevo filed a legal claim against Alcoa challenging the validity of the related lease agreement on the grounds that the leased machines were valued at amounts substantially in excess of their market value and requested, among other remedies:*

*a) suspension of future lease obligations;*

*b) a revision of the contract's terms, qualifying the transaction as a sale and purchase agreement or, alternatively, the retroactive calculation of the fair rental values based on the leased equipment's fair value, and*

*c) annnulment of past due invoices amounting to R $ 700,000 whose payment Frevo is contesting. We have dealt with this item in our discussions on working capital.*

*As a result, lease payments under this agreement have not been made by Frevo since September 30, 2003.*

*The Frevo issues give rise to claims under Sections 2.7, 2.11 and 2.12 of the Agreement.*

*The stream of future lease payments was material to Amcor's valuation of the transaction. Because those payments ceased as a result of the legal claim filed on September 30, 2003, we are claiming $ 3,154,000 (monthly lease payment of $ 64,700 mutliplied by the 60 months remaining on the lease as at October 1 2003 discounted at 8.5 %). The discount is based on 3.5 % debt rate (5 year LIBOR) plus 5 % country risk premium for Latin America »*

112. However, the Sole Arbitrator has already found that Alcoa did not have an obligation under the Agreement to disclose the existence of the Frevo Lawsuit, only known to Alcoa after the Closing Date, and did not commit any breach of the Agreement in connection with the Frevo Lawsuit. The record does not permit to conclude either that the Frevo Lawsuit was legitimately

---

[73] Claimant's Exhbit 83.

occasioned by Alcoa's efforts to secure payments from Frevo under the Frevo Lease or the Frevo Agreement in compliance with its obligations under Section 4.1(a) of the Agreement or Alcoa's wrongful or negligent conduct. Thus, Amcor's conditioning of its assistance to participate in lawsuits involving Frevo on Alcoa's undertaking to indemnify Amcor for the loss of Frevo Lease post-Closing revenues caused by the Frevo Lawsuit was unjustified.

113. The Sole Arbitrator has already concluded that the record does not permit to find that Alcoa incurred in fraudulent conduct precluding it from invoking equitable estoppel as a defense to Claimant's Second Claim for Relief. The record shows instead that: (i) Amcor intentionally decided not to raise Amcor's post-Closing lost revenues claims relating to the Frevo assets eventually lost to Amcor, nor its claims regarding title to the Frevo Equipment, before or when undertaking settlement negotiations with Alcoa on 8 April 2004 in Miami; and (ii) Amcor undertook to cooperate with Alcoa in pursuing negotiations with and obtaining legal redress from Frevo. Thus, when making its decision to accept Amcor's position at settlement, Alcoa was only aware of Amcor's claims for pre-Closing Frevo Receivables and had no reason to believe or consider that in addition to Amcor's pre-Closing working capital claims, there were still pending claims regarding the Frevo assets Amcor had the intention to assert in the future, not only because at that point Amcor had decided not to raise its post-Closing Frevo revenues and title to the Frevo Equipment claims or that Amcor's undertaking to assist Alcoa in legal actions concerning Frevo was conditioned upon an acceptance of liabilities for lost post-Closing Frevo Lease revenues ensuing from the Frevo Lawsuit, but also in view of Alcoa's commitment to take back the Frevo asets should the negotiations/legal actions involving Frevo fail.

114. On the basis of all such converging circumstances, it is to be concluded that Alcoa acted upon Amcor conduct that concealed a number of relevant facts leading Alcoa to legitimately believe that when reaching settlement pursuant to the Miami Meeting there were no other pending issues or differences relating to Frevo to be then considered as part of the settlement discussions, and thus assumed to its detriment a position (readjustment to zero of Closing Date Balance Sheet working capital items) that Alcoa would likely not have taken had it known Amcor's real intention to further assert Amcor's claims against Alcoa based on the Frevo Lawsuit or to subject its undertaking to assist Alcoa in its legal actions against Frevo to Alcoa's undertaking to indemnify Amcor for potential Alcoa's liability vis-à-vis Amcor should Frevo prevail on the Frevo Lawsuit. Therefore, Alcoa is also entitled to succeed on its defense that Amcor is estopped from asserting its Second and Third Claims for Relief against Alcoa.

115. The findings and conclusions already made or reached lead to a dismissal on the merits of the Claimant's Second and Third Claims for Relief and render unnecessary any further consideration of other arguments and defenses raised by the Respondents to the same purpose.

C. The Claimant's Sixth Claim for Relief

116. On 10 November 2002 Pavax Comercio e Representaçao S.A. as lessor (« Pavax »), Itap Bemis Ltda as lessee (« Itap ») and Alcoa Aluminio as intervening party entered into a leasing agreement regarding a Trine 4500 labelling machine, or Trine Machine. According to such leasing agreement (the « Trine Machine Agreement »), the Trine Machine belongs exclusively to the lessor, but is to be installed in Alcoa Aluminio's plant in Brasilia and operated and

maintained by Alcoa Aluminio. Pursuant to the Trine Machine Agreement's Third Clause, lease payments amounting to R$. 12,500.00 are to be made monthly by the lessee to the lessor. According to its Second Clause, any interested party could terminate the lease agreement with a thirty-day advance notice and, if termination were without cause, the party seeking termination would be liable for five months of rent. So long as not terminated, the Trine Machine Agreement is automatically renewed for consecutive twelve-month periods with an automatic price adjustment [74].

117. In its Claims Memorial, the Claimant contends that Alcoa failed to disclose under Schedule 2.11 of the Agreement or otherwise during due diligence that the Trine Machine was subject to a lease or that Alcoa had ongoing payment obligations regarding the Trine Machine. The Claimant says that only in October 2003 it learnt that the Trine Machine did not belong to Alcoa Aluminio (but belonged to Pavax), and that the Trine Machine had been leased by Pavax to Itap. The Claimant claims that Alcoa is to compensate Amcor for the costs of having to maintain the Trine Machine Agreement (according to Amcor's allegations, apparently in excess of US$ 100,000.00) and that, at least, Amcor is entitled to a recovery of the potential termination fee it is facing (R$. 62,500.00 resulting form multiplying by five the monthly lease payment) with interest thereon.

118. In its Answer Memorial Alcoa points out that the existence of the Trine Machine Agreement was disclosed to Cesar Manarin and Antonio Mathiello of Amcor by e-mail of 25 September 2003. Since Amcor was aware before Closing of the existence of the Trine Machine Agreement, by signing the Agreement Amcor represented, pursuant to the Agreement's Section 3.5. (reproduced in para. 47 above) that, to Amcor's best knowledge, no consequences of any fact existed that would put Alcoa in breach of any of Alcoa's representations and warranties under the Agreement. Therefore, no breach of warranties under the Agrement's Section 8.1. is attributable to Alcoa in respect of the Trine Machine Agreement. Alcoa further points out that Amcor is precluded from claiming damages because of the proviso at the end of Section 8.1 of the Agreement whereby Amcor is not entitled to claim Losses thereunder to the extent claimed on the basis of the infringement of the Agreement's Section 3.5.

119. The Sole Arbitrator finds that the Trine Machine Agreement should have been specifically disclosed under Schedule 2.11 of the Agreement. A mere – and apparently tangential – reference to such agrement in an e-mail from Alcoa's personnel to Amcor's does not appear to constitute the specific disclosure required in such respect under the Agreement's Section 2.11.

120. However, to the extent this Claim for Relief is only quantified at R$ 62,500.00, it obviously falls below the threshold of US$ 50,000.00 set forth in Section 8.4(a)(ii) of the Agreement that excludes any Seller's liability for claims not exceeding such threshold. This would suffice to reject this Claim for Relief if such proves to be its quantification. It is to be also observed that there is no evidentiary support regarding the Trine Machine Agreement maintenance costs the compensation of which is sought by Amcor or their quantification, or in connection with the US$ 100,000.00 amount claimed by Amcor for such costs. Further, Amcor appears to have been using for its benefit the Trine Machine until now (i.e., for about four years after Closing). There is no allegation or indication that Amcor is not legally entitled to avail itself of the right under Clause

---

[74] Alcoa's Exhibit 47.

Second of the Trine Machine Agreement to terminate it by paying the penalty provided thereunder. There is no denial by Amcor that it could have terminated the Trine Machine Agreement (and thus avoid incurring the costs and charges derived for Amcor from maintaining it) immediately after learning of its existence by paying such penalty, but did not do so.

121. All such circumstances indicate that, until now, Amcor willingly and intentionally operated and utilized the Trine Machine under the Trine Machine Agreement and drew benefit from such utilization and operation without the intention of terminating it although its termination and the ensuing cessation of any economic burdens on Amcor associated with its maintenance could have been easily obtained at what appears to be a comparatively low economic cost. Thus –the Sole Arbitrator concludes - Amcor is to bear all costs and charges imposed on Amcor under the Trine Machine Agreement in connection with such utilization or operation and Amcor's claim that Alcoa be held liable for past or future charges or costs on Amcor for maintaining the Trine Machine Agreement are to be denied. Further, since Amcor has not terminated the Trine Machine Agreement pursuant to its Second Clause, nor are there reasons to believe that it has attempted or is determined to do so, Amcor's claim for the reimbursement of the R$ 62,500.00 termination penalty plus interest is necessarily abstract and unsubstantiated. For all these reasons, the Claimant's Sixth Claim for Relief is rejected in its entirety.

D. The Claimant's Seventh Claim for Relief

122. In addition to relevant text in the Agreement's Sections 2.25 and 3.5, reproduced in para. 47 of this Final Award, the Claimant's Seventh Claim for Relief concerns the following provisions of the Agreement, which in their relevant parts read as follows:

*Section 1.3. __Assumption of Liabilities by Buyer__ . At the **Closing**, **Buyer** shall assume the liabilities and obligations of the **Sellers** arising in the ordinary course of business with respect to the **PET Business** which have been disclosed to **Buyer** and are required to be accounted for by **Sellers** in accordance with Alcoa's applicable accounting policies as defined to, and mutually agreed with, **Buyer**, and as noted in a line item basis review of the **Preliminary Pricing Date Balance Sheet** as defined below (the « **Agreed Accounting Policies** ») or (a) which arise with respect to acts or events that occur after the **Closing** under the contracts being assigned to, **Buyer** hereunder and otherwise with respect to events that occurred prior to the **Closing** or (b) which arose from acts or events that occurred prior to the **Closing** that were incurred by the **PET Business** in the ordinary course of business consistent with past practices, except for the conditions that **Sellers** expressly represent, warrant and indemnify **Buyer** under the terms of this Agreement (« **Assumed Liabilities** »).*

*Section 2.14. __Taxes.__ The **Sellers** and **Subsidiaries**, as the case may be, have filed or caused to be filed (on a timely basis since their incorporation) with respect to the **PET Business** all tax returns that are or were required to be filed by them and paid all **Taxes** required to be paid by them, and no such amounts are past due or delinquent as of the date hereof. All taxes expected to be payable by the **Sellers** and the **Subsidiaries** based on the results of operations of the **PET Business** to March 31, 2003 have been properly accrued on the **Final Pricing Date Balance Sheet** and through the **Closing**. Except as set forth on __Schedule 2.14__, neither the **Sellers** nor the **Subsidiaries** are a party or subject to any assessment, collection or pending action, proceeding*

*or claim which in any way may result in any liability to **Buyer** or **Vinisa, Uruguay Preform, Tamboré**, or **Newco** or **Newco II** (.....).*

***Section 7.10 Liabilities*.** ***Buyer*** *agrees to pay, as they become due, all debts and liabilities of the* ***PET Business*** *arising out of* ***Buyer's*** *ownership or operation of the* ***PET Business*** *after the* ***Closing Date*.** ***Buyer*** *understands and agrees that from and after the Closing, except as specifically provided in this* ***Agreement*** *to the contrary, Seller will have no liability nor responsibility for the Assumed Liabilities.*

***Section 8.1 Indemnification by Sellers*** *. Subject to Section 8.4(a) hereof,* ***Sellers***, *hereby indemnify and agree to promptly defend and hold harmless* ***Buyer*** *or the actual buyer of the* ***PET Business Shares*** *and* ***Assets*** *as appointed by* ***Buyer***, *and* ***Vinisa, Uruguay Preform, Tamboré*** *and* ***Newco II*** *from and against any and all claims resulting in costs, expenses (....)(collectively « Losses » the burden of proving that such* ***Losses*** *were actually incurred is upon the claiming* ***Party***) (...) resulting from any of the following:*

*(....)*

***(c)*** *any (...)* ***Taxes*** *(....) relating to the Assets, the* ***Shares Vinisa, Uruguay Preform, Tamboré Newco Newco II*** *arising from acts, facts, activities or events occurring prior to the* ***Closing***, *including any products manufactured and delivered or services performed on or prior to the* ***Closing Date*** *(....)*

123. The Claimant's Seventh Claim for Relief includes two separate heads of claim.

*a*)  The Vinisa Tax Claim

124. Under the first one – the Vinisa Tax Claim - the Claimant contends that, prior to Closing, Alcoa failed to register Vinisa Fueguina S.A. («Vinisa») (an Alcoa wholly owned subsidiary incorporated in Argentina and acquired by Amcor pursuant to the Agreement) as a tax collector of the *Ingresos Brutos* Argentine Province of Buenos Aires excise tax. After Closing Amcor requested its auditors PriceWaterhouseCoopers, in addition to registering Vinisa as a tax collector, to determine any liability arising from the Claimant's failure to register Vinisa pre-Closing. The auditors confirmed that Amcor failed to collect applicable excise taxes from November 1999 through the Closing .

125. Based on information provided by the auditors, Amcor estimates the potential tax liability in US$ 1,400,000.00. Amcor relies on the written witness satement of Mr. Eugenio P. Andisco, its Finance Manager for Amcor PET Packaging de Argentina S.A.[25], to contend that: (i) despite Amcor's warning to Alcoa, Alcoa failed to avail itself of a tax moratorium in the Province of Buenos Aires that would have allowed to discharge the outstanding excise tax liability by a payment of approximately US$ 700,000.00 to the provincial tax authority; (ii) pursuant to the applicable statute of limitations, such tax claims will start expiring in November 2009 and fully become extinct in 2013; and (iii) in the meantime the tax authorities may commence actions to

---

[25] Mr. Andisco's written witness statement of 13 November 2006.

collect applicable taxes, penalties and interest. Consequently, Amcor seeks a declaration that Alcoa is bound under the Agreement's Section 2.14 to indemnify and defend Amcor for a tax, penalties and interest amount of US$ 1,400,000.00 if eventually demanded from Amcor.

126. Alcoa does not deny that it failed to register Vinisa as required under Province of Buenos Aires excise tax law, nor the existence of a potential Vinisa's liability vis-à-vis the Buenos Aires Province tax authority for excise taxes not collected and paid potentially resulting from such failure. In fact, in her letter to Mr. Losch dated 7 February 2005[76], Ms. Schmidt wrote that:

« *Vinisa Excise Tax* » *We acknowledge Amcor's potential claim pursuant to the indemnification provisions of the Agreement if an assessment is rendered by the tax authorities relating to this matter. Until any such liability has crystallized, there is not claim for indemnity »*

127. Alcoa's position – already set out in such letter - is that, since no claim from the tax authorities has been actually made for non-collection of Province of Buenos Aires excise taxes, the tax liability has not yet « crystallized ». Accordingly, Amcor is not entitled to a declaratory judgment against Alcoa stating that Alcoa is bound to compensate Alcoa for US$ 1,400,000.00 for uncollected taxes, interest and penalties thereon. Alcoa relies on Section 8.1 (c) of the Agreement (set forth in para. 122 above) to contend that since losses to be indemnified have not yet been incurred and, furthermore, are not proven, Amcor is not entitled to a declaration that Alcoa's obligation to indemnify Amcor for Amcor's asserted tax liability amounts has arisen.

128. The Sole Arbitrator finds that Alcoa has already acknowledged (through Ms. Schmidt's statement and also Alcoas's papers submitted in this arbitration) its obligation to defend and indemnify Amcor for a potential Vinisa Tax Claim under Section 8.1(c) of the Agreement. Therefore, any declaration of the Sole Arbitrator in this respect is – or has become - unnecessary.

129. A different issue is whether Alcoa's indemnity obligations thereunder have crystallized or reached a degree of ripeness allowing the Sole Arbitrator to grant the declaratory relief sought by the Claimant.

130. In this respect, the Sole Arbitrator notes that there is no evidence that the tax authorities of the Province of Buenos Aires have required payment from Amcor of any Vinisa excise tax moneys Amcor would have failed to collect or as to the existence of any legal actions initiated by those authorities to such effect. There is no evidence either that such authorities have given notice to Alcoa or Amcor of any assessment of pre-Closing Vinisa excise payment obligations not complied with. The record does not contain any argument based on Argentine legal tax authorities, nor any expert opinion on Argentine law tax matters, permitting to assess with some degree of reasonable objectiveness the likelihood or the soundness of any potential excise tax claim against Vinisa. There is no certainty as to whether such tax claims will be at all raised by the tax authority or, if likely to be raised, when. Clearly, any obligation of Alcoa to defend Amcor from such claims has not yet come into existence.

---

[76] Alcoa's Exhibit 4.

131. Further, the Sole Arbitrator is not persuaded that Amcor's estimate of such obligations premised on Amcor's own evaluation of figures set out in a spreadsheet originated in its auditors, unaccompanied by the bases on which such estimate was made, specific argument based on the Province of Buenos Aires tax law provisions giving rise to the alleged pre-Closing tax claims against Alcoa or a legal expert opinion in such connection, suffice to properly assess at the present juncture the Vinisa Excise Tax potential liability, its economic dimension or the legal basis for its materialization.  Section 8.1 (c) of the Agreement is clear that the burden of proving the existence of the Losses to be indemnified is on the Buyer (i.e., Amcor), and that the duty to indemnify does not arise before such proof has been joined. The Sole Arbitrator concludes that Amcor has not discharged its burden of proof in this respect.

132. Consequently, the Sole Arbitrator concludes that the Claimant's Seventh Claim for Relief in regard to the Vinisa Tax Claim is premature and not ripe for decision and, accordingly, that no declaratory relief is to be granted in connection with such claim.

### b) The Brazilian Tax Claims

133. The Claimant alleges that according to the Agreement, certain pre-Closing tax claims arising out of an assessment carried out by the Brazilian tax authorities in 2000 against the Queimados plant (the « Brazilian Tax Claims ») were left with Alcoa and not assumed by Amcor at Closing. The Claimant bases its position on Alcoa's representation and warranty under Section 2.14 of the Agreement at Closing (see relevant text in para.122 above) that all pre-Closing taxes relating to the Alcoa PET Business had been paid and that as of the Closing Date no such taxes were due or delinquent and on Section 8.1 (c) of the Agreement that Alcoa would indemnify and defend Amcor for any such claims.

134. Based on a combined reading of Sections 1.3 , 2.14, 2.25 and 3.5 of the Agreement, Alcoa disagrees.

135. Alcoa points out that Section 1.3 of the Agreement (see relevant text in para.47 above) distinguishes between pre-Closing existing tax liabilities or obligations disclosed on the Preliminary Pricing Date Balance Sheet, post-Closing tax liabilities or obligations and tax liabilities or obligations arising from acts or events occurring prior to Closing. Alcoa argues that the Brazilian tax liability relating to the Queimados plant could not be disclosed on the Preliminary Pricing Date Balance Sheet (since « ...they were considered highly unlikely to be decided against Alcoa... »)". Since such Brazilian liability did not come into existence post-Closing, it falls under the third category of liabilities or obligations arising out of pre-Closing acts or events. Such liabilities or obligations necessarily pass to the Buyer (Amcor) since it is not always possible to forecast at Closing the future appearance or materialization of liabilities originated in pre-Closing fact or events. Pursuant to the letter of Section 1.3 of the Agreement – Alcoa contends – such third-category liabilities or obligations only remain with Alcoa (and are not assumed by Amcor) to the extent Alcoa shall have expressly represented, warranted and indemnified Buyer (Amcor) against the existence of such claims liabilities or obligations « under the terms » of the Agreement. The fact that Alcoa disclosed the Brazilian tax liability

---

[73] Alcoa's Answer, No. 7.19, at 56.

relating to the Queimados plant under Schedule 2.14 to the Agreement conveyed to Amcor on 24 September 2003[*] (as required under Section 2.14 thereof), does not imply or constitute a recognition by Alcoa that such obligations or liabilities were not transferred to Amcor at Closing.

136. Alcoa has stated – and Amcor has not disputed – that all of the about 25 assessments of the Brazilian taxes made against the Queimados plant were challenged by Alcoa first in administrative, and then in legal, proceedings, that one case has been decided in Alcoa's favor, and that but for a minor claim Alcoa has decided not to pursue further, the remaining claims are under appeal. The Sole Arbitrator finds that the mere existence of a pending tax claim does not constitute a tax liability or obligation for inclusion as a pre-Closing liability in the Preliminary Pricing Date Balance Sheet in terms of Section 1.3 of the Agreement. Also, there is no evidence that Alcoa breached its representations and warranties under Section 2.14 of the Agreement in connection with the Brazilian Tax Claims or the acts or events leading to them. The mere existence of such Claims or the possibility that they may result in liability to Amcor does not constitute, in itself, a breach of Section 2.14 of the Agreement, since such Claims have been disclosed through their incorporation into Schedule 2.14 thereof and the fact that the Brazilian Tax Claims are pending does not constitute proof that by the date of the Agreement (as warranted in the said Section 2.14) or, indeed, by the Closing Date, Alcoa was not in compliance with the filing of tax returns or was delinquent in or had defaulted in honoring its tax obligations.

137. Since the Brazilian Tax Claims are clearly not post-Closing, it remains to be determined whether: (a) liabilities or obligations giving rise to such claims arise out of acts or events that occurred pre-Closing; (b) such liabilities or obligations passed from Alcoa to Amcor at Closing; and (c) Alcoa « *expressly represented, warranted and indemnified* Amcor *against* » « *conditions* » concerning such liabilities or obligations or is otherwise bound by indemnification obligations in respect of such Claims.

138. The purpose of pre-Closing disclosures made by Alcoa pursuant to Schedule 2.14 of the Agreement (in which the Brazilian Tax Claims were disclosed to Amcor) could only have been to provide information to Amcor about potential liabilities or obligations actually transferred to Amcor at Closing. To go through such disclosure in connection with liabilities or obligations that instead of going to Amcor at Closing would have remained with Alcoa after Closing does not seem to make much sense. Further, there is no indication that Amcor objected, when or reasonably promptly after such disclosure was made, to the making of such disclosure as a Schedule 2.14 disclosure or to the passing at Closing, from Alcoa to Amcor, of the Brazilian tax obligations and liabilities being disclosed. A necessary conclusion is that the Brazilian tax liabilities disclosed under Schedule 2.14 did pass to Amcor at Closing pursuant to the Agreement's Section 1.3. On the other hand, it is not disputed that should potential tax obligations or liabilities concerned by the Brazilian Tax Claims arise, they would originate in pre-Closing acts or events.

139. Section 8.1(c) of the Agreement constitutes a specific indemnification undertaking granted by Alcoa the wording of which is so broad as to also cover the third category of obligations or liabilities referred to in Section 1.3 of the Agreement that passed to Amcor thereunder; i.e,

---

[*] Alcoa's Exhibit 51.

including Losses arising out of Tax liabilities giving rise to or that may arise out of the Brazilian Tax Claims.

140. However, it is unreasonable to automatically extend indemnification obligations under the Agreement's Section 8.1(c) to potential tax liabilities or obligations qualifying as Assumed Liabilities under the Agreement's Section 1.3, further disclosed prior to Closing by Alcoa under Schedule 2.14, and that passed to Amcor at Closing. Either such liabilities or obligations stay with Alcoa – and Alcoa remains responsible for them – or they pass to Amcor, and Alcoa is no longer responsible for such liabilities or obligations. Indemnification obligations regarding Assumed Liabilities should reasonably only survive after transfer of such liabilities in case of breach by Alcoa of specific warranties or representations concerning those liabilities. The wording of Section 7.10 of the Agreement, according to which only when specifically provided in the Agreement to the contrary, Alcoa will have liability or responsibility for Assumed Liabilities, necessarily requires a narrow interpretation of any provision supporting the view that Alcoa maintains idemnification obligations in respect of Assumed Liabilities.

141. A logical interpretation to accomodate Sections 1.3 and Section 8.1 (c) of the Agreement supports such conclusion. Section 1.3 triggers Alcoa's obligation to indemnify in connection with liabilities arising or that may arise under the Brazilian Tax Claims subject to « conditions » expressly warranted or represented by Alcoa in connection with such Claims or, presumably, the acts or events occurred prior to Closing that gave rise to them. It is clear that Amcor has not represented or warranted any « condition » in respect of such claims, acts or events, either if one looks at the plain meaning of this term : « *mode or state of being* »[79] or its legal meaning : « *a future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance* »[80]. On the contrary, disclosure of such liabilities or obligations under Section 2.14 unaccompanied by any specific assurance of specific « conditions » signifies that no specific warranties were undertaken in connection with such liabilities or ensuing obligations.

142. Further, pursuant to Sections 8.1 (d) and (f) of the Agreement, the Seller is to indemnify Buyer for: (i) any liabilities and claims disclosed or that should have been disclosed by Seller prior to Closing under Schedule 2.19 of the Agreement pursuant to Section 2.19 thereof (« *material liabilities or obligations of any nature whether absolute or accrued, contingent or otherwise* »); (ii) or liabilities disclosed on Schedule 3.5 of the Agreement pursuant to its Section 3.5 (According to Section 3.5 of the Agreement, except as set forth by Amcor in such Schedule 3.5, Amcor acknowledges that, to its best knowledge, Alcoa's representations are correct). Amcor has not indicated that Alcoa should have incorporated existing or potential liabilities under the Brazilian Tax Claims in the Agreement's Schedule 2.19 rather than in its Schedule 2.14, and there is no basis for the proposition that by including the Brazilian Tax Claims in Schedule 2.14. Alcoa was in breach of any representation or warranty under the Agrement. The Brazilian Tax Claims have not been incorporated into Schedule 3.5. of the Agreement either.

---

[79] Webster's II New College Dictionary.

[80] Black's Law Dictionary, Eighth Edition (2004).

143. If it were interpreted that Alcoa's indemnification obligations under Section 8.1 (c) of the Agreement extend to all contingent debts, claims, or tax obligations or liabilities passing to Amcor at Closing and arising from acts or activities occurred prior to Closing, without the need of any proof or even allegation that Alcoa incurred a specific breach of any representation or warranty in connection with such acts or activities, Alcoa's indemnification liabilities could extend to occurrences or circumstances not known or that could not have been known by the Closing Date, up to the ceiling set forth in Section 8.4 (a)(iii) of US$ 32,500,000.00, i.e., 43.33 % of the sale price of the Alcoa South American PET Business of US$ 75,000,000.00. It goes against any rational or common sense interpretation of the Agreement to conclude that, without incurrence of a contractual breach, Alcoa intended to assume such possible obligation or that, when contracting, Amcor understood that Alcoa was assuming it.

144. Consequently, a Seller's (Alcoa) obligation to indemnify and defend Amcor under Section 8.1 (d) of the Agreement in connection with Assumed Liabilities regarding taxes covered by Section 1.3 thereof can only arise in case of proof of breach by Alcoa of representations and warranties regarding such liabilities or the acts or events giving rise to specific warranties or « conditions » concerning such liabilities, acts or events. The existence of such specific warranties could be determined through the inclusion of the Assumed Liability in question in Schedule 3.5 of the Agreement (Section 8.1(f) of the Agreement), which did not happen in connection with the Brazilian Tax Claims. Another possible situation triggering the obligation to indemnify is the inclusion (or the failure to include) of the Brazilian Tax Claims in Schedule 2.19 of the Agreement (Section 8.1(d) of the Agreement (which did not take place and was not raised either by Amcor). Thus, the Sole Arbitrator concludes and decides that the Claimant's Seventh Claim of Relief relating to the Brazilian Tax Claims shall not be allowed.

D.  The Claimant's Eighth Claim for Relief

145. On 2 October 1996 Alcoa Aluminio entered into a *Promessa de Compra e Venda* (or Promise for the Acquisition of Property, the « Promessa ») with Companhia de Desenvolvimento Industrial Do Estado Do Rio de Janeiro - CODIN[81]. Pursuant to the Promessa, CODIN undertook to sell to Alcoa the Queimados Property, located in the *Distrito Industrial de Queimados*, Rio de Janeiro, Brazil. After a downpayment made by Alcoa Aluminio upon the execution of the Promessa, the balance of the price was to be paid to CODIN in 23 consecutive monthly instalments.  Full possession of the Queimados Property and responsibility for any tax payments associated with it  were transferred to Alcoa Aluminio simultaneously with the signature of the Promessa (Promessa Clause Second).

146. Having regard to the public interest nature of the *Distrito Industrial de Queimados*, Alcoa Aluminio undertook to build an industrial plant in the Queimados Property within 24 months of the execution of the Promessa and was subject to penalties in case of delays in the construction of the plant (Promessa Clause Fourth). Alcoa Aluminio cannot assign or transfer any rights arising out of the Promessa without the prior express consent of CODIN (Promessa Clause Sixth). The final deed of transfer of the Queimados Property was to incorporate all the provisions of the Promessa (Promessa Clause Ninth). No deed of transfer to Alcoa Aluminio could be

---

[81] Alcoa's Exhibit 55.

granted before fulfillment of all obligations undertaken by Alcoa Aluminio under the Promessa, including full payment of the price and erection of the plant (Promessa Clause Tenth).

147. To implement the sale to Amcor of the Alcoa PET South-American Business, a number of local implementing agreements (« Local Agrements ») were executed for each Latin American country where assets to be transferred to Amcor are located. Section 6.2 of the Brazil Local Agreement, dated 2 October 2003[x2] (a day after the Closing Date), provides that the Queimados Property will be contributed at book value to the share capital of Newco (a Brazilian company apparently affiliated with Amcor) as soon as Alcoa Aluminio obtains CODIN's agreement for such transfer (as required under the Promessa), or as soon as Alcoa Aluminio, after recording the definitive deed in the appropriate Real Estate Registry, notifies that the Queimados Property will be transferred to Newco.

148. It is undisputed that Alcoa Aluminio completed the construction of the plant in the Queimados Property and paid the full balance of the price set forth in the Promessa.

149. On 6 October 2003 Alcoa Aluminio wrote a letter to CODIN[x3] stating that Alcoa Aluminio had satisfied all its obligations under the Promessa, informing the sale of the Queimados Property as a part of the sale of Alcoa's PET South-American Business to Amcor, and requesting CODIN's approval of the sale and transfer of the Queimados Property.

150. On 15 October 2003 CODIN wrote back to Alcoa Aluminio acknowledging the full payment of the price and construction of the plant in accordance with the Promessa, expressing that since the industrial activity carried out in the plant would not be discontinued CODIN did not have any objection to the intended transfer of the Queimados Property to Amcor, and informing that its legal department was preparing the documentation necessary for executing the final deed of transfer.

151. On the same date – 15 October 2003 – CODIN and Alcoa Aluminio executed the final public deed of transfer of the Queimados Property from CODIN to Alcoa Aluminio[x4]. Such deed of transfer, passed before a Brazilian notary public, states that the property is free of all sort of liens or encumbrances or tax liabilities (Clause III). Clause V of the public deed states that Alcoa Aluminio installed and set in motion in the Queimados Property an undertaking approved by CODIN as a condition for the sale of such Property to Alcoa Aluminio. The transfer of the Queimados Property to Alcoa Aluminio was registered with the Real Estate Registry on 30 September 2004. The certificate showing the registration also states that as of 10 June 2006 the property was free from liens or encumbrances[x5].

---

[x2] Alcoa's Exhibit 54.

[x3] Alcoa's Exhibit 56.

[x4] Alcoa's Exhibit 58.

[x5] Alcoa's Exhibit 59.

152. Section 2.7 of the Agreement provides, in its relevant part, as follows:

*« As of the date hereof, **Sellers** (....) have, and as of the **Closing** shall have good, valid and marketable title to all of their **Fixed Assets**, respectively free and clear of all debt, liens, charges, security interests and other ecumbrances, including minority interests or liabilities »*

153. At Closing, with Alcoa's consent, PET Business working capital receivables representing the sum of R$ 1,500,000.00 (then equivalent to approximately US$ 655,193.00) were held as security until delivery to Amcor of good and marketable title on the Queimados Property (it should be then inferred that such receivables could not be computed towards the minimum US$ 15,000,000.00 working capital requirement to be satisfied by Alcoa – as Seller - under the Agreement). Such security amount seems to reasonably  represent or be close to representing the sale price of the Queimados Property from Alcoa to Amcor in view of the US$ 524,682.00 book value assigned to the Queimados Property according to a string of internal Alcoa e-mails in the record[86]. Amcor says that at Closing, without Amcor's authorization, Alcoa improperly deducted post-closing receivables due to Amcor for an amount equaling the secured amount, thereby neutralizing the security ensuring transfer of good and marketable title on the Queimados Facility to Amcor.

154. In its Answer Memorial Alcoa addressed Amcor's arguments that Alcoa failed to deliver free and marketable title on the Queimados Property to Amcor. In connection with one of those arguments – that the deed of transfer from CODIN to Alcoa incorrectly showed the surface of the Queimados Property – Alcoa explained that such error had been rectified and joined documentation in support of its explanation. Amcor has not refuted such explanation nor the documentation in the record supporting it. The Sole Arbitrator then concludes that such issue has become moot and that Amcor's argument based on a mistake in the surface of the Queimados Porperty is to be rejected.

155. Amcor's remaining basis for contending that Alcoa failed to deliver free and marketable title on the Queimados Property is that the deed of transfer from CODIN did not include the plant built by Alcoa on the Property. Amcor contends that Alcoa did not resort to any of the procedures under Brazilian law to rectify the deed, namely, (a) by the Real Estate Registry in case of a material obvious error; (b) by means of an administrative procedure when nobody challenges the intended rectification; and (c) by means of a judicial procedure[87].

156. In response, Alcoa argues that, with the consent of Amcor, it was decided that both Parties would enter into a purchase agreement that would include, in the description of the property sold (the Queimados Property) by Alcoa Aluminio to Amcor, the plant built by Alcoa Aluminio in compliance with the Promessa terms and conditions. Alcoa refers to an e-mail of 10 November 2003 from Alcoa's  Rogerio Santos to Amcor's Carlos Ferretto and Fabio Giannini attaching a *« Contrato de Promessa de Venda e Compra »* or draft purchase agrement promise for the sale of the Queimados Property by Alcoa to Amcor (the « Draft Purchase Promise») and further stating

---

[86] Alcoa's Exhibit 61.

[87] Amcor Reply Claims Memorial at 26.

that *« As we have discussed, the amount is being deducted from the Working Capital to be transferred to Amcor »*.

157. Clause Second (ii) of the Draft Purchase Promise identifies as part of the immovable sold the appurtenances or additions (*bienfetorias*) erected on the property, in the process of being registered in the Real Estate Registry of Nova Iguaçu, Estado do Rio de Janeiro, and leaves a blank space for the description of such fixtures or additions. Clause Ninth of the Draft Purchase Promise provides that once such registration shall have been fulfilled, Alcoa Aluminio is obligated to grant Amcor a final deed of property.

158. Alcoa states that without any objections from Amcor, it proceeded between November 2003 and November 2004 to deduct the purchase price for the Queimados Property showing in Clause Fourth of the Draft Purchase Promise of R$ 1,520,790.27 from the working capital account until full payment of the purchase price under the Draft Purchase Promise. This implied at the same time reducing to zero the working capital receivables holdback guaranteeing the registration of the plant in the Real Estate Registry records corresponding to the Queimados Property. Alcoa has joined to the arbitral record e-mails from Alcoa to Mr. Antonio Carlos of Amcor's accounting department showing such deductions in attached spreadsheets entitled *« Capital de giro Alcoa x Amcor »*, including a final e-mail of 30 November 2004 closing such account (thus apparently denoting both total payment of the Queimados Property purchase price under the Draft Purchase Promise and the reduction to zero of the working capital receivables holdback)[xx]. Alcoa points out that the sale of the Queimados Property to Amcor under the Draft Purchase Promise and payment of the purchase price or elimination of the working capital holdback thereunder was never subject to negotiations with or objections from Amcor nor were raised as a breach of the Agreement by Alcoa in Mr. Losch's letter to Alcoa of 23 July 2004, already referred to several times in this Final Award. For the first time, Amcor raised its objections through a letter to Alcoa dated 31 March 2005. Also, Alcoa points out, Amcor is and has been in full possession of the Queimados Property and the plant built on it by Alcoa and has been leasing to third parties or able to use both assets without factual or legal restrictions.

159. Mr. Fabio Giannini, Director of Finance and Administration of Amcor PET Packaging Brazil, testified that he never consented to the deduction of the acquisition price of the Queimados Property as set forth above or accepted or gave instructions to accept that Alcoa was transferring good and marketable title on the Queimados Facility to Amcor, or consented to the release of the security ensuring the tranfer to Amcor of good and marketable title on the Queimados Property[xxi].

160. The Sole Arbitrator observes that, as a consequence of the consents obtained from CODIN in its letter to Alcoa Aluminio of 15 October 2003 and the execution on the same date of the deed of transfer in favor of Alcoa by CODIN referred to above, Alcoa Aluminio did receive

---

[xx] Alcoa's Exhibit 62.

[xx] Alcoa's Exhibits 63 and 64.

[xxi] Mr. Fabio Giannini's witness statement dated 13 November 2006.

good and marketable title on the Queimados Property from CODIN taking into account circumstances that Amcor could not have ignored in the course of its due diligence procedures; namely, that transfer of title to Alcoa Aluminio could not have taken place without an acknowledgement by CODIN that the acquisition price under the Promessa had been fully paid and that obligations relating to the construction of the plant in the *Distrito Industrial de Queimados* had been fulfilled. The evidence shows that such requirements were promptly satisfied by 15 October 2003 (fourteen days after Closing Date). Although such deed of transfer does refer to the fact that Alcoa Aluminio had installed an industrial unit on the Queimados Property, it could not of course mention the plant erected by Alcoa Aluminio as part of the assets transferred by CODIN to Alcoa Aluminio, since the plant had been erected by Alcoa after receiving possession of the Queimados Property and could thus not be the subject of a transfer from CODIN to Alcoa.

161. Whatever Mr.Giannini's personal intervention in connection with the Amcor's approval of payments for the purchase price or the reduction of the working capital holdback may have been required according to Amcor's internal organization, there is no evidence that his personal intervention was legally required to bind Amcor to the Draft Purchase Promise. The record shows that Mr. Giannini received a copy of the Draft Purchase Promise and was informed by Alcoa of the course of action Alcoa intended to follow to pay the purchase price provided for in the Draft Purchase Promise (and gradually reduce the working capital holdback) without ever rejecting or raising reservations in any such connection. The evidence also shows that for a period of one year Amcor received payment of the purchase price according to the mechanism set forth by Alcoa in its e-mail to Mr. Giannini, without any objection or reservation from Amcor despite being in full cognizance of the payments and their purpose. The Sole Arbitrator then concludes that the Draft Purchase Promise reflects the binding agreements reached by Alcoa Aluminio and Amcor for transferring free, valid and marketable title on the Queimados Property, including appurtenaces or buildings not presently showing on the records of the Real Estate Registry corresponding to such Property.

162. Despite such circumstance and the fact that Amcor has not indicated that it is not peacefully enjoying and using the Queimados Property – including the plant built by Alcoa Aluminio and other appurtenances on the Property – or shown that it is actually limited in its ability to sell or otherwise dispose of such Property within the legal constraints arising out of its location in the *Distrito Industrial de Queimados,* it is clear that as of today Amcor does not have a properly recorded title covering the entire property; i.e., including the plant erected on the Queimados tract of land. On the other hand, for the title on the Queimados Property to constitute an absolute title on the land and its appurtenances or fixtures vis-à-vis third parties, it must show such fixtures or appurtenances – like the plant – existing on it. The very fact that Alcoa has proposed the promise to purchase device to achieve the registration of the plant as a part of the Queimados Property is proof of this.

163. Alcoa essentially relies on Articles 1417 and 1418 of the Brazilian Civil Code apparently in support of the proposition that the Draft Purchase Promise has *per se* the effect of delivering good and marketable title on the Queimados Property to Amcor (i.e., including its appurtenances or fixtures not yet recorded in the Real Estate Registry) with full effects vis-à-vis third parties upon the recording of the promise to purchase in such Registry.

164.  The Claimant's translation into English of Article 1417 of the Brazilian Civil Code[71] recites as follows :

> *« Upon a commitment to purchase and sell, when there is no retraction clause, in private or public instrument, registered in the Real Estate Notary, the committed purchaser acquires the right in rem to acquire the real estate ».*

The Claimant's translation into English of Article 1418 of the Brazilian Civil Code[72] is as follows:

> *« The committed purchaser, holder of the right in rem, may demand from the committed seller, or any third party to whom the rights of the committed seller be assigned, the granting of the definitive deed of the commitment to purchase and sell, according to the provisions of the preliminary instrument; and if there is refusal, the committed purchaser may demand before a judge the ajudication of the real estate ».*

165.  However, according to Article 1417 of the Brazilian Civil Code, although a promise to purchase a property vests the purchaser with a real right on the property acquired, it does not indicate that such real right is free of pre-existing defects, omissions or limitations affecting the registration of the property being transferred. Article 1418 of the Brazilian Civil Code vests the promisee under a promise to purchase with the right to go to a judge to obtain the transfer of the property if the promisor does not honor his promise. Indeed, Alcoa would be in breach of contract if the transfer to Amcor of free, valid and marketable title on property undertaken under the Agreement would further require or depend on a court order to be implemented.

166.  Perhaps more importantly, Alcoa does not seem to have diligently complied with the very provisions of the Draft Purchase Promise it relies upon. Although admittedly Alcoa received in November 2004 entire payment of the purchase price (or reduction to zero of the working capital holdback) for the Queimados Property and its appurtenances or fixtures, there is no indication that it has diligently pursued the undertaking under Clause First (ii) thereof to register the plant in the Real Estate Registry, nor given any explanation for the substantial delay in achieving such registration, still pending today. Such Clause strongly suggests that the Draft Purchase Promise, even if it were executed in final form and registered in the Real Estate Registry, does not have the effect of modifying the Real Estate Registry Record to incorporate the plant as a part of the Queimados Property, since such modification depends on a separate (and apparently still

---

[71] In its original in Portuguese, it reads as follows: *«Mediante Promessa de compra e venda, em que se não pactuou arrependimento, celebrada por instrumento público ou particular, e registrada no Cartório de Registro de Imóveis, adquire o promitente comprador direito real à aquisiçao do imóvel».*

[72] The Portuguese original recites as follows: *«O promitente comprador, titular de direito real, pode exigir do promitente vendedor , ou dos terceiros, a quem os direitos deste forem cedidos, a outorga da escritura definitiva de compra e venda, conforme e disposto no instrumento preliminar ; e, se houver recusa, requerer ao juiz a adjudicaçao do imóve ».*

pending) proceeding before the « *5o Oficio de Registro de Imóveis da 2a. Circunsrição da Comarca de Nova Iguaçu, Estado do Ro de Janeiro* » already underway, according to Clause First (ii) of the Draft Purchase Promise, when it was e-mailed to Mr. Giannini. However, no indication has been given, despite the time elapsed, as to the present state of such proceeding or the reasons why it has not been successful so far.

167. The Sole Arbitrator is then of the view that the Claimant is entitled to receive from Alcoa sufficient security that such registration shall be finalized within a reasonable time so as to allow, promptly or simultaneously with that registration, the granting by Alcoa to Amcor of a final deed of property for the Queimados Property. However, the Sole Arbitrator does not consider that such security should be for the full amount requested by the Claimant nor for an amount equal or close to the purchase price of the Queimados Property, since there is no element in the record permitting to conclude that the costs for modifying the real estate registration of the Queimados Property to include the plant would come even close to the purchase price of the Queimados Property.

168. Additional reasons for not requiring such security to cover the entire value of the Queimados Property is that, as indicated above, there is no allegation or evidence of any damages suffered by the Claimant because the plant is not showing in the Real Estate Record for the Queimados Property, nor evidence that the plant is subject to third party claims, liens, encumbrances or any other situation challenging or reducing Amcor's rights on such asset or on its right to dispose of the Queimados Property. Further, pursuant to Article 1253 of the Brazilian Civil Code", it is presumed that Alcoa, as owner of the Queimados Property, owns the plant and has built it at its expense until proof of the contrary, and there is no evidence that such proof has been or is likely to be brought or attempted by a third party to assert priority rights or claims on the plant. Since ownership of the Queimados Property by Alcoa or its ability to transfer ownership rights on such Property to Amcor are not disputed, if today a deed of transfer of the Queimados Property were executed by Alcoa and accepted by Amcor, Amcor would gain ownership of the plant and benefit from similar presumptions.

169. Thus, the Sole Arbitrator shall order: (i) the Respondents, to reconstitute a holdback of working capital receivables corresponding to the PET Brazilian business transferred to Amcor by Alcoa for a net principal amount of US$ 75,000.00 (or for an amount in Brazilian currency equivalent at all times, at the U$ Dollar/Brazilian currency official selling rate for the US$ Dollar quoted by the Central Bank of Brazil, to US$ 75,000.00) as security for the registration of the plant built by Alcoa Aluminio on the Queimados Property in the record (*matricula*) corresponding to such Property at the Real Estate Registry, on the understanding that such security shall fully remain in place and in effect until such registration shall have been achieved in compliance with Brazilian law and, once achieved, until a deed of transfer of the Queimados

---

" In the Portuguese original, Article 1253 of the Brazilian Civil Code recites as follows : « *Toda construção ou plantação existente em um terreno persume-se feita pelo propriétario e à sua custa, até se prove o contrário* ». According to the translation provided by Alcoa, the English text of this provision is the following: « *There is a presumption that all construction or plantation existing on a real estate are made by the owner of the real estate, at its expenses, until proof to the contrary* ».

Property from Alcoa to Amcor (or the Amcor Brazilian affiliate indicated by Amcor) shall have been executed and registered in accordance with Brazilian law and the Draft Purchase Promise; and (ii) the Claimant, to diligently take or cause to take all necessary action within the terms and conditions of the Draft Purchase Promise to help and cooperate with the Respondents in completing such registration and transfer.

IV. Costs

170. Section 10.3 (e) of the Agreement provides that *« The prevailing party shall be awarded reasonable attorney's fees, expert witness costs and expenses, and all other costs and expenses incurred in connection with such proceedings, unless the arbitrators shall for good cause determine otherwise ».*

171. In accordance with such provision, arbitral and legal assistance and representation costs shall in principle be allocated on the basis of the success of the Parties in the different claims and defenses submitted in this arbitration and, in such connection, the Sole Arbitrator notes that the Respondents have prevailed on practically all their defenses. The Sole Arbitrator further notes that Article 31 of the ICC Rules vests ICC arbitrators with broad authority to decide on fee and cost allocation and therefore grants the Sole Arbitrator ample discretion to determine both such allocation and the existence of good cause pursuant to Section 10.03 (e) of the Agreement.

172. According to the Parties' submissions, the Claimant's legal representation and assistance fees and costs total US$ 907,114.68 and the Respondents' amount to US$ 3,082,598.25. The Claimant has objected to this latter figure, considering it unjustified. Despite the disparity between the costs and fees required by the legal representation and assistance of the Claimant and the Respondents, the Sole Arbitrator considers that both are reasonable and provided with adequate support. Although the Respondents' costs and fees of legal defense and assistance are considerable, the Arbitral Tribunal does not find that they are disproportionate or unreasonable in view of the complexity of the case, the multiplicity of discovery and other evidentiary matters requiring attention and determination during the arbitration, the number and variety of claims under different laws to be analyzed and argued, the nature of the matters requiring expert advice, and the not infrequent fluctuations in the claims and arguments put forward by the Claimant along the arbitral procedure, or in its strategies.

173. Against the backdrop of the above considerations, Article 31 of the ICC Rules and Section 10.03(e) of the Agreement, since the Respondents are the prevailing party in this arbitration, the Claimant shall bear its own legal assistance and representation fees and costs (amounting to US$ 907,114.68) and those of the Respondents (amounting to US$ 3,082,598.25). However, in view of the complexity of these proceedings and the legal and fact nature of the issues originating it, that may have justified the Claimant's decision to take to arbitration disputes arising from such issues, the Sole Arbitrator finds that there is good cause pusuant to Section 10.03 of the Agreement to have the Claimant and the Respondent side in this arbitration equally share the arbitral costs and fees fixed by the ICC Court, amounting to US$ 210,000.00 (Article 31 of the ICC Rules).

V. Decision

174. Based on the reasons, findings and conclusion set forth in this Final Award, the Sole Arbitrator DECLARES and DECIDES as follows:

(i) Claimant's Claims for Relief Fourth, Fifth, Ninth and Tenth, and the portion of the Claimant's Seventh Claim for Relief relating to « ....a potential liability of US$ 793,800.00 arising from a pre-Closing resin purchase in the amount of US$ 2,385,000.00 which was not a transaction in the ordinary course of business... » have been withdrawn with prejudice;

(ii) all Respondents' counterclaims (Counterclaims First, Second and Third) have been withdrawn with prejudice;

(iii) Claimant's Claims for Relief First, Second (including Claimant's claims for lost post-Closing revenues from the Frevo Lease and the Frevo Agreement), Third, and Sixth are denied with prejudice;

(iv) Claimant's Seventh Claim for Relief (to the extent such Claim for Relief relates to the ArgentineVinisa Excise Tax Obligations) is not ripe for determination and no declaratory relief is granted in respect of this claim;

(v) Claimant's Seventh Claim for Relief (exclusively as far as the Brazilian Tax Claims disclosed under Schedule 2.14 of the Agreement are concerned) is denied with prejudice,

(vi) Claimant's Eighth Claim for Relief is granted only to the extent of and subject to the following: (a) The Respondents are ordered to reconstitute, not later than 20 days after the notification of this Final Award, a holdback of working capital receivables corresponding to the PET Brazilian business transferred to Amcor by Alcoa for a net principal amount of US$ 75,000.00 (or for an amount in Brazilian currency equivalent at all times, at the US$ Dollar/Brazilian currency official selling rate quoted for the US$ Dollar by the Central Bank of Brazil, to US$ 75,000.00) as security for the registration of the plant built by Alcoa Aluminio on the Queimados Property in the record (*matricula*) corresponding to such Property at the Real Estate Registry, on the understanding that such security shall fully remain in place and in effect until such registration shall have been achieved in compliance with Brazilian law and, once achieved, until a deed of transfer of the Queimados Property from Alcoa to Amcor (or the Amcor Brazilian affiliate indicated by Amcor) shall have been executed and registered in accordance with Brazilian law and the Draft Purchase Promise; and (b) the Claimant is ordered to diligently take or cause to take all necessary action within the terms and conditions of the Draft Purchase Promise to help and cooperate with the Respondents in completing such registration and transfer;

(vii) the Claimant and the Respondents shall bear in equal shares arbitral costs, fees and expenses, fixed by the ICC Court in the amount of US$ 210,000.00.

(viii) the Claimant shall bear its own legal representation and assistance fees and costs, amounting to US$ 907,114.68; and shall bear and pay those of the Respondents, amounting to US$ 3,082,598.23; and

(ix) all claims and counterclaims in this arbitration not expressly granted under or decided upon in this para.174 are rejected.

Seat of the Arbitration: New York, New York, United States of America.


This Final Arbitral Award is signed this seventeenth day of February 2008.



Dr. Horacio A. Grigera Naón
Sole Arbitrator

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS,   07·03·2008

Jason A. FRY
Secretary General
ICC International Court of Arbitration